**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:22-cv-1828 |
| v. | ) | |
| | ) | JURY DEMANDED |
| BUTLER UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by and through his attorneys, Saeed & Little, LLP and Nesenoff & Miltenberg, LLP, as and for his Complaint against Defendant Butler University ("Butler" or "the University"), respectfully alleges as follows:

**THE NATURE OF THIS ACTION**

1.      Plaintiff John Doe, an undergraduate student at Butler University, brings this Complaint to remedy the damaging effects of Butler's repeated breaches of its express and implied contractual promises to Doe as an enrolled student, throughout the course of a baseless and flawed student conduct process initiated by students who were, in fact, bullying Plaintiff.

2.      Plaintiff, who matriculated to Butler in fall 2019, started to have friction with his friend group after he came out to them as gay in the fall of 2020. In the spring of 2021, his relationship with the friend group completely deteriorated, largely as the result of absurd, narcissistic and irrational claims made by another student in the friend group, J.F. (who was goaded

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym.

1

on by lies propagated by Plaintiff's suitemate and former best friend within the friend group, a student named B.P.[2]).

3.    On March 3, 2021, Plaintiff participated in an emotionally devastating "mediation" arranged by Butler student-employees, by which Plaintiff was essentially "dumped" by his entire friend group, who took turns barraging Plaintiff with everything they found annoying or dislikeable about him and ended with their declaration that he could not be their friend anymore.

4.    A few days later, student B.P. eavesdropped on a private phone call Plaintiff made to his mother discussing the "mediation" and how he felt he had been bullied and mistreated, and that in particular, he felt that J.F. was pulling the strings and everyone else followed her lead.

5.    B.P. then disclosed Plaintiff's private conversation to J.F., and on information and belief, almost immediately thereafter, J.F. filed a formal complaint with Butler University falsely alleging that Plaintiff had stalked J.F. in violation of Butler's Sexual Misconduct Policy.

6.    The primary elements of J.F.'s "stalking" complaint were essentially that: (1) Plaintiff utilized social media to socialize with his friends; (2) Plaintiff spent too much time in his friends' suite and did not request formal, advance permission to come to their suite on each occasion when they hung out (Plaintiff lived across the hall and would just knock on their door, instead); and (3) on a single occasion, while Plaintiff was in his friends' suite, he used J.F.'s bathroom when she was not home, without calling her first to ask for permission.

7.    Notably, J.F. did <u>not</u> allege that Plaintiff damaged, stole, or in any way interfered with any of her property, nor that Plaintiff had ever threatened or presented any threat of any harm whatsoever, nor that any of his conduct was aimed specifically at J.F.  Instead, J.F. alleged that the

---

[2] All non-party students shall be referred to by their initials, in the interest of student privacy.

mere fact of Plaintiff's use of her bathroom was in and of itself a horrible, severely traumatizing violation.

8.      Specifically, J.F. alleged that her discovery of Plaintiff's use of her bathroom without her express permission caused her to suffer a complete "mental breakdown", including "screaming", "crying uncontrollably", and "rocking back and forth" mumbling nonsensically, and that from that day forward, she had a "mini heart attack" anytime someone knocked on the suite door.  J.F. alleged that the "trauma" of having a male friend use her bathroom without express permission was so severe that it caused her to be unable to concentrate on her schoolwork.

9.      On information and belief, J.F. utilized the false and baseless sexual misconduct complaint against Plaintiff for two improper purposes: first, as an opportunity to bully Plaintiff and enact retribution for his talking badly about her (to his mother), and second, as an avenue to request and receive academic accommodations for J.F's courses that semester—at least one of which, on information and belief, she had been failing.

10.     Despite J.F.'s complaint being absurd on its face, and the obvious alternative motivation(s) for her filing her complaint, Butler initiated a formal disciplinary investigation against Plaintiff in March 2021 for Stalking under Butler's Sexual Misconduct Policy (hereinafter, "SMP" or "the Policy").

11.     Over the course of the next several months, Butler's investigation of the stalking claim sprawled into a disorganized, general examination of Plaintiff's various friendships over his entire history at Butler and involved eleven student "witnesses."

12.     Despite J.F.'s own admission during her investigative interviews of facts that would preclude a finding of Stalking under Butler's policies, Butler persisted with forcing Plaintiff to

continue participating in a drawn out, emotionally exhausting, expensive, complicated, and time-consuming investigation and grievance process.

13.     To add insult to injury, after forcing Plaintiff to expend significant time, energy, and money participating in Butler's investigation, Butler ultimately decided to toss out its own investigation report, and proceed to the hearing without said report, in violation of its policies.

14.     In October 2021, after a live hearing, an independent adjudicator rightly held that Plaintiff did not violate Butler's Stalking policy; unfortunately, Plaintiff had already suffered substantial harms by that point, including through Butler's numerous violations of its contractual obligations and the apparently pointless seven-month adjudication.  Moreover, Butler has taken no action whatsoever against the students who bullied Plaintiff and filed knowingly false claims about him.

15.     Plaintiff therefore brings this  .

## THE PARTIES

16.     Plaintiff John Doe is a natural person and citizen of the state of Washington.

17.     Defendant Butler University is a private institution of higher education with an undergraduate enrollment of approximately 4500 students, located in Indianapolis, Indiana.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

19.     This Court has personal jurisdiction over Defendant Butler on the grounds that it is conducting business and principally located in Indianapolis, Indiana.

20.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Butler is considered to reside in this judicial district and a substantial part of the acts or omissions giving rise to this action occurred in this judicial district.

## RELEVANT FACTUAL BACKGROUND

21.     Plaintiff matriculated to Butler in fall 2019, and over the course of his first few semesters, became close friends with a group of approximately 8-10 fellow students (hereinafter, "the friend group" or "the group"). As was typical with college friendships, the friend group and individual members thereof would often socialize without formal plans or express invitations, including spontaneous run-ins/hangouts on campus, at local coffee shops, and in the friends' respective on-campus housing.

