UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN DOE,

          Plaintiff,

v.

                              Case No:  1:22-cv-01828-SEB-MG

BUTLER UNIVERSITY,

          Defendant.

**BRIEF IN SUPPORT OF MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM**

Defendant, Butler University ("University"), by counsel, submits this brief in support of its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff seeks to pursue claims against the University for breach of contract and unjust enrichment. However, the Complaint does not adequately plead the breach of any specific contractual terms between Plaintiff and the University. Moreover, Plaintiff's claim that a contractual relationship exists, regardless of whether there is a viable claim for breach of contract, bars Plaintiff from asserting a claim for unjust enrichment.

The Complaint does not identify any definite and concrete promises by the University to Plaintiff. Each of the failures Plaintiff alleges in the investigation are either without basis or based upon aspirational or discretionary statements, which cannot form the basis of a breach of contract claim. Moreover, under Indiana contract law for claims related to procedures for misconduct and discipline, the complaint must include factual allegations to support a claim that the University acted

1

arbitrarily or in bad faith. Plaintiff's Complaint alleges no such claim. For these reasons and as set forth more fully below, Plaintiff's Complaint fails to state a claim upon which relief can be granted and must be dismissed in its entirety.

## I.    <u>STANDARD OF REVIEW</u>

A motion to dismiss tests whether a complaint contains sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss, a court must accept all factual matter as true. *Id.* (citing *Twombly*, 550 U.S. 570). However, this does not apply to legal conclusions, including those "couched as a factual allegation." *Id.*; *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft*, 556 U.S. at 678 (citing Fed. Rule Civ. Proc. 8(a)(2)). A claim may be dismissed if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Antonelli v. Sheahan*, 81 F.3d 1422, 1427 (7th Cir. 1996).

## II.    <u>PLAINTIFF'S FACTUAL ALLEGATIONS</u>

In summary and only as relevant to this Motion, Plaintiff alleges the following in his Complaint for Damages:

Plaintiff began attending Butler University in Fall 2019. [Filing No. 1, at ¶ 21]. He became friends with a group of 8-10 students, referred to as "the friend group" in Plaintiff's Complaint. [Filing No. 1, at ¶ 21]. Five members of the friend group, including a female individual with the initials J.F., lived together in an on-campus dorm suite, referred to as "Room 113." [Filing No. 1, at ¶ 28]. Plaintiff and other members of the friend group frequently spent time in Room 113. [Filing No. 1, at ¶ 31].

In November 2020, the residents of Room 113 asked Plaintiff and another member of the friend group to stop using their room as the default hangout spot, stop coming over during daytime hours or late at night, and accept that the residents of Room 113 did not always want to host guests in their suite. [Filing No. 1, at ¶ 34]. In January 2021, Plaintiff moved in with a member of the friend group who lived across the hall from Room 113. [Filing No. 1, at ¶¶ 39-40].

During the Spring 2021 semester, students returned to campus following a period of remote learning due to the COVID-19 pandemic. In February 2021, Plaintiff used J.F.'s private bathroom in Room 113 while J.F. was not home. [Filing No. 1, at ¶ 46-49]. J.F. expressed to the Plaintiff that she was upset about this. [Filing No. 1, at ¶ 50]. A few weeks later, J.F. sent a message in the friend group's group chat asking Plaintiff to not leave personal items in Room 113, to ask before coming over, to not stay too late or too long, to ask for J.F.'s permission before entering her bedroom, and to use his own bathroom that was across the hall. [Filing No. 1, at ¶ 52]. That evening, Plaintiff's suitemate went to Room 113 and stated to J.F. that

3

Plaintiff would check the entire friend groups' locations on SnapMaps "compulsively" and incessantly every day; that she once caught Plaintiff staring out of their suite window, waiting for members of Room 113 to come home; and that he would check Room 113 to see if people were home multiple times every day. [Filing No. 1, at ¶ 58].

