Maria Kanger
August 4, 2023

1

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA

CIVIL ACTION NO. 1:22-cv-01828-SEB-MG

JOHN DOE,                )
                         )
     Plaintiff,          )
                         )
V.                       )
                         )
BUTLER UNIVERSITY,       )
                         )
     Defendant.          )

　　　　Deposition by Zoom of MARIA KANGER, a witness who appeared remotely before me, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, taken on behalf of the Plaintiff, with all parties appearing via Zoom, taken on August 4, 2023, commencing at 10:00 a.m., pursuant to all applicable rules, with Notice as to the time and place thereof.

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, IN 46184
(317) 345-6179
vfillenwarth@gmail.com

Maria Kanger
August 4, 2023

### Page 30

1   sure.
2   Q.  Okay. Did you initiate the informal resolution
3       process at Indiana University?
4   A.  I don't believe I did. If I recall correctly,
5       the Indiana University policy was a systemwide
6       policy that was developed at the Indiana
7       University system level, and we were able to
8       have input into that policy, but it was created
9       elsewhere.
10  Q.  Was Brian Tomlinson -- did he author that
11      policy?
12  A.  I don't believe he authored that policy, no.
13  Q.  Okay. Did he have -- did you discuss the
14      informal resolution process at Butler with
15      Brian Tomlinson?
16  A.  I don't believe I did. I would consult with
17      others. And by networking, we would talk with
18      other professionals about policies and that
19      sort of thing. And Brian was among them from
20      time to time, although not as much because he
21      had moved on from higher ed. But I don't
22      recall specifically if I had talked to him
23      about informal resolution.
24  Q.  All right. So when this letter went out, this
25      notice of allegation letter went out, did

### Page 31

1       the -- you had already -- well, strike that.
2           Generally speaking, when a notice of
3       allegation letter was sent out, when you were
4       at Butler, the Title IX investigative process
5       had already started? You had decided I'm going
6       to investigate this?
7           MS. ROBERTS: Hold on. Objection to form
8       and foundation.
9           Maria, you can --
10          THE WITNESS: I can answer?
11          MS. ROBERTS: You can answer, if you
12      understand.
13  A.  Okay. So I think if I'm hearing what you're
14      saying -- I guess what you're asking is when a
15      letter -- when a notice of allegations is sent,
16      typically an investigation would follow. Is
17      that kind of what you're asking?
18  Q.  Yeah, let me ask you this: Did people ever
19      come into your office and -- when you were at
20      Butler, in your role you described earlier, did
21      students ever make allegations to you and you
22      didn't even send out a notice of allegation
23      letter? Like they just -- you just said, pfft,
24      this is nothing, even if it's all true, it's
25      not something that rises to the level of

### Page 32

1       warranting your investigation?
2   A.  Yes, I believe I have done -- I did that when I
3       was in that role. I can't -- I wouldn't be
4       able to give you numbers of times or things
5       like that, but I believe that that had happened
6       from time to time.
7   Q.  Okay. And that was just based on your
8       discretion that none of the alleged conduct,
9       even if it's true, violates the policy of
10      Butler University, right?
11  A.  Right.
12  Q.  And then -- but if you took the time to write
13      up a notice of allegation letter, then, in your
14      mind, at least, if this -- if this stuff is --
15      these allegations are true, that this warrants
16      going through the process at Butler University?
17  A.  I would say if it were to move forward with a
18      notice of allegations -- and again, there were
19      differences in process, based on requirements
20      that came after the 2020 regulations, so I
21      can't recall all specifics, but, typically, if
22      a notice of allegations was sent, it was
23      because I had made the determination that what
24      was alleged rose to the level of a potential
25      policy violation. There was no decision made

### Page 33

1       on and it was not my role to decide whether the
2       policy was violated. It was just a decision
3       that there was the potential there.
4   Q.  Okay. And if you felt there was a potential
5       for a policy violation, you know, if the
6       allegations were true, then you initiated the
7       Title IX process. Your notice of allegation
8       letter kicked off the Title IX process for the
9       alleged perpetrator?
10  A.  For the respondent, yes, it initiated the
11      process.
12  Q.  Okay. Now, let's take a look at the -- at your
13      letter there, specifically, paragraph 2, the
14      second paragraph.
15  A.  Okay.
16  Q.  And let's go through these. Where it starts,
17      "It is alleged that you (respondent)," do you
18      see that?
19  A.  I do. I just don't know if you know that your
20      camera is off.
21  Q.  Oh, yeah, because I pulled the letter up on the
22      screen. I'm sorry.
23  A.  Oh, gotcha. Okay, sorry.
24  Q.  Yeah, I'm using an iPad. I'm sorry.
25  A.  No. Sorry, I just wanted to make sure you

Maria Kanger
August 4, 2023

**Page 34**

1     knew. But you said the second paragraph that
2     said "It is alleged"?
3   Q. Right, "It is alleged."
4   A. Yeah, okay, I'm there.
5   Q. So these are the allegations that J.F. made
6     against [redacted], right, and, you know, you
7     may have paraphrased, but that's -- these are
8     the allegations, right?
9   A. Right.
10  Q. So let's go through them. And I want you to
11     tell me if they are true or, you know, if they
12     were -- turned out to be true, what it
13     violated, right? So tracking -- I guess the
14     first one would be "Tracking her location via
15     social media throughout the course of your
16     friendship." Do you see that?
17  A. Uh-huh.
18  Q. What did you mean by that?
19  A. So what I will say is that, again, the
20     information that's found in here did not come
21     from me, it came from what the complainant
22     shared with me. And so it would be what she
23     meant by that. And at the time of the report,
24     if I recall correctly, I believe she was saying
25     that the respondent would follow her friends --

**Page 35**

1     her, specifically, I believe is what she
2     alleged, but, again, I can't recall exactly,
3     through social media, would figure out where
4     she was.
5   Q. And what would that have violated in -- what
6     policy of Butler University would that have
7     violated?
8   A. So in this particular situation, with these
9     particular notice of allegations and the
10     alleged policy violation, later on in the
11     letter it states that the alleged violation was
12     stalking. And so with stalking cases, it is --
13     it is kind of a culmination of a course of
14     conduct. It's more than one instance. So that
15     tracking, plus the other things that are
16     included in this notice of allegations would
17     make up that course of conduct.
18  Q. Do you remember what J.F. told you about [redacted]
19     [redacted] tracking her location?
20  A. I don't remember exactly, I believe there
21     was -- this is what I recall. I don't know if
22     this is exactly correct, but this is what I
23     recall, is that she had said that he had seen
24     where she and a friend was through, I believe,
25     a friend's post on Snapchat and used that