22.     As is typical with college students, many members of the group utilized social media sites and apps, including Instagram and Snapchat. Both such sites have options for users to make their accounts "private" such that their posts would only be seen by other accounts that were expressly approved by the user.

23.     In addition, at relevant times herein, Snapchat had a feature called "SnapMaps" whereby users could *choose* to make their location data available to their friends on the platform, and in fact, the feature permitted users to choose and limit precisely to whom such data is made available (for example, a user could choose to share location data with only specific friends, rather than enabling it for all friends). On information and belief, the default setting on this feature was to *not* share location data, meaning a user would have to specifically elect to turn it on to share information. *See, e.g.*, https://support.snapchat.com/en-US/article/share-location-select-friends.

24.     On information and belief, student J.F. did not make her location data available on SnapMaps, but she did admit to using SnapMaps herself to locate other people, such as her

boyfriend.  Plaintiff would also occasionally view SnapMaps to see where his friends (who, again, were choosing to share their location data with him) were on campus, sometimes out of idle curiosity and sometimes in order to locate the friends for hanging out – i.e., embracing the actual purpose of *social* media: to socialize.

25.     In the spring of 2020, Plaintiff and eight other members of the friend group were invited by J.F. to spend a few days at a two-bedroom cabin in Michigan owned by her family.  At the cabin, J.F. and her boyfriend, K.C. (also a Butler student) shared one bedroom, while Plaintiff and the other seven students shared the second bedroom.  The cabin had a single bathroom which was shared by all ten students without incident and without anyone having to ask J.F. for permission to use it first.

26.     At the time of the trip, J.F. mentioned to the friend group that the cabin had been broken into twice in the past, and that the person was never caught, which caused J.F. a lot of anxiety.

27.     At one point during the cabin trip, Plaintiff and B.P. kissed and cuddled, but nothing further came of it.  On information and belief, B.P. told another member of the friend group that she had a crush on Plaintiff.

28.     In late September 2020, Plaintiff John Doe came out to his friend group as gay. Plaintiff, who was living in an on-campus fraternity house at the time, felt increasingly uncomfortable at the fraternity after he came out, and began spending more time in a dorm suite shared by five members of the friend group, including J.F., hereinafter referred to as "Room 113".

29.     Because five members of the friend group all lived in Room 113, and several other members of the group lived in other rooms in the same building, Room 113 became a de facto frequent hangout spot for the group, with various members often coming and going.  Sometimes

the residents of Room 113 would leave or go to sleep while other friends in the group were still in the living room, including Plaintiff.  On these occasions, the non-resident members of the friend group were not asked or instructed to leave.  The residents of Room 113 generally left their suite door unlocked.

30.     As the fall 2020 semester went on, Plaintiff confided in the friend group that he was having a really hard time, socially, and that Plaintiff viewed Room 113 as his "safe space."  No one in the friend group expressed any issues or concerns with this sentiment.

31.     Throughout the fall 2020 semester, Plaintiff, along with B.P. (who lived across the hall from Room 113) and another member of the friend group, S.B. (who lived elsewhere in the same dorm building), would frequently spend time in Room 113 without a formal invitation or prior notice; as is quite common and unremarkable on college campuses, the students would simply locate their friends or go to places their friends would likely be, in order to socialize.  Occasionally, Plaintiff and B.P. would bring food or study materials to Room 113 and eat or study in the main area, as the residents of the suite would filter in and out according to their own schedules.

32.     On November 4, 2020, Plaintiff and B.P. were in Room 113 watching media coverage of the presidential election along with some of the residents of Room 113.  It became apparent during this event that the members of Room 113 did not hold the same political views as Plaintiff.  According to J.F., the residents of Room 113 were "conservative" and found the recently-out Plaintiff's viewpoints "annoying."

33.     Further in the Fall of 2020 J.F. said that Plaintiff would send TikTok's of "sappy friend things" such as taking polaroids together. J.F. described that Plaintiff had a list of activities that he wanted to do together, however that was unlike their friend group. J.F. said the friend group was heavily male, and they are more conservative men who "are not into trendy things."

34.     On or about November 5, 2020, the members of Room 113 decided to collectively speak to Plaintiff and B.P. about their frequent presence in the suite.  The residents of Room 113 expressed frustration that their room was considered the default hangout spot, as they did not always enjoy hosting and wanted some more privacy and flexibility in their social schedule.  In furtherance of this, the residents of Room 113 asked Plaintiff and B.P. not to come to their suite during daytime hours or very late at night. There was also a discussion about asking to come to the suite and accepting that sometimes the residents of Room 113 did not want to hang out/host.

35.     During this discussion, Plaintiff sincerely apologized if he did anything to make any members of the suite uncomfortable and reiterated the friend group's importance to him.  The friend group appeared to appreciate this and reassured Plaintiff that he was still their friend, they just needed a little more space.

36.     A few days after this conversation, in the interest of preventing any future conflicts with his friends, Plaintiff met with the residents of Room 113 again and requested that if he did anything that bothered them in the future, to please let him know right away so that he can correct the behavior in the moment, rather than letting their feelings fester.  Plaintiff's primary concern was to avoid upsetting or offending the people he considered to be his closest friends.

37.     Just before Thanksgiving of 2020, there was a coronavirus outbreak in Plaintiff's fraternity.  Therefore, after going home for Thanksgiving, Plaintiff did not return to campus for the remainder of the fall 2020 semester and completed his coursework remotely.  He remained in touch with the friend group via social media, including group-chats and Houseparty[3] calls.

38.     Over winter break, Plaintiff began dating someone who attended another college.

_____

[3] Houseparty is an application that facilitates group video messaging, similar to Zoom.