Several days later, Plaintiff's Resident Advisor and J.F.'s Resident Advisor held a "mediation" attended by the Plaintiff, Plaintiff's suitemate, the five residents of Room 113, and one other member of the friend group. [Filing No. 1, at ¶ 59-60]. At the "mediation," the members of the friend group repeated previous concerns and essentially stated that they did not like the Plaintiff, found him annoying, and did not want to be his friend. [Filing No. 1, at ¶ 61].

Plaintiff requested an emergency room change and copied Martha Dwizlik, Dean of Students, in his email. [Filing No. 1, at ¶ 70-71]. He stated in the email, "The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment." [Filing No. 1, at ¶ 71]. Plaintiff's mother also reached out to Dwizlik to report bullying and harassment of her son. [Filing No. 1, at ¶ 72]. The next day, Butler's then-Title IX Coordinator, Maria Kanger, emailed Plaintiff to set up a meeting. [Filing No. 1, at ¶ 74]. Plaintiff does not allege anywhere in his Complaint that he reported acts of bullying or harassment by any specific individuals during or after that conversation. [Filing No. 1, at (in its entirety)].

During a Zoom meeting the next day, Kanger informed the Plaintiff that J.F. had filed a formal complaint against him on March 9, 2021, for stalking in violation

of Butler's Sexual Misconduct Policy ("SMP"). [Filing No. 1, at ¶ 76]. Plaintiff thereafter went through Butler's formal grievance process as a respondent in a sexual misconduct matter. [*See* Filing No. 1, at ¶ 77]. The investigator assigned to J.F.'s complaint examined Plaintiff's relationships with the friend group. [Filing No. 1, at ¶ 88(a)]. The investigator's notes contained many typos and grammatical errors, and he redacted all student names in his notes and evidence without using any identifying markers, such that the investigative file contained statements such as: "(Redacted) believes that (Redacted) said something about (Redacted)." [Filing No. 1, at ¶ 88(b)-(c)]. Butler refused to provide Plaintiff with unredacted versions. [Filing No. 1, at ¶ 88(d)]. Plaintiff could only access the investigative materials by using a computer screen while connected to the internet. [Filing No. 1, at ¶ 88(e)].

On August 2, 2021, the investigator completed his final report. [Filing No. 1, at ¶ 94]. A hearing was held on October 13, 2021, and on October 29, 2021, Plaintiff received an outcome letter finding him not responsible for Stalking under the SMP. [Filing No. 1, at ¶¶ 115, 117].

### III.   PLAINTIFF'S CLAIMED DAMAGES

Plaintiff claims that because of Defendant's alleged breach of its contractual obligations, he "was subjected to an unnecessary, lengthy, expensive, and emotionally draining disciplinary process that failed to comport with Butler's promises to Plaintiff as an enrolled student and resulted in the waste of tens of thousands of dollars spent on advisors to guide Plaintiff through Butler's process." [Filing No. 1 at ¶ 142] Plaintiff further claims he was "subjected to essentially school-sponsored bullying and a hostile environment such that he was forced to vacate campus in the middle of

the spring 2021 semester and lose the benefit of his tuition, room and board fees to Butler." [Filing No. 1 at ¶ 143] Finally, Plaintiff claims he "suffered unchecked harassment leading to emotional distress, anxiety, and depression, and the breach by Plaintiff's future roommates of an already-executed lease agreement." [Filing No. 1 at ¶ 144]

## IV.   LEGAL CLAIMS PLAINTIFF SEEKS TO ASSERT

*1. Breach of Contract*

Plaintiff alleges that a contractual relationship existed between himself and Butler University by virtue of Plaintiff's enrollment and payment of tuition and fees. [Filing No. 1, at ¶ 146] Plaintiff asserts the University created express and implied contracts through dissemination and publication of its relevant policies, including its Sexual Misconduct Policy. [Filing No. 1, at ¶ 149] Plaintiff identified numerous written terms that he alleges the University violated in its handling of J.F.'s stalking complaint. In only relevant part, Plaintiff alleges the University violated:

a. A policy that conduct that falls outside of the University's definitions for sexual misconduct are adjudicated under the standard Student Conduct System, a less formal process with shorter timelines, by failing to properly screen complaint and classifying it as a stalking claim [Filing No. 1, at ¶¶ 124, 125, 150(a)];