**Page 36**

1     information to go where they were.
2   Q. Okay. And if that was true, that would be a
3     violation of Butler's stalking policy?
4   A. So like I said, with stalking, when you're
5     looking at potential policy violations, you're
6     looking at a course of conduct. So that was
7     one piece of the alleged course of conduct that
8     could potentially rise to the level of
9     stalking.
10  Q. Okay. Let's go after this semicolon.
11     "Watching from the window of your POD to see
12     'when members of J.F.'s pod were at Fairview,
13     come and go'." Okay, so that's her language,
14     right, that's J.F.'s language?
15  A. Uh-huh. I believe so, yes. I believe that
16     anything in quotation marks would have been her
17     language.
18  Q. Okay. And so that -- this allegation, if I
19     understand it, and please correct me if I'm
20     wrong, she's alleging that [redacted] would
21     watch from his dorm room for her and her pod
22     mates to come and go?
23  A. Yes, I believe that's what this is saying.
24  Q. Is that stalking?
25  A. So, again, when we're talking about stalking,

**Page 37**

1     we are looking at a course of conduct, and so
2     we're looking at multiple pieces, and so that's
3     what's included here in this notice of
4     allegations is sort of the culmination of an
5     alleged course of conduct.
6   Q. Okay. And then "Entering the general" -- so
7     semicolon, so a new allegation. "Entering the
8     'general area' of complainant's pod on multiple
9     occasions while she and her roommates were not
10     present." Do you see that?
11  A. Uh-huh.
12  Q. "'Searching' for them; and entering" -- oh,
13     "'Searching' for them;" -- so we won't go past
14     that. So tell us about that allegation from
15     what you recall?
16  A. From what I recall, I believe complainant was
17     saying that she was aware that respondent was
18     going into -- I believe the way the pods are
19     set up, again, from what I can recall in
20     Fairview is that there's a common area and then
21     bedrooms off of that common area.
22         And from what I can recall of
23     complainant's allegations, she was alleging
24     that respondent would go into that common area
25     when nobody in the pod was present to see if

10 (Pages 34 to 37)

Maria Kanger
August 4, 2023

**Page 38**

1  they were there, I believe is my -- that's my
2  recollection of what she shared.
3  Q. And [redacted] lived in the same dorm, right?
4  A. Right, yes, as I recall.
5  Q. Okay. And then semicolon: Entering the
6     individual's room without her permission and
7     using the bathroom, do you see that, while she
8     wasn't there?
9  A. Uh-huh.
10 Q. Tell us what you remember about that.
11 A. From what I can recall, I believe complainant
12    had alleged that she had shared with pod mates
13    and friends that she was particularly nervous
14    about people being in her space without her
15    being there, without permission, because she
16    had had a prior experience with, I think, a
17    cabin of her family, something along those
18    lines, had been broken into. And so she felt a
19    heightened sense of awareness when people were
20    in her space without permission.
21         And I believe, if I'm recalling
22    correctly, she had also shared that she wanted
23    to limit the people who used her bathroom and
24    had said I think maybe -- I can't recall
25    exactly, but I think maybe a couple of female

**Page 39**

1     friends and her boyfriend could use the
2     bathroom, but had made clear that she didn't
3     want anybody else using her bathroom. That's
4     what I can recall of the allegations.
5  Q. Let's go back to that social media post. Is it
6     your understanding, now, that that social media
7     post was a general post? It was generally I'm
8     at X locat- -- you know, a picture of me at X
9     location, right, that was the post?
10 A. From what I can remember, yes.
11 Q. Okay. So I just -- let me see if I can get
12    back on the camera here. Hold on. I just want
13    to be clear. At this point we've launched an
14    investigation because my client -- and for
15    purposes of this conversation, taking it as
16    true, so all public social media posts where
17    his friends were and went to that location,
18    watched for people who lived near him who were
19    his friends coming and going from the dorm,
20    went into their common area without their
21    permission, and one time used a woman's
22    bathroom when she wasn't there, correct?
23         MS. ROBERTS: Objection as to the form.
24         Go ahead, Maria, you can answer.
25         MR. LITTLE: Go ahead.

**Page 40**

1  A. Okay. So what I would say is those are part of
2     the allegations. So the -- in the letter, it
3     also contains additional information regarding
4     complainant's expectations, regarding entering
5     her space, and also boundaries had been
6     expressed to the respondent in terms of -- I'm
7     looking at the letter. Like hours that they
8     could visit -- he could visit their room, those
9     types of things. So that was also included in
10    that notice of allegations.
11 Q. Even if all of this is true, right, like this
12    seems really petty to me, but maybe I'm missing
13    something, why does this involve an
14    investigation -- why does this warrant a Title
15    IX investigation? Why not just say: Stay away
16    from the room, here's the letter, you're not to
17    go near Susie Smith's room?
18 A. So part of the sexual misconduct process is if
19    it's determined -- and so, again, that notice
20    of allegations contains several paragraphs that
21    sort of lays out how potentially this could
22    have been a violation of the policy. And,
23    again, it was not my role to determine whether
24    it was, it was just is it possible. And part
25    of that is -- a part of the process is the

**Page 41**

1     complainant has the option to determine if it's
2     decided that, yes, potentially there's a
3     violation here, they have the option to
4     determine how they would like to resolve the
5     case.
6          And if I recall correctly in this
7     particular situation, the complainant
8     determined that they would like to resolve the
9     case with a formal process.
10 Q. It seems to me the formal process is like a
11    ridiculous amount of overkill for these
12    allegations, even if they're true. Was there
13    anything that Butler could have done short of
14    an informal process here -- or strike that.
15         MS. ROBERTS: Objection as to form.
16    BY MR. LITTLE:
17 Q. Was there anything Butler could have done,
18    short of the formal investigation -- the
19    investigative Title IX process, was there
20    anything Butler could have done short of the
21    informal Title IX investigative process in this
22    situation?
23 A. So I want to clarify. I think you said
24    informal invest- -- did you mean formal
25    investigation?