39.     In January 2021, Plaintiff returned to Butler's campus for the spring semester.

40.     Around this time, Plaintiff expressed to B.P. his desire to move out of the fraternity and into other housing.  B.P. shared with Plaintiff how she had been able to receive a room change the prior school year, and further advised that she had an empty room in her suite that Plaintiff could move into.

41.     Plaintiff took B.P. up on her invitation and requested to move into her suite.  The request was granted and in mid-late January 2021, Plaintiff moved into an empty double-room, which was across the hall from Room 113.

42.     As the spring 2021 semester got underway, Plaintiff tried to be more respectful of the Room 113's occupants' space, as they had requested, including by not going over there during the daytime and by knocking on their (unlocked) door rather than walking right in.

43.     In addition, Plaintiff was spending less time with the friend group in general, as he would spend every other weekend visiting his boyfriend at another school.  Plaintiff's boyfriend would also sometimes visit Butler.

44.     At the same time, Plaintiff expressed to his suitemate and best friend, B.P., that he had social anxiety and fear of missing out, such that he sometimes worried that his friends were all hanging out without him, and that such social anxiety increased to significant social anxiety as events unfolded.  Plaintiff confided in B.P. that he would sometimes look at S.B.'s (deliberately shared) location in SnapMaps to see if she was hanging out with other members of the group, because that was an indication to him that the friend group might be hanging out all without him. B.P. told Plaintiff that true friends would not exclude him on purpose, and not to think too much on it.

45.     On or about February 26, 2021, Plaintiff, B.P., and S.B. went to Room 113 together to hang out with their friends.  J.F. was out of town that night, but all four of the male residents were present and socializing.  Eventually, the residents returned to their individual rooms, but Plaintiff, B.P., and S.B. remained in the living room for a little while.

46.     Room 113 consisted of three double-bedrooms and three bathrooms; J.F. had one bedroom and bathroom to herself, and the four male roommates shared the other two double-bedrooms and bathrooms, respectively.

47.     It was generally understood that one of the bathrooms which was primarily used by two of the male suitemates, was the "public" bathroom for visitors to the suite.  However, on one or two previous occasions Plaintiff had used J.F.'s bathroom – she even made a joke to him about making sure to lift the seat.

48.     On the night of February 25, 2021, while in Room 113, Plaintiff had to use the bathroom.  He initially went to use the male roommate's bathroom as per usual, but that roommate advised Plaintiff he had Spanish Exam starting shortly and he needed to keep the door to his room area (which included the bathroom) closed.

49.     Later in the evening, Plaintiff had to use the bathroom again, and stated aloud that he was going to use J.F.'s bathroom.  S.B. mentioned that he should use the (usual) male bathroom instead, but Plaintiff responded that he could not, as per the male roommate's earlier request not to reenter the room because he was taking an exam.  So, Plaintiff walked towards J.F.'s bathroom and neither S.B. nor B.P. indicated he should not do so. Plaintiff briefly and uneventfully utilized J.F.'s bathroom and returned to the living room.  He, B.P., and S.B. spent a little more time in the suite and then Plaintiff and S.B. left to get food together and socialize at another location. B.P. remained in Room 113.

10

50.     The next day, S.B. disclosed to J.F. that Plaintiff had used her bathroom when she was out the previous night.  J.F. texted Plaintiff that it was "so not cool" that he had used her bathroom when she wasn't home.  In his response, Plaintiff apologized *multiple times* and stated he would not do it again.  J.F. did not respond further.

51.     A day or so later, Plaintiff ran into J.F. in the hallway of their dorm and apologized yet again for having used her bathroom.  J.F. causally laughed it off and said "it's okay, we'll talk about it later."

52.     On March 1, 2021, J.F. sent a lengthy message in a group chat via Snapchat, directed at Plaintiff, stating that the members of Room 113 were unhappy with Plaintiff and that he was still hanging around too much.  The text contained a list of behavior adjustments Plaintiff would need to make in order to remain part of the friend group, including not leaving any personal items in their suite, specifically asking in advance of coming over, not staying too late, not staying in the suite too long, asking for J.F's express permission to enter her room, and using his own bathroom across the hall when he's hanging out with them, rather than any of theirs. The list also criticized Plaintiff for making jokes that the friend group did not care for, such as a stray comment about the single friends in the group being a "lonely hearts club."

53.     The lengthy message acknowledged that Plaintiff had previously asked his friends to say in the moment if he was doing something wrong, but stated that made them too uncomfortable.  The message further stated that the group <u>did</u> still want to remain friends with Plaintiff.

54.     Plaintiff immediately, profusely apologized for upsetting anyone, clarified that he thought he was doing better after their conversation the prior semester, and reiterated that he had no idea that J.F. cared so much about other people using her bathroom.  He also requested some

time for them to chat in the future so that his friends could further instruct him on how to best respect their space.  Plaintiff also again requested to be let known in the moment if he did or said anything that upset his friends.

55.     When Plaintiff received the lengthy text message from J.F., he was in his suite with B.P., who also saw the message and saw how upset Plaintiff was.

56.     Undoubtedly sensing that her own status in the friend group was potentially endangered by her closeness with Plaintiff, B.P. almost immediately went over to Room 113 to speak with J.F. and the roommates.

57.     On information and belief, B.P. then told the residents of Room 113 numerous lies about Plaintiff that appeared designed to ingratiate B.P. to the friend group by throwing Plaintiff under the bus.

58.     By way of example, B.P. disclosed Plaintiff's admission that he would sometimes check SnapMaps, but distorted it into a lie that he checked the entire friend groups' locations "compulsively" and incessantly every day.  B.P. further lied by claiming that she once caught Plaintiff staring out of their own suite window, waiting for members of Room 113 to come home (in reality, their room was across the hall and their window faced the opposite direction of the building entrance to Room 113).  B.P. further claimed that Plaintiff would check Room 113 to see if people were home multiple times every day.