b. A statement in the SMP that the University "aims to treat all parties and participants in this process fairly, equitably, and with respect," by over-redacting the investigatory record [Filing No. 1, at ¶¶ 130, 150(b)];

c. A statement in the SMP that Butler "aims to complete all investigations in a reasonably prompt manner," by unnecessarily expanding the investigation to include incidents involving students who had not filed any claims against the Plaintiff [Filing No. 1, at ¶ 131];

d. A statement in the SMP that, "All witnesses and parties are expected to provide true and accurate information. Should a witness or party willfully provide false information, they may be subject to disciplinary action," by not taking disciplinary action against B.P. for allegedly lying during the investigation [Filing No. 1, at ¶ 132];

e. The University's Campus Life Harassment Policy, which states, "Alleged harassment occurring between students, other than what is described in policies noted above, may result in referral to the University student conduct system," by not disciplining B.P. or J.F. [Filing No. 1, at ¶¶ 139, 140]; and

f. The University's Residence Life Community Standards and Rules, which state, "The Butler community expects mutual respect from all members. Residence Life staff members are trained to respond to emergency situations and conduct violations to maintain a safe and comfortable living environment for everyone," by holding a mediation where members of the friend group ganged up on the Plaintiff and insulted him [Filing No. 1, at ¶ 141].

*2. Unjust Enrichment*

Plaintiff alleges that he paid tuition, room and board fees, and various other costs and fees to Butler University for the Spring 2021 semester, for which Plaintiff was prevented from realizing the benefit of the bargain. [Filing No. 1 at ¶ 156] He alleges that because of the investigation under the Sexual Misconduct Policy and his feeling of being bullied and harassed, he was forced to leave campus in the middle of the Spring semester 2021, thereby losing the benefits of his payments. [Filing No. 1 at ¶ 157] Plaintiff baldly claims that "Butler has therefore been unjustly enriched by Plaintiff's various payments." [Filing No. 1 at ¶ 158]

## V.   **ARGUMENT**

### 1. **Breach of Contract**

In Indiana, "[t]he relationship between a university and its students is considered contractual in nature." *See Neel v. I.U. Bd. of Trustees*, 435 N.E.2d 607,

610 (Ind. Ct. App. 1982). The decisions of the Indiana appellate courts are "best characterized as recognizing an implied contract between the student and the university." *Neel v. I. U. Bd. of Trustees*, 435 N.E.2d 607, 610 (Ind. Ct. App. 1982). "The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Id*. Generally, written items made available to the students, such as school policies and student handbooks, become a part of the contract. *See Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)).

Simply pleading the existence of an implied contract between a student and a university is not enough to survive a motion to dismiss. To establish entitlement to a right or benefit under the implied contract, a student must "point to an identifiable contractual promise that the [university] failed to honor." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 574 (1972); *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) (student must "be specific about the source of this implied contract, the exact promises the university made to the student, and the promises made in return"). Moreover, to state a claim for breach of contract involving matters of discipline or academic achievement, in which courts have traditionally granted universities deference, *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) (*citing Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007)), *trans. denied*, a student must allege facts to support a showing that the university acted in arbitrarily or in bad faith. *See Chang v. Purdue Univ.*, 985 N.E.2d

35, 47 FN2 (Ind. Ct. App. 2013) ("bad faith is an element of a breach-of-contract claim by a student against a post-secondary institution that is premised upon a failure to adhere to university regulations pertaining to student disciplinary proceedings").

### a. *Plaintiff has failed to state a claim for breach of contract relating to the disciplinary proceedings because the University is not alleged to have acted arbitrarily or in bad faith.*

The allegations in the Complaint do not allege a breach of an implied contract related to educational instruction, services, or activities in exchange for tuition. Rather, the Complaint attempts to state a claim based on the University's investigation into allegations that Plaintiff violated the Sexual Misconduct Policy. Plaintiff contends that the University failed to follow its own internal policies and procedures for investigating claims under the Sexual Misconduct Policy. To state such a claim Plaintiff must allege that the University acted arbitrarily or in bad faith and breached a specific and definite term that was part of the offer and acceptance that forms the basis of the contractual nature of the relationship between Plaintiff and the University. He has failed to do so.

*Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) provides controlling Indiana law for the Court's analysis of this issue. *Amaya* involves a claim against a university for an alleged breach of an implied contract for failure to follow its internal policies and procedures for disciplinary misconduct

In *Amaya* the Plaintiff was a third-year medical student at Indiana University when, during a test, three professors observed Amaya look to his right at the paper of another student. *Id*. at 1237. Amaya denied that he cheated and stated he was merely looking at the wall clock on the right side of the room. *Id*. The chair of the

9

Student Promotions Committee (the "SPC ") wrote to Amaya and notified him that he had been accused of cheating and that, if true, his behavior constituted a serious breach of professionalism and a violation of the medical school's Honor Code. Amaya was advised that a hearing was scheduled, during which Amaya should appear and explain why he should not be dismissed from medical school "for failure to maintain acceptable professional standards." *Id*. Amaya was provided copies of written correspondence from the three professors wherein they each explained the basis of their allegations of cheating. *Id*. Prior to the hearing, Amaya was advised of the process for the hearing. *Id*. At the hearing, Amaya maintained that he was not looking at the other student's paper. *Id*.

Following Amaya's presentation, the SPC voted to table the matter so it could thoroughly review Amaya's information and then "deliberate with utmost seriousness and give due consideration to the evidence presented." *Id*. Over the next three weeks, instead of just considering the information from Amaya's presentation and the evidence already presented, the SPC directed additional written questions to the three professors, permitted Amaya to submit to the SPC Amaya's written responses to the Professors' additional comments, and conducted field tests by having members of the committee go to the testing location and sit in Amaya's seat while other members observed the difference between glances up at the clock and glances to a neighbor's paper. *Id*. The SPC concluded that the "field tests revealed that professors could easily distinguish between glances up at the clock and glances at another student's paper. *Id*. The SPC concluded "the preponderance of evidence support[ed]

the charge of ethical misconduct (cheating) during the [] exam on March 29, 2010." *Id.* at 1238. Pursuant to the medical school's Student Handbook, "Dishonesty of any kind with respect to examinations ... shall be considered cheating. It is the responsibility of the student not only to abstain from cheating but, in addition, to avoid the appearance of cheating...." *Id.* at 145. The SPC voted to recommend to the Dean that Amaya be "dismissed from medical school for failure to maintain acceptable professional standards." *Id.* at 144.

Amaya requested reconsideration, and a reconsideration hearing was held. Amaya presented additional testimony and documentation, but the SPC declined to reverse its earlier recommendation for dismissal. Amaya then appealed the SPC's recommendation to the Dean. Prior to meeting with Amaya, the Dean requested additional field tests at the testing site, which tests again revealed that the proctors "could tell what direction the accused was looking by eye movement alone." *Id.* The following month, the Dean met with Amaya and reviewed all the material submitted but concluded he would not reverse the SPC's recommendation. *Id.* Amaya was dismissed from Indiana University School of Medicine. *Id.*

Amaya filed a lawsuit against IU alleging (among other things) breach of contract and breach of good faith and fair dealing. The trial court granted summary judgment in favor of IU and Amaya appealed. "[T]he sole issue for our determination on appeal is whether the trial court erred when it entered summary judgment on Amaya's claim for breach of contract." Id. at 1239.

In reviewing the decision, the Court of Appeals started by accepting that the legal relationship between Amaya and IU was one of implied contract, and that "the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become part of the contract." *Id.* at 1240. "[A]lthough an implied contract exists between the student and the university, the nature of the terms vary:

> In the area of academic services, the courts' approach has been similar to that used with contracts conditioned upon the satisfaction of one party. The university requires that the student's academic performance be satisfactory to the university in its honest judgment. Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes academic freedom and provides an acceptable approximation of the educational expectations of the parties.