42

1  Q.  I feel like Mitch McConnell, I can't even --
2      all right, so here we go.  I'm like freezing
3      up, not remembering.
4          Short of the formal investigation that
5      Butler did, was there anything else Butler
6      could have done, you know, not to that level?
7  A.  Sure.  Oh, okay, now I'm clear on your
8      question.  Thank you.
9  Q.  I'm sorry.  That was a terrible question.
10 A.  No, that's okay.  So the option was offered to
11     both parties, and I believe it was stated in
12     this letter as well, that there was an option
13     available for informal resolution, but both
14     parties needed to agree to that.
15 Q.  Okay.  Can you tell me what was alleged here --
16     what about what was alleged here when you made
17     the decision to go ahead with the formal Title
18     IX process, what -- which of these allegations
19     did you think warranted -- actually, let me
20     back up.
21         Okay.  Can you describe the Title IX
22     process at Butler?  We've got to the point
23     where you decide to send out this notice of
24     allegations.  What happens next?
25 A.  What happens once the notice of allegations is

43

1      sent?
2  Q.  Yeah.
3  A.  If I recall correctly, and it's been a little
4      while since I've done the process, but if I
5      recall correctly, the next step -- so notice of
6      allegations would happen, and then a meeting
7      would take place with the respondent to make
8      sure that they were aware of what to expect in
9      the process, what their rights were in the
10     process, those types of things.  And then from
11     there, an investigator would be appointed to
12     investigate the case.  Each party would have
13     the opportunity to object to the appointment of
14     the investigator if they felt there was a
15     conflict of interest or bias on the part, I
16     believe is the wording, I can't recall exactly,
17     something along those lines.  And then if there
18     was no objection to the investigator, then an
19     investigation would begin.
20 Q.  And then the investigation, what does the
21     investigation entail?
22 A.  So with the investigation, each party would be
23     provided the opportunity to meet with the
24     investigator.  They could have an advisor
25     present with them if they would like.  And they

44

1      could share as much or as little information
2      with the investigator that they wanted to
3      share.  And then they could also provide names
4      of witnesses that they would like the
5      investigator to talk to and any sort of other
6      information that they wanted to provide.
7      Sometimes that would be, just as examples, like
8      screenshots of text messages, social media
9      posts, that type of thing.
10 Q.  Okay.  And then would the investigator -- would
11     the next step be the investigator issue a
12     report?
13 A.  Yes.  Once the investigation was complete, they
14     would create a report that both parties could
15     review and respond to.
16 Q.  And in this case, was a report created?
17 A.  Yes.
18 Q.  So an investigation was conducted and a report
19     was created?
20 A.  Correct.
21         (WHEREUPON, Deposition Exhibit 2 was
22     marked for identification.)
23         MR. LITTLE:  Can you put up what I'd like
24     to mark as Exhibit 2, which is the final
25     investigative report?  It was 102, Libby, in

45

1      your -- you had it as Exhibit 102.
2          MS. ROBERTS:  Thank you.  I know it's a
3      long document.  I'm going to drop it in the
4      chat, too, you in case it's easier for Maria.
5          MR. LITTLE:  Yeah, just drop it in the
6      chat.
7      BY MR. LITTLE:
8  Q.  I guess the first thing I want you to do,
9      Ms. Kanger, is look at it and make sure
10     that's -- this is the report.
11 A.  (Witness complied with request.)
12 Q.  My first question is:  Do you know who wrote
13     it?
14 A.  I believe it was Kody Rother who wrote it.
15 Q.  Okay.  And who's Kody Rother?
16 A.  He, at the time, was -- I think at the time his
17     title was associate dean of students or
18     assistant dean, I can't remember which one, but
19     he was the investigator for the case and his
20     role was to investigate sexual misconduct cases
21     at Butler.
22 Q.  And so during the course of the -- and did you
23     review his report when you worked at Butler?
24 A.  I did.
25 Q.  Okay.  And during the course of the

<br>

62

1    students, right?
2  A. The charge of our office was, as a whole, to
3     prevent and address sexual misconduct, and
4     within our definition, that was included, yes.
5  Q. And in your time at Butler University, being
6     picked on or harassed for being gay, that could
7     have been sexual harassment, right? That could
8     have violated the sexual misconduct policy?
9  A. Yes, I believe so, yes.
10         MR. LITTLE: All right. Can I have five
11    minutes? I'm going to talk to Regina, but I
12    think I'm pretty close to being done, if that's
13    all right with everybody.
14         MS. ROBERTS: Okay.
15         (WHEREUPON, at this time a brief recess
16    was taken.)
17     BY MR. LITTLE:
18  Q. Go ahead.
19  A. So you had asked if the policy had violated --
20    if sexual harassment or harassment on the basis
21    of sexual orientation had violated the policy.
22    And the answer is yes, but I just wanted to
23    make sure and reiterate there was a moment --
24    there was a point in time, and I can't say
25    exactly how long, that that piece regarding

63

1     sexual -- the discrimination on the basis of
2     sex and gender was not in there, and so -- but
3     at no point in time was there a thought that it
4     wasn't prohibited. It just had been
5     accidentally omitted from the policy. So I
6     just wanted to clarify and caveat that.
7  Q. Okay. So you talk about earlier -- thank
8     you -- Kody -- or not Kody. You talked about
9     earlier you going to trainings where spotting
10    signs of sexual harassment based on sexual
11    orientation were discussed, right? Remember
12    that?
13  A. Yes.
14  Q. Did Kody go to those trainings?
15  A. I know he did go to some trainings. I can't
16    recall exactly which ones he went to, but he
17    would have gone to training.
18  Q. And trainings where that would have been
19    discussed?
20  A. I would assume so, but I can't say for sure
21    because I wasn't the one at that training, but,
22    yes, I would assume so.
23  Q. Did you ever go to trainings with Kody either
24    at Indiana or at Butler?
25  A. I can't recall at IU. I can't remember if

64

1     there was a time where we would have gone to
2     both -- that we would have been there at the
3     same time, I can't remember. And then I can't
4     recall whether Kody was able to attend the
5     Cozen O'Connor training at the same time I was,
6     so I don't know. I can't remember.
7  Q. Okay. Now, if you or if you invest- -- strike
8     that.
9         If you or Kody or people in the Title IX
10    department at Butler had seen signs of sexual
11    orientation-based harassment, you could have
12    initiated an investigation on your own, whether
13    or not the participant wanted to, right?
14  A. So I'm trying to recall what the policy and
15    process was at that point in time. I will
16    caveat this with I don't remember exactly. But
17    I would say that it would be difficult to move
18    forward without a complainant, because at the
19    time, I believe -- and I can't remember when
20    the cross-examination piece went away, but for
21    at least some time, there was a provision in
22    the Title IX regulations that said information
23    provided by someone couldn't be considered
24    unless they submitted themselves to
25    cross-examination in a hearing. So it would be