59.     Several days later, Plaintiff was asked by J.F. to meet with her at a building on campus.  On his arrival, Plaintiff found J.F., the rest of the Room 113 residents, S.B., B.P., Plaintiff's Resident Advisor, and J.F.'s resident advisor.

60.     J.F.'s resident advisor had apparently, at J.F.'s request, set up this ambush "mediation" to assist J.F. and her friends in breaking off their friendship with Plaintiff.

61.     Although couched as a "mediation", the March 1, 2021 session devolved into basically a group bullying session, wherein each member of Plaintiff's friend group told Plaintiff about his personality flaws, including that he didn't pick up on "social cues" indicating, essentially, that they all actually disliked him and found him annoying.  There was some mention made of Snapchat, but it was very brief and made in passing.  A lot of the session was about J.F.'s displeasure that Plaintiff had used her bathroom without her permission (but again, she did not claim that he damaged, stole, or even moved anything in doing so).

62.     Towards the end of the session, B.P.—who was not a resident of Room 113, but was Plaintiff's own suitemate and best friend—then suddenly declared that she could not be friends with Plaintiff anymore either, and mimicked the personal space concerns claimed by J.F.

63.     Needless to say, Plaintiff was overwhelmed with emotion at being essentially dumped and lengthily insulted by his entire friend group, just days after they had claimed in the group chat that they still wanted to be his friend.  Plaintiff was especially crushed at the sudden betrayal of B.P.

64.     In the "mediation", Plaintiff cried, repeatedly apologized, and again stated that he didn't realize he was doing anything wrong because yet again, no one in the group was saying anything in the moment, and he thought he had been complying with the requests they had made in November 2020 (i.e., he was going over less often, he would knock before coming in, he was not going over during the day).  He reiterated that as to the J.F. bathroom issue, he had no idea it was a concern for J.F., and pointed out that S.B. and B.P. were also present that night and neither of them told him not to use her bathroom or to call her and ask permission first.

65.     After J.F. and the rest of the friend group left the mediation, Plaintiff was inconsolable.  His resident advisor stayed behind to try to comfort him and help him calm down.

She advised him that the situation would "blow over" if he gave it some time.  In later discussing the "mediation", the resident advisor admitted that the situation had gotten out of hand and that Plaintiff was essentially ganged up on.

66.     After the March 1, 2021 "mediation", Plaintiff made no further contact with anyone in the friend group.

67.     For days, Plaintiff was bewildered at the sudden and devastating rejection by his entire social circle at Butler.  He had trouble eating, sleeping, and concentrating on school and daily activities.

68.     On or about March 9, 2021, Plaintiff was in his private room (although it was a double, Plaintiff had no roommate), talking on the phone to his mother about everything that had occurred.  At one point in the conversation, he mentioned that it seemed like J.F. just decided she didn't want Plaintiff in the friend group anymore and everyone else was following along.  Plaintiff also mentioned his particular confusion and feelings of betrayal by B.P.

69.     Almost immediately, B.P.—who had apparently been eavesdropping on Plaintiff— burst into Plaintiff's room and yelled at him for daring to question her motives or behavior.  She then stated she was having meetings about him with campus security and the dean of students, that they "know what [Plaintiff] did", and she made a vague threat that she "didn't want to make this any harder" on Plaintiff than it already was.

70.     At this point, despite being assured by his resident advisor that the situation would "blow over", Plaintiff simply could not take anymore.  He immediately emailed the person in charge of housing at Butler, requesting an emergency room change.

14

71.     Plaintiff's email, which was cc'd to Dean of Students, Martha Dwizlik, stated in relevant part: "The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment."

72.     Plaintiff's mother also reached out to the Dean of Students separately, to report the bullying and harassment.

73.     Plaintiff also reached out to his professors, cc'ing Dean Dwizlik, advising that he was struggling to stay on top of his coursework due to the devastating social situation he was going through.

74.     On March 10, 2021, Plaintiff received an email from Butler's then-Title IX Coordinator, Maria Kanger. The email stated, in relevant part:

> I'm reaching out because I've been made aware of your and your parents' conversations with Martha Dziwlik and Bridget Bucey. Martha and Bridget are currently dealing with a campus emergency and are not able to return phone calls and emails. I'll be the point person for this situation moving forward.
>
> I would be happy to talk with you about what you've discussed with Martha and Bridget. I have information that I need to share with you, as well.

75.     By that point, Plaintiff no longer felt safe in the dorms and had already decided to fly back home to Washington until the housing situation was resolved, so that he could be in a supportive and safe environment, for his mental health.  He agreed to meet with Kanger by zoom the next day.

76.     At the March 11, 2021 meeting with Kanger—which was scheduled under the guise of assisting and supporting Plaintiff with the bullying and harassment he had reported— Plaintiff was shocked to learn that J.F. had filed a formal complaint against him, on March 9, 2021, alleging that Plaintiff stalked J.F. in violation of Butler's Sexual Misconduct Policy.

77. During the March 11 meeting with Kanger, Plaintiff's own victimization was quickly tossed to the side and the entire focus of the meeting became Plaintiff's status as a respondent in a Sexual Misconduct matter and how he would need to go through Butler's (very involved) formal grievance process, which would likely go on for months.

78. The next day, Plaintiff received a formal Notice of Investigation and No Contact Order barring him from having any contact with J.F. – which was unnecessary, as he had not communicated with her in any way since the March 1 "mediation."

79. The Notice of Investigation made it clear that J.F.'s complaint had no legitimate grounds and that Plaintiff's behavior did not constitute Stalking under Butler's applicable policy.

80. To wit, the sum and substance of the accusations were that: (1) Plaintiff sometimes utilized social media to find and meet up with his friends, (2) Plaintiff once looked out his window to see if his friends were around, (3) Plaintiff sometimes visited his friends' (unlocked) pod when they were not there, and (3) on one occasion, he used J.F.'s bathroom without permission.