*Id.*

The court explained that "bad faith is not simply bad judgment or negligence, [r]ather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity" and that "[l]iteral adherence by a university to its internal rules will not be required when the process rests upon judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at." *Id.* The court succinctly stated, "In other words, the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Id.*

The Court found that IU substantially followed its procedures, and its decision to dismiss Amaya was not arbitrary, capricious, or made in bad faith. *Id.* Amaya's allegations that IU withheld evidence, misled him during the pre-hearing meeting, misled him during the hearing, inappropriately speculated regarding facts, and failed

to disclose the second field test were not sufficient to support a finding that IU acted in bad faith. *Id*. at 1242. Those allegations did not support an assertion that IU engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or that IU had "a state of mind affirmatively operating with furtive design or ill will." *Id*. The Court gave "judicial deference" to IU's process and conclusion and noted that "[c]ourts are ill-equipped to second-guess professional judgments that are non-arbitrarily arrived at." *Id*.

Like Amaya, Plaintiff complains that the University did not strictly comply with its procedures under a school conduct policy – there the Honor Code, here the Sexual Misconduct Policy. Like Amaya, Plaintiff does not allege any facts to support an assertion that the University engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or that the University had "a state of mind affirmatively operating with furtive design or ill will." *See Amaya*, 981 N.E.2d at 1242.

Amaya claimed IU withheld evidence, misled him, and failed to disclose the independent testing, and those allegations were not sufficient to support a finding of arbitrariness or bad faith. Here, Plaintiff alleges that the University failed to properly screen a complaint, take action against the student who submitted the complaint, take action against witnesses who participated in the investigation, ensure a safe and non-hostile living environment, and make the investigator (who had left the employment of the University) available at the hearing. Additionally, Plaintiff claims the University did not provide meaningful access to information, was not "reasonably

prompt" in completing the investigation, and failed to give proper notice of the hearing.

As was the case in *Amaya*, here Plaintiff's claims alleged failure to strictly comply with the procedures for investigating and arriving at a decision on each's alleged misconduct. As the Court explained in *Amaya*, a plaintiff cannot maintain a claim for breach of implied contract against a university for failures in the process of investigating and deciding allegations of misconduct absent alleged conscious wrongdoing with dishonest purpose, moral obliquity, or ill will.

Based on the allegations in Plaintiff's Complaint the University did not consciously do wrong because of dishonest purpose or moral obliquity, nor did it have act with furtive design or ill will. Absent factual allegations to support such bad faith on the part of the University, Plaintiff cannot maintain a breach of implied contract claim. Plaintiff's breach of contract claim should be dismissed for failure to state a claim.

### b. A breach of contract claim cannot be based on indefinite, aspirational or discretionary statements.

Even if Plaintiff's breach of contact claim was not subject to dismissal for failure to alleged bad faith, Plaintiff's breach of contract claim would nonetheless fail for failure to identify specific or definite terms or promises that the University allegedly breached. The University cannot be liable for breach of contract based on alleged failures to follow nonexistent, discretionary, or aspirational terms of its policies and procedures.

To establish entitlement to a right or benefit under the implied contract, a student must "point to an identifiable contractual promise that the [university] failed to honor." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 574 (1972); *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) (student must "be specific about the source of this implied contract, the exact promises the university made to the student, and the promises made in return").

Here, Plaintiff has not pled the existence of any specific contractual promises obligating the University to:

- Screen student misconduct complaints or adjudicate complaints under any specific process;

- Provide an unredacted investigatory record to parties in a proceeding for alleged sexual misconduct;

- Conduct a sexual misconduct investigation in a specific timeframe;

- Limit the scope of its sexual misconduct investigations;

- Provide certain training to Residence Life staff members;

- Provide living environment free of conflict; or

- Take disciplinary action against students for their statements in a disciplinary process.

It makes sense that the University has not made specific promises to take the above actions. Each requires the use of the University's subjective, professional judgment to best address the facts and circumstances of a situation. Out of deference

to this professional judgment, "courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Castelino v. Rose-Hulman Inst. of Tech.*, 999 F.3d 1031, 1040 (7th Cir. 2021) (internal quotations omitted).[1] Because the University has not made specific promises to the Plaintiff to take the above actions, its decisions throughout the course of investigating the sexual misconduct complaint cannot provide grounds for breach of contract.