65

1     difficult to move forward without a
2     complainant.
3  Q. Okay. But, in fact, Butler has moved forward
4     in Title IX investigations without a
5     complainant, correct, without a complainant's
6     participation?
7         MS. ROBERTS: Objection as to form and
8     foundation.
9         You can answer, Maria.
10    BY MR. LITTLE:
11  Q. Let me ask a better question. She's right.
12        Has Butler ever, to your knowledge -- or
13    strike that.
14        When you were at Butler, did Butler ever
15    proceed with a Title IX investigation without
16    the cooperation of the complaining party?
17  A. I can't recall.
18  Q. Okay. In the case of the Scooby Johnson, did
19    Butler move forward with a Title IX
20    investigation without the participation of
21    Mr. Johnson?
22  A. Yes. Yes, now that you mention that, I do
23    remember that, yes, we moved forward on that
24    one.
25  Q. Okay. And, in fact, the responding party

Maria Kanger
August 4, 2023

**66**

1  didn't participate either, did she?
2  A. I don't believe so, to my recollection.
3  Q. Okay. So, then, can Butler do an investigation
4     of sexual orientation -- or could, you know,
5     when you worked there -- could Butler have done
6     an investigation of sexual orientation-based
7     harassment without the participation of a
8     complaining party?
9  A. Yes, it was possible to do so.
10 Q. Okay. And if Butler -- when you were at
11    Butler, if you became aware that students were
12    abusing the Title IX process, could Butler have
13    investigated students for abuse of process?
14 A. I believe it would have been possible, I can't
15    say for sure, you know, whether that would have
16    been under the sexual misconduct policy or
17    under the code of student conduct where that
18    would fallen.
19        Whenever looking at allegations or
20    concerns that someone is abusing the process,
21    the other -- that concern also has to be
22    balanced with making sure that any
23    investigation brought towards a complainant is
24    not retaliatory in any sense.
25 Q. Okay. In this case, did Butler consider or did

**67**

1     you consider J.F.'s actions to be retaliatory
2     or abusive to the process?
3  A. So I will clarify, when I spoke about
4     retaliation, what I meant was being mindful
5     that allegations of abuse of process brought by
6     a respondent was not retaliatory towards the
7     complainant for making a report.
8        In this particular case, to my
9     recollection, I believe the respondent met with
10    me and said that the only -- as I had said
11    before, the only reason he could think of that
12    he -- that this report was being brought was
13    because of his sexual orientation, and that --
14    but there was no other type of conduct on the
15    part of complainant that let to that conclusion
16    that I recall him saying.
17       And what I believe -- again, this is to
18    the best of my recollection, what I believe I
19    said to him was that if it became clear at some
20    point that the process was being abused and
21    used for that purpose, that there could
22    potentially be an investigation into that.
23 Q. Did you do an investigation into that?
24 A. We did not. At least as far as I know, at
25    least when I was there.

**68**

1  Q. Did you do any investigation into whether or
2     not _____ was being harassed -- or strike
3     that -- was being -- let me ask you this: Did
4     you do anything to investigate whether or not
5     _____ was being harassed because he was
6     gay?
7  A. We did not have a formal investigation into
8     that.
9  Q. Any informal investigation into that?
10 A. Like I said, I spoke with the respondent about
11    his concerns and that was what we had talked
12    about. But to the best of my recollection,
13    there wasn't no -- other conversations about
14    that.
15 Q. So when _____ told you he thought -- or he
16    couldn't think of any other reason why he was
17    being accused of these things, other than his
18    sexual orientation, did you take any steps to
19    follow up on that?
20 A. So like I said when he talked with me about
21    that, I asked additional questions of him to
22    see, you know, if there was anything else that
23    would provide a basis for that -- that sort of
24    concern or that -- what led him to conclude
25    other than he could not think of why someone

**69**

1     would bring a report against him, and he said
2     that -- again, this is to the best of my
3     recollection. He said that he had no reason,
4     other than this, to believe that there was any
5     sort of discrimination towards him for being
6     gay, and that the complainant had seemed to
7     like his boyfriend.
8        They, I think -- someone at some point, I
9     can't remember if it was the complainant or
10    respondent, said that they had gone on double
11    dates and things. So other than him not
12    understanding why this report was filed, he did
13    not provide information that would indicate
14    there was any concern with his sexual
15    orientation.
16 Q. Okay. And just some background questions. You
17    went to Notre Dame for undergrad?
18 A. I did.
19 Q. Did you go to Catholic high school?
20 A. I did.
21 Q. Which high school?
22 A. St. Francis DeSales in Columbus, Ohio.
23 Q. Okay. And then you went to Notre Dame for law
24    school?
25 A. I did.

Maria Kanger
August 4, 2023

### Page 70

1  Q.  Did you have Amy Coney Barrett as a professor?
2  A.  I did.
3  Q.  Okay. I heard she was actually a pretty good
4      professor. Anyways...
5          I think -- I mean, do you have any
6      opinions that homosexuality is a -- on
7      homosexuality or its sinfulness or anything
8      like that?
9          MS. ROBERTS: Objection as to relevance.
10 A.  So I'm assuming I can answer that question?
11     BY MR. LITTLE:
12 Q.  Correct.
13         MS. ROBERTS: You can.
14 A.  Okay. So I'll say a couple of things. So,
15     number one, my opinions were not relevant at
16     any point when I was Title IX coordinator.
17     That was not my job. I was trained very, very
18     well that neutrality and objectivity was the
19     name of the game and that my personal opinions
20     do not matter.
21         That being said, while I believe your
22     implication is that I belong to a religion or
23     at least go to schools affiliated with a
24     religion, that have views of homosexuality as
25     sin, I would say that I do not share those

### Page 71

1      views.
2          And I would also say that my -- I have a
3      sister-in-law who's married to a woman and we
4      are very close with them.
5          So all of that to say, again, I cannot
6      reiterate more strongly that in my role as
7      Title IX coordinator, personal opinions did not
8      matter. But because you asked, that's what I
9      will share.
10         MR. LITTLE: Okay. I'm just texting
11     Regina, hold on. I don't think I have anything
12     else. Okay. I don't have anything else.
13         MS. ROBERTS: Okay. Maria, I have some
14     questions for you. I'm going to drop in the
15     chat what has previously been identified as
16     Exhibit 112.
17         Jon, do you have that -- access to that
18     or do you -- well, I guess it's in the chat.
19     You'll be able to open that, too, right?
20         MR. LITTLE: Yeah. But can we mark it
21     Exhibit 7 for this deposition for sanity's
22     sake, right?
23         MS. ROBERTS: I appreciate that. I can't
24     remember who our judge is.
25         MS. FEDERICO: I can send it to Jon as