81. There were no allegations that Plaintiff ever threatened anyone, accessed *non-public* information about anyone, physically or surreptitiously followed anyone, opened a locked door, stole anything, damaged any property, or posed any kind of threat to anyone.

82. As such, even if the allegations against Plaintiff were true, they could not have constituted Stalking under Butler's Sexual Misconduct Policy, which required a "course of conduct *directed at a specific person* that would cause a *reasonable person* to fear for the person's safety or the safety of others or to experience *substantial* emotional distress" (emphasis added).

83. In light of Butler's apparent indifference to the harassment and bullying suffered by Plaintiff, and its insistence on forcing Plaintiff to defend an obviously bunk Stalking claim in

16

an extensive formal grievance process, Plaintiff felt obligated to hire a professional to assist him and serve as his advisor during the grievance process.

84.     With the aid of his advisor, Plaintiff sent several communications to Butler, including to Maria Kanger, challenging the applicability of Butler's Stalking/Sexual Misconduct Policy and repeatedly seeking for the case to be dismissed as falling outside of the policy.

85.     Unfortunately, Butler refused, and Plaintiff was then forced to expend substantial sums of money and time in defending an obviously baseless disciplinary process which was clearly initiated by his bullies as a method to further bully and punish him.

### BUTLER'S IMPROPER DISCIPLINARY PROCESS

86.     As mentioned above, the allegations made by J.F. against Plaintiff represented little more than the story of an over-eager friend who did not pick up on subtle social cues that he was falling out of favor with his friend group.

87.     Nonetheless, Butler repeatedly refused to dismiss the case or remove it from the SMP grievance process.

88.     Making matters worse, the manner in which Butler conducted its investigation was sloppy and patently improper.  By way of example, and not limitation:

    a.  The investigator dragged the investigation out and involved more students than was necessary, by unilaterally expanding the investigation to include a general examination of Plaintiff's relationships with various members of the friend group, including such mundane claims as: (i) on a single occasion the previous school year, Plaintiff ran into a male friend in the group in their shared dorm lounge, and watched a sports game together, or (ii) Plaintiff once showed up to the (only)

campus Starbucks when one of the friends in the group (not J.F.) was there studying.

b.  The investigator's interview notes/summaries were extremely sloppy, including countless typos, incomplete sentences, incorrect pronouns, and incoherent sentences, making it difficult to discern the actual testimony against which Plaintiff was supposed to be defending himself.

c.  The investigator egregiously over-redacted the interview notes/collected evidence, such that every single student name was fully redacted out and was *not* replaced with an identifying marker such as "Witness 1" or "complainant".  The result was that investigative file was virtually incoherent.  For example, the investigator's interview summaries contained the following statements: (i) "(Redacted) believes that (Redacted) said something about (Redacted)"; and (ii) "(Redacted) heard that (Redacted) had sent (Redacted) a message, and (Redacted) asked (Redacted) about it."

d.  Despite *repeated* pleadings from Plaintiff and his advisor, Butler *refused* to provide access to an unredacted version of the evidence file *and* refused to provide a version where the redactions were at least replaced with generic identifiers, forcing Plaintiff to expend substantial amounts of time poring over an inscrutable record in order to attempt to defend himself.

e.  Butler further limited Plaintiff's access to relevant investigative materials by posting them online in a non-downloadable format such that Plaintiff could only view the materials on a computer screen, when he was connected to the internet.

f.  Butler declined to permit Plaintiff reasonable extension requests, particularly given

the indecipherable nature of the investigative file.

89.    In contrast to Butler's insistence on pursuing a baseless formal Sexual Misconduct grievance process against Plaintiff, Butler failed to take appropriate action to remedy the harassment and bullying that Plaintiff had suffered at J.F. and B.P.'s hands.

90.    To wit, even though the purpose of Plaintiff's initial March 2021 meeting with Kanger was *supposed* to be a discussion of how Butler could support Plaintiff and assist him with a housing change due to the bullying and hostile living environment, that meeting turned entirely into a discussion of Plaintiff's purported offenses against his bully/ies.

91.    Butler then failed to properly follow up with Plaintiff about his own potential complaint for nearly a month, during which Plaintiff repeated his request for assistance.  At one point, Dean Dwizlik offered to meet with Plaintiff, but when Plaintiff replied suggesting times when he could be available, Dean Dwizlik stopped responding.

92.    Unfortunately, by the time Butler finally got around to addressing Plaintiff's concerns, it was already evident to him that Butler did not take his claims very seriously, and he was terrified that reporting J.F. and/or B.P. would only lead to more harassment and retaliation, including, potentially, more false and baseless complaints against him.

93.    Butler's Stalking investigation dragged on into the summer, despite Butler being out of session, precluding Plaintiff from being able to enjoy his time off and forcing him to spend his summer "vacation" continually reliving the rejection/bullying by his friend group and fighting with Butler to receive appropriate access to the files.

94.    After months of Butler's sprawling, sloppy investigation, the investigator completed his final report and investigative file on or about August 2, 2021.

95.    Without consulting with Plaintiff as to his availability to attend a hearing during

summer break, Butler then notified Plaintiff that a hearing on the charges was scheduled for August 20, 2021 – the date that Plaintiff already had tickets booked to fly back to Butler in advance of the fall semester.

96.    The hearing on the matter was then rescheduled for September 2, 2021.

97.    One week prior to the hearing, Plaintiff requested the hearing agenda and list of witnesses who would attend. Plaintiff was told the witness list was forthcoming.

98.    On August 31, Plaintiff again requested a witness list, and with less than 48 hours prior to the hearing, Plaintiff was finally provided an agenda and witness list.

99.    Plaintiff worked diligently with his advisor and his parents in preparing for the hearing, including preparing questions for the nine (9) witnesses that Butler told Plaintiff would be attending the hearing.