Plaintiff does not identify any contractual promise for his claim that the University breached its contract with him because it did not properly "screen" J.F.'s stalking complaint and then adjudicated the complaint under the Sexual Misconduct Policy. As asserted by the Plaintiff:

(1) alleged conduct that falls within Butler's definitions for sexual misconduct is adjudicated under the investigation and adjudication process set forth in the SMP [Filing No. 1, at ¶ 123];

(2) stalking is one type of conduct that falls within the SMP's definitions for sexual misconduct [Filing No. 1, at ¶ 126]; and

(3) J.F.'s complaint against Plaintiff was for stalking. [Filing No. 1, at ¶ 5].

Plaintiff points to no written policy or statement by the University that it would do any kind of threshold review or screening of a complainant's allegations to determine which adjudication process to use. Again, absent a specific promise by the University, courts do not "second-guess[] the professional judgment of the University faculty on

---

[1] Indeed, even if a university does fail to follow specific and explicit provisions of its rules and policies regarding disciplinary proceedings, a student must show that the university acted illegally, arbitrarily, capriciously, or in bad faith before the university can be held liable for its exercise of professional judgment. *Chang v. Purdue University*, 985 N.E.2d 35, 47 (Ind. Ct. App. 2013).

academic matters." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Ross*, 957 F.2d at 415). Thus, as a matter of law, the University did not breach its implied contract with the Plaintiff by employing the processes outlined in the SMP to investigate and adjudicate J.F.'s stalking complaint.

Plaintiff also fails to identify any contractual obligations the University breached during the Residential Life staff's preliminary handling of the friend group's issues, wherein the other members of the friend group "ganged up" on the Plaintiff. [Filing No. 1, at ¶ 141]. The alleged statement in the Residence Life Community Standards that, "The Butler community expects mutual respect from all members," simply relays an expectation of students. The University cannot make promises dependent on the actions of those outside its control. The subsequent statement, "Residence Life staff members are trained to respond to emergency situations and conduct violations to maintain a safe and comfortable living environment for everyone," is merely a statement of fact regarding the training of Residence Life staff members. Neither statement provides a basis for the University's Residential Advisors' conduct when attempting to resolve student conflict constitute a breach of contract.

Plaintiff seeks to rely on statements in the SMP that which explain Butler "aims" to meet certain standards. Aspirational statements such as these are not terms of the implied contract between a university and its students. *See Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1064 (N.D. Ill. 2021) (holding that only a university student handbook's "specific promises become part of the contract, not its

expressions of intention, hope or desire") (internal quotations omitted). Expressions of intention must be distinguished from definite and concrete promises. *Id*. Plaintiff has not pled that the University made definite or concrete promises regarding its practices in redacting an investigative file or in determining the scope of an investigation.

Additionally, the policy statements at issue contain only subjective standards for the University's conduct: One statement expresses an aim to treat students "fair, equitably, and with respect," and the other, an aim to complete investigations in a "reasonably prompt" manner. There are no objective means for a court to determine whether the University complied with these policy statements. Rather, the Court would be required to make its own subjective determinations of whether the University lived up to its goal statements. Thus, public policy does not support an interpretation of these types of statements as contractual promises by a university to its students.

Similar to aspirational statements, statements that use the word "may" are not definite or concrete. They give the University discretion to take a specified action—or not. *See, e.g., Tsuruta v. Augustana Univ., No. 4:15-CV-04150-KES*, 2015 WL 5838602, at *7 (D.S.D. Oct. 7, 2015) (holding that the decision of a school to exercise discretion afforded by policy in student handbook was not a violation of that policy). Here, the two discretionary policy statements Plaintiff identifies as contractual "promises" state:

> All witnesses and parties are expected to provide true and accurate information. Should a witness or party willfully provide false information, they ***may*** be subject to disciplinary action;

and,

> Alleged harassment occurring between students, other than what is described in policies noted above, ***may*** result in referral to the University student conduct system.