### Page 72

1      well.
2          MR. LITTLE: No, I got it right here in
3      front of me. I wanted to try to keep these
4      numbered in a logical sequence, but that --
5      yeah, it's not -- this is not Magnus-Stinson,
6      but that's how she would number it, I know
7      that.
8          MS. ROBERTS: And that's why I was trying
9      to remember who our judge was --
10         MR. LITTLE: I don't remember who it is,
11     but I know it's not her.
12         MS. ROBERTS: -- who -- if we were
13     required to keep them.
14         MR. LITTLE: Okay.
15         MS. ROBERTS: I'm fine with numbering
16     that as 7, yes.
17         MR. LITTLE: Okay.
18         (WHEREUPON, Deposition Exhibit 7 was
19     marked for identification.)
20     CROSS-EXAMINATION,
21     QUESTIONS BY MS. ROBERTS:
22 Q.  And, Maria, do you see the document that we're
23     labeling as Exhibit 7?
24 A.  Yes.
25 Q.  Have you seen a document in this format before?

### Page 73

1  A.  I don't know that I've seen it in this exact
2      format. It looks like it's -- based on what
3      it -- just based on sort of the heading, it
4      looks like it was potentially pulled from the
5      Advocate system, but...
6  Q.  And is the Advocate -- I'm sorry, go ahead.
7  A.  But I don't think I've seen it in this exact
8      format before.
9  Q.  Okay. In the -- is the Advocate system a
10     software that you use to keep track of
11     information during Title IX or sexual
12     misconduct investigations?
13 A.  Yes.
14 Q.  And is the document we're looking at notes that
15     you made in that system as a result of a --
16     whether it's a phone call or -- I'm sorry, it
17     appears to be a Zoom meeting with ▮▮▮▮?
18 A.  Yes, that's what this looks like.
19 Q.  Okay. And when you gave testimony earlier
20     about ▮▮▮▮ mentioning his sexuality and
21     how that may have impacted J.F.'s complaint,
22     was this the conversation -- I'm sorry, is this
23     document the summary of that conversation?
24 A.  I believe so. I think that's what this is.
25 Q.  Okay. In looking at this document, it appears

19 (Pages 70 to 73)

Maria Kanger
August 4, 2023

74

```
 1      there are times that you put statements in
 2      quotes, can you tell us why you sometimes use
 3      quotes and what that means?
 4   A. Yes, to the best of my recollection, when I
 5      used quotes, that was a direct -- I believe
 6      would have been a verbatim quotation from the
 7      person I was talking to.
 8   Q. Okay.  And if you will scroll to page 2, we are
 9      roughly in the middle of the page.  There's all
10      these bulletin points that start a new
11      sentence.
12   A. Uh-huh.
13   Q. I'm sorry, I'm trying to get you to the one.
14      So I'm looking at a bulletin point that starts
15      with "When Kanger said if         specified
16      any concerns about    ,    , said no."  Do
17      you see that sentence?
18   A. I do.
19   Q. It may you take a while to find that.
20   A. Yeah, I've got it, yeah.
21   Q. Okay.  And that that next part says, "He said
22      that it could be that        'feels left out'
23      now that he is dating    , there could be a
24      number of issues, perhaps it is due to
25      sexual orientation."  Is that one statement
```

75

```
 1      throughout this conversation what you have
 2      testified to previously?
 3   A. I believe so, yes.
 4   Q. Okay.  Do you recall any other reference during
 5      this Zoom meeting where there was any concern
 6      raised or mentioned by         about his
 7      sexual orientation playing into this complaint?
 8   A. Not that I recall.  As I've shared before, from
 9      my recollection of that meeting and what seems
10      to be in the notes, it seems as though what he
11      had shared was he didn't understand why a
12      report could have been made.  And now that I
13      see the notes, I remember that he had said it
14      could be a number of things.
15          I just remember from that meeting that
16      the general tone seemed to be that he couldn't
17      understand why a report was filed, and maybe
18      that was the reason why, but he had no other
19      reason to think.
20   Q. Okay.  Going down two bulletin points from that
21      sentence that we just looked at, there's a
22      sentence that starts, "At one point,
23      stated that he and         'were peas in a
24      pod, then     came around."
25   A. Uh-huh.
```

76

```
 1   Q. Do you see that sentence?
 2   A. I do.
 3   Q. Do you recall if J.F. was aware that
 4      was gay at the time the two of them were
 5      considered to be "peas in a pod"?
 6   A. That, I don't know.
 7   Q. Do you have any knowledge as to when J.F.
 8      learned that         was gay?
 9   A. I don't know in terms of timing.  I mean, based
10      on the notes and things, and from what I can
11      recall, like it was not -- once respondent
12      began dating his boyfriend, it was -- seemed to
13      be common knowledge among that friend group.
14   Q. If         alleges in his complaint that he
15      came out to his friend group in the spring of
16      2020, do you have any reason to -- I'm sorry,
17      strike that.
18          If         alleges in his complaint
19      that he came out to his friend group in late
20      September of 2020, do you have any reason to
21      disagree with that?
22   A. Not that I can remember or recall, no.
23   Q. Okay.  And then just so our timeline is
24      accurate, do you recall the date that -- or the
25      time of year that J.F. made her complaint
```

77

```
 1      against         ?
 2   A. Yes, I believe it was, and if I remember from
 3      looking at the notice of allegations, I think
 4      the date on that notice was March 11, early
 5      March, something like that.  And that was
 6      around the time that the complainant had
 7      brought the report, was sometime in early
 8      spring 2021.
 9          It was at a time -- if I'm remembering
10      correctly, it was at the time when most of us
11      were still working from home because there were
12      still pretty significant pandemic restrictions
13      going on.
14   Q. And you mentioned that at some point there were
15      edits made to the sexual misconduct policy
16      where a portion of the policy was omitted --
17   A. Uh-huh.
18   Q. -- inadvertently.  Did the omission in that
19      policy play any role in the investigation in
20      this case?
21   A. No, not that I can recall.
22   Q. Okay.  Was this complaint investigated in the
23      same manner it would have been regardless of
24      whether that omission was there?
25   A. Yes, and I would say that -- I can't recall
```