100.    Because the hearing was going to be conducted via Zoom, and Plaintiff, his parents, and his advisor all lived in different states, Plaintiff and his parent flew to his advisor's office in New York in order to support Plaintiff at the hearing.

101.    Less than ninety minutes prior to the start of Plaintiff's scheduled hearing, he was notified via email by Butler that the hearing was cancelled, as the investigator had supposedly quit his job that very morning, effective immediately.

102.    At the time, Butler acknowledged that its policies required the parties to have the opportunity to question the investigator at the hearing.

103.    In connection with Butler's cancellation of the scheduled hearing, Butler offered the parties the option of either moving forward with a hearing without the investigator present for questioning, or pursuing an informal resolution without a hearing.

104.    Plaintiff, who had twice proposed informal resolution during the course of the grievance process, once again requested informal resolution. The complainant, J.F., rejected informal resolution, and therefore the option was eliminated.

105.    Butler then stated that, since there was not agreement from both parties as to proceeding with informal resolution or to a hearing without the investigator present for questioning, the only other option was for the matter to be re-investigated from scratch by a new investigator.

106.    Needless to say, after suffering through nearly seven (7) months of an improper, mentally exhausting, personally humiliating, and socially destructive investigation already, Plaintiff vehemently opposed being subjected to a new investigation all over again, particularly when there could be no guarantee that the next investigator wouldn't just quit at the last minute again.

107.    Nonetheless, Title IX Coordinator Kanger announced that she had appointed a newly hired Assistant Dean of Students to assume the role of investigator for a new investigation of Plaintiff's case.

108.    Plaintiff challenged the appointment of the new investigator who, Plaintiff discovered, appeared to lack any experience/proper training and had been employed by Butler University in this capacity for *less than one (1) month*.  Plaintiff was also concerned that the new investigator may have been trained by the previous, outgoing investigator, whose sloppy and improper work and unprofessional conduct of quitting on the morning of a hearing, raised further concerns about the qualifications and proper training of the proposed new investigator.

109.    Plaintiff thus requested once again that the case be dismissed outright, not only because of the issues with Butler trying to force through a new investigation from scratch (with a

potentially untrained or improperly trained investigator), but also, in light of the continuing fact that nothing uncovered in the initial investigation could support a claim of Stalking under Butler's Sexual Misconduct policy, even if everything J.F. had alleged were true.

110.    Specifically, in J.F.'s own interviews with the investigator, which were part of the final record in Butler's possession, she: (i) confirmed that she "never claimed" that Plaintiff's conduct was specific to, or directed at her; (ii) confirmed that her own Snapchat location data was set to private/off, meaning Plaintiff could not have monitored her location; (iii) acknowledged that her personal reaction to someone using her bathroom was not a standard, typical, or expected response (in her own words, "normally people wouldn't lose their shit about someone using their bathroom"; and (iii) admitted that she was not even sure whether Plaintiff was aware that she didn't like other people using her bathroom.

111.    Despite Plaintiff's repeated requests, Butler refused to close/dismiss the patently baseless complaint.

112.    On October 1, Plaintiff was notified by Title IX Coordinator Kanger that "Given that both parties have raised concerns regarding re-investigation, [Butler has] identified another option for resolving this matter. We will be proceeding with a hearing, but because the investigator will not be present due to circumstances beyond our control, the decision-maker will not use the investigation report in determining responsibility. The materials gathered in the course of the investigation can be used to determine responsibility."

113.    In other words, given that the original investigator was not available to testify, as required by Butler's policies, Butler decided to discard the investigation report altogether and proceed on the hearing testimony and documentary evidence alone.

114.    The new hearing date was set for October 13, 2021.  Plaintiff was not given any options in scheduling the hearing date before receiving this notice, and the notice did not comply with the hearing notice requirements in Butler's policies.  Butler's fall break was scheduled to begin on October 14, 2021.

115.    On October 13, 2021, Plaintiff attended a hearing on the Stalking charge brought by J.F.

116.    Due to the rescheduling, only three (3) witnesses were present at the hearing out of the original nine (9) witnesses who were supposed to testify (and for whom Plaintiff had worked with his advisor and his parents to craft hearing questions).

117.    Finally, on October 29, 2021, Plaintiff received an outcome letter finding him not responsible for Stalking under Butler's Sexual Misconduct Policy.

118.    As Plaintiff had been arguing all along, the impartial adjudicator concluded that given *Complainant's own admissions*—the same ones she made in her investigative interviews— the alleged conduct simply did not meet the definition of Stalking.

119.    Although Plaintiff was relieved to finally have reason prevail, Butler's refusal to drop the charges before it got to a hearing, combined with its ultimate discarding of the investigation report, resulted in Butler having forced Plaintiff to waste considerable time, effort, and money going through a grievance process that was unnecessary from the start.

120.    To date, Butler has taken no action against J.F. nor B.P. for the patently baseless sexual misconduct complaint and the numerous demonstrable lies that B.P. told during the investigation, such as: (i) claiming that on the night Plaintiff used J.F.'s bathroom, he went in there "five or six times in twenty minutes", despite Plaintiff and the other witness present, S.B., both stating Plaintiff only went in once; and (ii) claiming that Plaintiff monitored the coming and going

23

of Room 113 residents out of his dorm window, even though his window actually faced the opposite direction (which B.P. knew, since they shared a suite).  Nor has Butler taken any action against B.P. for the implied threats she made against Plaintiff when she stormed into his room after eavesdropping on him.

### AGREEMENTS, REPRESENTATIONS, COVENANTS AND WARRANTIES
### BETWEEN PLAINTIFF AND BUTLER UNIVERSITY

121.   Upon Plaintiff's acceptance to Butler, Butler provided him with the Butler University Student Handbook, as well as other relevant policies and procedures including, but not limited to, the Student Code of Conduct, Student Conduct System policies, and the Sexual Misconduct Policy ("SMP"), which set forth student rights and responsibilities, prohibited actions and definitions, as well as the process for investigating and adjudicating potential policy violations.