(emphasis added). Plaintiff alleges the University violated these provisions when it did not discipline B.P. or J.F. for allegedly false statements they made during the University's stalking investigation. However, the use of "may" means the University was not *required* to take disciplinary action; it simply could if it found the circumstances appropriate. Moreover, these provisions have nothing to do with the University's relationship with the Plaintiff. Plaintiff has no contractual right, implied or otherwise, to another student's discipline.

In any case, even if an implied right to another student's discipline did exist, Plaintiff does not allege that he ever reported harassment by B.P. or J.F. to the University. Plaintiff alleges that in an email to the Dean of Students requesting a new room assignment, he stated, "The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment." [Filing No. 1, at ¶ 71]. He further alleges that his mother reached out to the Dean of Students "to report the bullying and harassment," and that he reached out to his professors and Dean Dwizlik, "advising that he was struggling to stay on top of his coursework due to the devastating social situation he was going through." [Filing No. 1, at ¶ 73]. At a meeting with the University Title IX Coordinator, according to

Plaintiff's allegations, his own complaints were "quickly tossed to the side." [Filing No. 1, at ¶ 77]. At no point does Plaintiff allege he reported that B.P. and J.F., specifically, had harassed or bullied him. The University cannot take disciplinary action for conduct of which it has no knowledge. Such failure to act cannot provide a basis for a breach of contract claim.

### 2. Unjust Enrichment

Plaintiff's unjust enrichment claims fails as a matter of law. No such claim exists where there is a contract, and as established above, the relationship at issue is contractual in nature.

"Unjust enrichment operates when there is no governing contract." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024–25 (Ind. Ct. App. 2001). "A claim for unjust enrichment "is a legal fiction invented by the common law courts in order to permit a recovery ... where the circumstances are such that under the law of natural and immutable justice there should be a recovery ..." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (citation omitted). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id.* (*quoting* RESTATEMENT OF RESTITUTION § 1 (1937)). "To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 220 (Ind. 2009)

Here, Plaintiff has pled the existence and enforceability of an implied contract. Based on the face of Plaintiff's Complaint, the implied contract purportedly governs the same relationship and alleged conduct that is at issue in his unjust enrichment

claims. [Filing No. 1, at ¶¶ 155-159] His breach of contract and unjust enrichment claims are founded on the same facts. [Filing No. 1, ¶ 155] (incorporating by reference breach of contract allegations into his unjust enrichment claim). In both claims, Plaintiff alleges that he paid tuition based on an implied contract. If the contract does not support his claim, Plaintiff cannot rely on equitable theories of unjust enrichment to fill in missing terms. *See Zoeller*, 904 N.E.2d 213, 221 (Ind. 2009) ("The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract." (*quoting Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992))); *See also Amaya*, 981 N.E.2d at 1240 (noting that the law is clear that "the legal relationship between a student and a university [i]s one of implied contract"). Based on his own factual allegations, Plaintiff's sole remedy is his breach of contract claim, even if that contract does not actually entitle him to the relief he seeks.

## VI.   CONCLUSION

Plaintiff's Complaint fails to state a claim upon which relief can be granted for breach of contract or unjust enrichment. Plaintiff's entire action against Butler should be dismissed for failure to state a claim, and for all other appropriate relief.

Respectfully submitted,

*Liberty L. Roberts*
Liberty L. Roberts, Atty. No. 23107-49
Cassie N. Heeke, Atty. No. 36497-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060

Attorney for Defendant Butler University

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November 2022, a true and exact copy of the foregoing was filed electronically via the Court's Electronic filing system. Notice of this filing was sent to the following persons by operation of the Court's Electronic filing system.

Jonathan Little
Gabrielle Olshemski
SAEED & LITTLE, LLP
133 W. Market Street #189
Indianapolis, IN 46204
jon@sllawfirm.com
gaby@sllawfirm.com

Stuart Bernstein
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
sbernstein@nmllplaw.com

*Attorneys for Plaintiff John Doe*

*Liberty L. Roberts*
Liberty L. Roberts

CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
T:  (317)773-2190 / F:  (317)773-5320
LRoberts@cchalaw.com
CHeeke@cchalaw.com