**Page 78**

1  when I became aware of the omission, but when
2  respondent made those allegations, my response
3  to him was the same regardless. Again,
4  especially because he had, A, number one, my
5  approach would have been to address those
6  allegations, but B, my concern was that because
7  the only thing he could identify was the report
8  being made, I wanted to be sure that this was
9  not retaliatory in any way either.
10 Q. As the Title IX coordinator, once you
11    determined that allegations fit within the
12    context of a policy, do you have any power or
13    ability to tell the complainant that they
14    cannot proceed with a formal complaint?
15 A. No. At that point -- so if -- you're saying if
16    it's been determined that a potential policy
17    violation has been alleged and complainant
18    states they want to more forward with a formal
19    process, is that what you're asking?
20 Q. Correct, yes. If that's the situation, can a
21    Title IX coordinator tell the complainant they
22    cannot proceed with a formal complaint?
23 A. No, I --
24    MR. LITTLE: Objection.
25    THE WITNESS: I'm sorry.

**Page 79**

1     MR. LITTLE: Just to the -- you can
2  answer. I'm just objecting because I'm a
3  little lost. But keep going. Sorry.
4  A. I don't believe -- if I remember kind of the
5     requirements of federal regulations and those
6     types of things, if we determined that a report
7     fell under the jurisdiction of the policy and a
8     complainant wanted to move forward with a
9     formal investigation or formal process, then we
10    had to move forward with that. As I've stated
11    before, any sort of informal resolution
12    required the agreement of both parties.
13    BY MS. ROBERTS:
14 Q. And then I believe you mentioned that you
15    thought the hearing in this case was recorded
16    via Zoom. And you talked about, and correct me
17    if I'm wrong, that the reason you think that is
18    is because that would be your normal procedure,
19    is that accurate?
20 A. Yes.
21 Q. Have you ever seen a recording of this hearing?
22 A. Not that I can recall. Again, I don't remember
23    specifics for this hearing. That was just
24    based on I believed we recorded the hearing,
25    but that was our process at the time, but,

**Page 80**

1  again, I don't remember specifically for this
2  case.
3     MS. ROBERTS: Okay. No other questions.
4     MR. LITTLE: I have one question on
5  Libby's questions.
6  REDIRECT EXAMINATION,
7  QUESTIONS BY MR. LITTLE:
8  Q. If a formal complaint -- so I want to make sure
9     I understand. If somebody makes a formal
10    complaint of allegations that would violate
11    Butler's policies, if true, and the complaining
12    party wants to go forward with a formal
13    process, then the formal process has to go
14    forward, is that correct?
15 A. To the best of my recollection at the time that
16    I was there, yes. That if they wanted to
17    resolve it -- if there was a desire for there
18    to be informal resolution, both parties would
19    need to agree to that.
20 Q. Okay. So I just want to make sure I'm correct.
21    So let me ask you this, then, what's to keep --
22    what's to keep somebody from making a -- you
23    know, a -- you know, something obvious; he
24    raped me and it was at such and such a place,
25    but you determined that it couldn't have

**Page 81**

1  possibly happened because, you know,
2  complainant was playing a -- was off campus
3  that day, you can prove it or something like
4  that, you still have to go forward with a
5  formal process? Don't -- isn't there some --
6  don't you have discretion to say, wait, we're
7  not going to go forward with the formal
8  process?
9  A. So I would say in that particular sort of
10    hypothetical that you've given, it would seem
11    as though that information of "this couldn't
12    have possibly happened because complainant
13    wasn't anywhere near respondent," something
14    along those lines, would be something that
15    would likely come out in the course of an
16    investigation and not necessarily on the face
17    of a complaint. But then, again, you know,
18    it -- there would still -- that would still be
19    up to a decision-maker if -- you know, so if
20    complainant disputes that and respondent says,
21    no, there's no way, then it would be up to the
22    decision-maker to determine whether a
23    preponderance indicates.
24 Q. Well, so I'm trying to determine how ironclad
25    this rule is here. So who would be the

### Page 86

```
Page No._____Line No._____
Change to:_____
Reason for change:_____

Page No._____Line No._____
Change to:_____
Reason for change:_____

Page No._____Line No._____
Change to:_____
Reason for change:_____

Page No._____Line No._____
Change to:_____
Reason for change:_____

Page No._____Line No._____
Change to:_____
Reason for change:_____

Page No._____Line No._____
Change to:_____
Reason for change:_____
```

### Page 87

ACKNOWLEDGMENT OF DEPONENT

I, MARIA KANGER, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____
MARIA KANGER                DATE

### Page 88

STATE OF INDIANA   )
                   ) SS:
COUNTY OF JOHNSON  )

CERTIFICATE

I, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, maintaining an office in Johnson County, Indiana, do hereby certify the following:

That the witness herein, MARIA KANGER, was first duly sworn to tell the truth, the whole truth and nothing but the truth in the foregoing deposition;

That all testimony was taken down in stenographic notes and afterward reduced to typewritten form under my direction and then presented to counsel for the purpose of obtaining the deponent's signature;

That I recorded and transcribed any and all objections made by counsel and the reasons

### Page 89

therefore; and

That I am not a relative or employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in this action.

IN WITNESS HEREOF, I have hereunto set my hand and affixed my Notarial Seal this 9th day of August 2023.

Valerie Fillenwarth, RPR
Notary Public
(Electronically signed)

Commission Number: NP0749965
County of Residence: Johnson
My Commission Expires on: July 5, 2031

317-940-6509
http://www.butler.edu/sexual-misconduct
Twitter: https://twitter.com/ButlerTIXCoord



EXHIBIT

Kanger Exhibit 7

Confidentiality Notice:
This email, including any attachments, is intended for the sole use of the addressee(s) and may contain legally privileged and/or confidential information.  If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this email or the information contained herein is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone or reply by email, and permanently delete this email from your computer system.  Thank you.


-----Original Message-----
From: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇>
Sent: Monday, April 5, 2021 10:04 AM
To: Kanger, Maria <mailto:mkanger@butler.edu>
Subject: Counselor

Hi Maria,

There are no let's talk hours today for Butler and I have decided that I need to see a counselor today.