122.   Collectively and individually, these policies and procedures comprise express and implied promises from Butler to its students, including Plaintiff John Doe, with regard to how Butler will define, address, and adjudicate various complaints of misconduct.

123.   For alleged student conduct that falls within Butler's definitions for Sexual Misconduct, the SMP sets forth a detailed, multi-step investigation and adjudication process, in compliance with federal Title IX regulations.

124.   For alleged student conduct that falls outside of Butler's definitions for Sexual Misconduct, those matters are adjudicated under the standard Student Conduct System.

125.   The standard Student Conduct System provides for a much less formal avenue for resolving disputes, through an administrative, summary proceeding, with shorter timelines than the SMP process.

126.   Butler's SMP defines Stalking as follows:

Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others or to experience substantial emotional distress.

1. "Course of conduct" means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

2. Substantial emotional distress means significant mental suffering or anguish.

[SMP at 6.]

127.    As set forth above, the allegations made by J.F. against Plaintiff, even if true, could not constitute Stalking under the SMP.  Specifically, J.F. did *not* allege that Plaintiff's conduct was directed at her in particular, and she did not allege that Plaintiff had done or said anything that would cause a reasonable person to fear for their safety or suffer substantial emotional distress— quite the contrary, she openly acknowledged that her extreme reaction to finding out that a friend used her bathroom was very much *not* how a reasonable person would react.

128.    Thus, Butler breached its policies by forcing Plaintiff to defend a Stalking charge under the SMP, when the alleged conduct did not rightly fall within the jurisdiction of the SMP.

129.    Plaintiff was damaged by this breach by virtue of having to spend significant time, energy, and money defending himself through the lengthy and botched investigation/hearing process.

130.    The SMP provides that Butler "aims to treat all parties and participants in this process fairly, equitably, and with respect." SMP at 13.

a.    Butler breached this provision because the investigator's creation of an overly-redacted, sloppy, incoherent investigative file rendered it nearly impossible for

Plaintiff to interpret and respond to the evidence to be used against him, and required substantial amounts of additional time and effort to try and interpret the inscrutable file.  Such hamstringing is not fair, equitable, or respectful.

131.    The SMP provides that Butler "aims to complete all investigations in a reasonably prompt manner." SMP at 15.

    a.    Butler breached this provision because the investigator unnecessarily extended and expanded the investigation to include entirely irrelevant incidents involving other students who had not filed any claims against Plaintiff, forcing the Plaintiff to again waste time and resources responding to such asinine "issues" as whether he once watched a sports game with one of his friends in the lounge of their shared dorm freshman year.

132.    The SMP provides that "All witnesses and parties are expected to provide true and accurate information. Should a witness or party willfully provide false information, they may be subject to disciplinary action."  SMP at 15.

    a.    Butler breached this provision because B.P. faced no disciplinary action whatsoever for her demonstrably false, deliberately inflammatory lies during the investigation, including her claim that Plaintiff used J.F.'s bathroom "five or six times in twenty minutes."

133.    The SMP provides that the parties to an investigation will be given access to "[a]n appendix containing raw materials gathered in the investigation (e.g., incident reports, documentation submitted by the parties, etc.)." SMP at 16.

a.  Butler breached this provision, because the overly-redacted, sloppy, typo-ridden "raw materials" were so inscrutable as to constitute a denial of access to the investigative materials.

134.   The SMP provides that "The Title IX Coordinator will send notice of the date, time, and location of the hearing, as well as the name(s) of the decision-maker(s) to the parties at least fourteen (14) business days prior to the hearing date."  SMP at 17.

a.  Butler breached this provision because it did not provide notice of the rescheduled October 13 hearing date until October 1, 2021.

135.   The SMP provides that "[i]n scheduling the hearing, the Title IX Coordinator will accommodate the parties' and advisors' schedules to the extent reasonable."  SMP at 17.

a.  Butler breached this provision because it unilaterally selected the October 13 hearing date without any input from Plaintiff or his advisor.

136.   The SMP provides that "[t]he decision-maker will be provided a copy of the Final Investigation Report." SMP at 18.

a.  Butler breached this provision because the adjudicator in Plaintiff's case was not provided with the Investigation Report.

137.   The SMP provides that "[e]ach party's advisor may question the other party, witnesses, and investigator on behalf of their advisee."

a.  Butler breached this provision because the investigator assigned to Plaintiff's case did not appear at the hearing.

138.   Butler's Campus Life Harassment Policy states:
Harassment of any kind is not acceptable behavior at Butler; it is inconsistent with the commitment to excellence that characterizes Butler University's activities.
. . .

Alleged harassment occurring between students, other than what is described in policies noted above, may result in referral to the University student conduct system.

. . .

Behaviors that would be considered harassment (not including gender based discrimination) include, but are not limited to . . . Behavior by any student that materially disrupts another's educational pursuits or educational process, invades the rights of others, or otherwise disrupts the regular and essential operation of the University [and/or] . . . Behavior of any kind that interferes with or involves an expressed or implied threat to interfere with an individual's personal safety, personal possessions, residence, academic efforts, employment or participation in University-sponsored functions and causes that person to have a reasonable apprehension that such harm is about to occur.

139.    Butler breached its Harassment policy because it failed to apply any disciplinary action to B.P. for her acts of: (i) spreading lies about Plaintiff to J.F. and the rest of the friend group, for the purposes of even further prejudicing them against Plaintiff and resulting in Plaintiff's complete social exile from his friend group; and (ii) eavesdropping on Plaintiff's private conversation with his mother and then bursting into his room, yelling at him and threatening him.