Thanks,

▇▇▇▇


**Type: Incident Report**
**Category:**
**Privacy: Semi-Private**
**ID Number: 00025-2021**

# TIXC Meeting with ▇▇▇▇▇▇ 4-2-2021

**Maria Kanger** on April 2, 2021 3:47 PM

Maria Kanger met with ▇▇▇▇▇▇ via Zoom on April 2, 2021. Also present in the meeting was ▇▇▇ advisor, Marybeth Sydor.

Kanger began the meeting by saying to ▇▇▇ that it was her understanding from Sydor's email that ▇▇▇ wanted to make a report about ▇▇▇▇▇▇▇, and ▇▇▇ said that was correct. Kanger said it would be helpful to hear from ▇▇▇ about the situation with ▇▇▇▇, and that she would take notes, if it was okay. ▇▇▇ said yes.

▇▇▇ shared the following information with regard to ▇▇▇▇▇▇:

--"She started this whole thing on Monday [prior to the mediation with the RA] with the first text." When Kanger asked if he was referring to the text he had mentioned in a previous meeting--specifically, a lengthy text outlining her concerns about ▇▇▇--he said yes.
--"She's filed a false claim about me to Title IX and to you guys."
--Now, she has told the men they were planning on living with in a senior house senior year not to live

with him.
--Later, ▮ said that the men, ▮ and ▮ texted him they they had heard some stuff and did not think they should live together senior year
--▮ believes that ▮ encouraged them to text him, because she started this situation, and she "has the biggest dog in the fight." Additionally, ▮ and ▮ each texted him at the same time and said "We" and not "I" in their texts. He felt that this was not coincidental.
--Several times throughout the course of the meeting, ▮ stated that ▮ and her pod mates, along with his roommate ▮, are "colluding against him." At the beginning of the meeting, ▮ stated "That whole group is colluding against me."
--The situation "keeps growing and growing every single day."
--"She's [▮ continuing to push this forward." First, it started on the Monday before the mediation with the text that brought up a "little issue" and then progressed to a Title IX matter.
--Since that first Monday, the situation has been blown "way out of proportion."
--▮ "feels like I'm [▮] stalking her" and to ▮, that does not make sense.
--He and Sydor feel that this situation might constitute sexual harassment because of planned senior year living arrangements. ▮ n, and ▮'s boyfriend were planning on living in a house together senior year.
--A possible reason for ▮ raising these issues and filing a report with the University is that she no longer wants to live with him in a senior house, because she has an issue with ▮ having a boyfriend (▮ stated his boyfriend's name is ▮).
--The only thing that has changed in the past month, when all of these issues were raised, is that ▮ is now dating ▮ and ▮ has been coming around.
--When Kanger asked if there was anything that indicated that ▮ had an issue with ▮ having a boyfriend, ▮ said no. He said that she seemed to be okay when he introduced ▮ to the group. Later, he said that ▮ has invited him and ▮ on double dates. ▮ said that "nothing really at that time" was different, after he introduced ▮.
--At another point in the meeting, ▮ said "All this blows up right after ▮ comes around, there has to be a reason."
--When Kanger asked if ▮ specified any concerns about ▮, ▮ said no. He said that it could be that ▮ "feels left out" now that he is dating ▮, there could be a number of issues, perhaps it is due to ▮'s sexual orientation.
--Throughout the meeting, ▮ indicated that he felt that the report ▮ made about him was false. He said that he "would like to get to the bottom of why" she did this. One possible reason, ▮ said, was that ▮ had a problem with him having a boyfriend.
--At one point, ▮ stated that he and ▮ "were peas in a pod, then ▮ came around." Then, their relationship changed when ▮ raised concerns.
--The situation is "progressing every day."

Kanger confirmed with ▮ that his main issue is with ▮, as opposed to ▮. Kanger also confirmed with ▮ that the core of his concerns with regard to ▮ is the text she sent him on the Monday before the mediation and the filing of a report with Kanger's office. There is an additional concern that she told ▮ and ▮ not to live with ▮ senior year.

When ▮ indicated (at the prompting of Sydor) that he would like notice to be sent to ▮ on Monday, Kanger reiterated what ▮ had told her--specifically, that he felt ▮ had raised concerns and filed a false report, and that it could be due to his sexual orientation, but it could be due to other things, as well, and ▮ wanted to learn the reason. ▮ confirmed this.

Kanger said that at this point, the information he shared did not rise to the level of a possible policy violation. If, in the course of the investigation, it is revealed that ▮ knowingly filed a false report, that is something that could be investigated. Kanger said that if information indicates that ▮ filed

a false report because of ▮'s sexual orientation, that could be something that fell under her area. If information indicates that it was not due to his sexual orientation, that is something that could fall under the Dean of Students' area as a code of conduct issue. When Kanger asked ▮ if this made sense, he said yes.

With regard to ▮ and ▮, ▮ shared the following:

--Initially, they texted ▮ something along the lines of "Hey, I've heard some stuff and I don't think we should live together senior year. Do you have any thoughts on this?" ▮ told them that "legally," he couldn't say anything to them, and "I don't have anything to say to you." He also indicated that false things were being said about him.
--They keep texting him "on and on" about the senior house. They "keep pushing" him to talk on the phone or in person about the situation, and have reached out to him on social media about it, as well.
--▮ said that it is "strange that they're pressuring me right now." There is no deadline approaching, he said--living in the senior house is a year and a half away.
--When Kanger asked if ▮ or ▮ specified what they had heard or from where, ▮ said no.
--▮ said it "seems really, really suspicious to me" that ▮ would not put in writing his reasons for not wanting to live with him.
--He has asked them several times what their reasons for not wanting to live with him were, and "even more suspiciously," they won't answer him in writing. They continue to ask to talk in person or on the phone. He feels that they are "prancing around this issue" and that there is a "deeper reason" that ▮ and ▮ don't want to put in writing. ▮ seemed to indicate that this reason might be ▮'s sexual orientation and/or the fact that he has a boyfriend.
--When Kanger asked if ▮ or J had indicated a concern with his boyfriend or sexual orientation, ▮ said no. He said that it seemed to be okay when he introduced his boyfriend ▮ to the group.
--Throughout the meeting, ▮ characterized ▮ and ▮'s conduct (choosing not to live with him in a senior house) as retaliation. He said they "keep retaliating" by continuing to text him about their living situation.