140.    Butler further breached its Harassment policy because it failed to apply any disciplinary action to J.F., whose claims to other students that Plaintiff was "stalking" her resulted in Plaintiff's roommates for the next year backing out of their lease and leaving Plaintiff to find a new future living situation.

141.    Butler's Residence Life Community Standards and Rules provide that "The Butler community expects mutual respect from all members. Residence Life staff members are trained to respond to emergency situations and conduct violations to maintain a safe and comfortable living environment for everyone."

a.   Butler violated this policy because Butler's resident advisors helped to organize and plan the ambush-style "mediation" wherein they permitted J.F., B.P. and other

28

members of the friend group to gang up on Plaintiff and extensively insult him with everything they found unlikeable or undesirable about him, leaving Plaintiff in tears, crushed, and extremely uncomfortable in his living environment.

## PLAINTIFF'S DAMAGES

142.    As a result of Butler's various breach of its contractual obligations, Plaintiff was subjected to an unnecessary, lengthy, expensive, and emotionally draining disciplinary process that failed to comport with Butler's promises to Plaintiff as an enrolled student and resulted in the waste of tens of thousands of dollars spent on advisors to guide Plaintiff through Butler's process.

143.    As a further result of Butler's breaches of its contractual obligations, Plaintiff was subjected to essentially school-sponsored bullying and a hostile environment such that he was forced to vacate campus in the middle of the spring 2021 semester and lose the benefit of his tuition, room and board fees to Butler.

144.    As a further result of Butler's breach of its contractual obligations, Plaintiff suffered unchecked harassment leading to emotional distress, anxiety, and depression, and the breach by Plaintiff's future roommates of an already-executed lease agreement.

## COUNT ONE:
### BREACH OF CONTRACT

145.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

146.    At all times relevant hereto, a contractual relationship existed between Butler and Plaintiff by virtue of Plaintiff's enrollment at Butler and payment of relevant tuition and fees, and as defined by and through Butler's policies and procedures, including but not limited to the Sexual Misconduct Policy.

29

147.     Through the documents it publishes and provides to students, Butler makes express and implied contractual commitments to students involved in the disciplinary process and/or students who report potential violations of Butler's policies.

148.     Indiana law recognizes that the relationship between a student and an educational institution is contractual in nature, and regulations and policies made available to the student form part of the contract.  *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013).

149.     Based on the aforementioned facts and circumstances, Butler created express and implied contracts when it offered, and Plaintiff accepted, admission to Butler, and when Plaintiff paid the required tuition and fees and Butler disseminated and published its relevant policies, including the SMP.

150.     As set forth in detail above, Butler repeatedly breached its agreement(s) with Plaintiff, resulting in damages.  By way of example, and not limitation, Butler committed the following breaches:

     a.     Butler failed to properly screen J.F.'s complaint, wrongly classifying it is a Stalking claim even though the allegations made by J.F., if true, would not constitute Stalking as defined by the SMP;

     b.     Butler did not provide Plaintiff with meaningful access to the information gathered during the investigation, including by over-redacting the records to such an extent that they were virtually inscrutable, and repeatedly refusing to ameliorate the issue despite numerous requests from Plaintiff;

     c.     Butler did not complete the investigation in a "reasonably prompt" timeframe, but rather, expanded the investigation above and beyond the relevant claims to become an aimless evaluation of Plaintiff's personality and friendships as a whole;

     d.   Butler failed to give Plaintiff proper notice of his hearing;

     e.   Butler failed to make the investigator available for questioning at Plaintiff's hearing;

     f.   Butler failed to properly address Harassment by B.P. and/or J.F.;

     g.   Butler failed to provide properly trained Resident Assistants and failed to ensure a safe and non-hostile living environment for Plaintiff; and

     h.   Butler failed to take any action against J.F. and/or B.P. for their dishonesty in the disciplinary process.

151.   As a direct and proximate foreseeable result of Butler's breaches, Plaintiff was subjected to a hostile environment while attempting to pursue his education at Butler and lost the benefit of the bargain of his tuition and room and board payments, including specifically Plaintiff's constructive eviction from his on-campus housing in Spring of 2021 (by virtue of the escalating and unremedied harassment by B.P. and/or J.F.).

152.   As a direct and proximate foreseeable result of Butler's breaches, Plaintiff was forced to expend significant sums of money defending a baseless Sexual Misconduct investigation, which money was rendered a complete waste after Butler determined to proceed to a hearing *without* the Investigation report – the entire purpose of the months-long investigation process.

153.   As a direct and proximate foreseeable result of Butler's breaches, Plaintiff suffered emotional distress, anxiety, and depression.

154.   As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT TWO:
## UNJUST ENRICHMENT

155.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

156.    Plaintiff John Doe paid tuition, room and board fees, and various other costs and fees to Butler University for the Spring 2021 semester, for which Plaintiff was prevented from realizing the benefit of the bargain.

157.    Due to Butler's initiation of a baseless Stalking investigation and its delay and seeming lack of concern in responding to Plaintiff's complaints of bullying and harassment, and its failure to initiate disciplinary action against Plaintiff's bullies, Plaintiff was forced to leave campus in the middle of the Spring semester 2021, thereby losing the benefits of his payments.

158.    Butler has therefore been unjustly enriched by Plaintiff's various payments.

159.    As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Butler University as follows:

(i)    On Count One, for breach of contract, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    On Count Two, Unjust Enrichment, damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iii)    for such other and further relief as the court deems just and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

Respectfully submitted,

SAEED & LITTLE, LLP
*Attorneys for Plaintiff John Doe*

s/ *Jonathan Little*
Jonathan Little, No. 27421-49
133 W. Market Street #189
Indianapolis, Indiana 46204
(317) 721-9214
jon@sllawfirm.com

-and-

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff John Doe*

s/ *Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq.
Stuart Bernstein, Esq.
Kristen Mohr, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
kmohr@nmllplaw.com