When Sydor asked if ▮ and ▮ behavior would constitute retaliation, Kanger read the definition of retaliation from the SM Policy to her and ▮. Kanger said that right now, there was not information indicating what "stuff" had caused them to decide not to live with ▮, or how they had learned that information. Kanger added that the University cannot tell people not to discuss a case, but does encourage people to respect the privacy of all involved in a process. Kanger told them that if more information was received, ▮ could always reach out to her.

With regard to ▮ shared the following:

--He believes ▮ has "colluded" with ▮ and her pod mates. On the Monday that ▮ sent ▮ the text listing her concerns, ▮ also texted ▮. ▮ went over to ▮'s pod and talked to ▮ and her pod mates.
--▮ had told ▮ "privately" that he had used Snapchat to track their friend ▮'s location. He did not share this information with anyone else.
--The "first issue of stalking came up" from the conversation between ▮ and ▮ and her pod mates on that Monday, when ▮ must have told them about ▮ tracking location via social media.
--There was a "pretty clear line" from the Monday text from ▮, which did not mention tracking location, to the stalking report, which contained allegations about using social media to track location. ▮ said, "how else would she [know about tracking location] other than talking to ▮?"
--The only person he tracked via social media (specifically, Snapchat) was ▮.
--His primary concern with ▮ is her "threatening" him about talking to the Dean of Students and BUPD.

--When Kanger asked for the context of how that came up, ▮ said that he was in his room, trying to take a nap. ▮ knocked on his door and initiated the conversation. ▮ said that she did not want to live with him next year, and that she had been talking to DOS and BUPD all week. She said, "BUPD is probably not going to get you in trouble, but they could."
--▮ "used the information to threaten [him]" and make him "feel scared."
--When Kanger asked ▮ to talk a bit more about the threat, he said that for students, any time the Dean of Students' name is brought up, it's "a huge issue." Saying that BUPD is also involved only exacerbated the concern.
--Kanger also asked if ▮ felt that ▮'s actions could be due to his sexual orientation and/or the fact that he has a boyfriend. ▮ said "No, not as much." He said that the primary difference between the situation with ▮ and the situation with ▮ is that ▮ was not planning to live with him senior year, so there wasn't the same concern that ▮'s boyfriend would be in their living space.
--▮ said that there does have to be a "deeper reason" for ▮s behavior, because they had been best friends and this came out of nowhere.
--▮ has not talked to ▮ since he went home. ▮ asked to Facetime once, but she hasn't talked to him other than that.

Kanger told ▮ that based on what he shared, it did not sound like ▮'s conduct would fall under her area, but it may fall under the Dean of Students' office under the Student Handbook. She wasn't sure, she said, and didn't want to speak for an area that wasn't hers. She said that if ▮ wished, she could assist with connecting him to Dziwlik.

▮, at Sydor's prompting, also shared the following information related to the impact of the situation:

--He "felt uncomfortable in [his] housing." and had to go home. When Kanger asked if the primary reason he felt uncomfortable and felt the need to go home was ▮'s comments about talking to the Dean of Students and BUPD, ▮ said yes.
--He was going to volunteer with Indiana Sports Corp for March Madness. A professor in CCOM had told him that if he was persistent with IN Sports Corps, he might get a summer internship. He was "super into it," and signed up for all of the volunteer events. He ended up not being able to volunteer, because he had to go home.
--When Kanger asked him to talk through the decision to go home, as opposed to changing his housing situation, ▮ said that the situation happened Monday and Tuesday, and he left Wednesday. He said that "If I'm that distressed, moving two floors isn't going to help me." Going home helped him to regroup and come up with a strategy for finishing the semester.

Kanger spoke with ▮ about his return to campus, and asked how she could help smooth the transition.

--He said he would be returning on Sunday. When Kanger asked if he needed to change his housing arrangements, ▮ said no, he didn't feel it was necessary.
--Sydor told Kanger that ▮ shares a common space with ▮, and their bedrooms are next to each other. She asked if ▮ found that he could not stay in that living space, could he reach out to Kanger. Kanger said yes, ▮ could feel free to reach out to her. She also noted that typically, the person requesting the change in housing was the person to move, regardless of whether they were Complainant, Respondent, etc. ▮ said he understood.
--With regard to academic adjustments, ▮ said he had four big projects starting in the next week or so that would go through finals and that the stress of the process could impact his ability to get them done. Kanger said that if he found that he needed a request to be made to his faculty for flexibility, she could connect him to Dean of Students Martha Dziwlik and explained the academic adjustment process.

--▮ said that before he went home, he had emailed all of his professors, copying Dziwlik and they were all "very nice" about it. He said that Dziwlik had then emailed and said that usually, she met with a student before sending a notice to faculty, and ▮ apologized and said he would be happy to meet with her. ▮ said Dziwlik never responded.
--Kanger reminded ▮ that after that, Kanger had met with him and his mother and let him know that she would be the point person for requests he had made about academic adjustments and housing. She said that when they met, ▮ had said that he was in a better headspace and didn't need academic adjustments. ▮ confirmed this.
--Sydor said that ▮ would not only be looking for flexibility from his professors, but from the Title IX process. Kanger said that as she had shared in their previous meeting, the process works around students' academic schedules. She provided the example of delaying review of the investigation report if the review would fall during finals week. She said that the investigator would make those kinds of adjustments, but ▮ could also ask for that flexibility.
--When Kanger asked if ▮ needed anything else to facilitate his return to campus, ▮ said no. Kanger reminded ▮ that Counseling and Consultation Services was available. He confirmed that he was aware of this.

At the end of the meeting, Kanger reiterated that ▮ could reach out to her if he needed a change in housing or academic adjustments, and that he could talk with the investigator, Kody Rother, if flexibility in the investigation schedule was needed.

Type: Incident Report
Category:
Privacy: Semi-Private
ID Number: 00025-2021

# New Housing (Complainant to Director of Residence Life 3-9-21)

**Maria Kanger** on March 31, 2021 12:22 PM

From: Dziwlik, Martha <mdziwlik@butler.edu>
Sent: Tuesday, March 9, 2021 6:41 PM
To: Kanger, Maria <mkanger@butler.edu>
Subject: Fwd: New Housing

Another.
Sent from my iPhone

Begin forwarded message:
From: ▮
Date: March 9, 2021 at 6:32:42 PM EST
To: "Bucey, Bridget" <mailto:bbucey@butler.edu>
Cc: "Dziwlik, Martha" <mailto:mdziwlik@butler.edu>
Subject: New Housing

Hi Bridget,

The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment. I need to be moved immediately. I suggest you contact Dean Dziwlik to