Tarryn Harris
August 11, 2023

1

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA

CIVIL ACTION NO. 1:22-cv-01828-SEB-MG

JOHN DOE,                )
                         )
    Plaintiff,           )
                         )
V.                       )
                         )
BUTLER UNIVERSITY,       )
                         )
    Defendant.           )

   Deposition by Zoom of TARRYN HARRIS, a witness who appeared remotely before me, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, taken on behalf of the Plaintiff, with all parties appearing via Zoom, taken on August 11, 2023, commencing at 2:30 p.m., pursuant to all applicable rules, with Notice as to the time and place thereof.

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, IN 46184
(317) 345-6179
vfillenwarth@gmail.com

30

1  A. During this case or during the Title IX case
2     that happened our sophomore year?
3  Q. Sure. During the Title IX case.
4  A. I did not understand that I was personally a
5     witness. Like I've never seen that list before
6     that you've given me. I understand that I was
7     called to report on the incidences that had
8     happened when I was an RA, during the time that
9     I was an RA, but I only, like I said, received
10    one phone call and then there was never any
11    follow-up after that.
12 Q. Okay. And you mentioned earlier that there was
13    a big group meeting that occurred with
14    respondent and others, is that correct?
15 A. Yes.
16 Q. Do you recall when that meeting occurred?
17 A. In terms of a specific date, I don't remember a
18    specific date.
19 Q. Okay. Do you remember approximately when it
20    occurred?
21 A. It probably was late February or early March.
22    It was early into when -- early into the
23    semester.
24 Q. Okay. And that was the, just to be clear, the
25    spring semester of 2021, is that correct?

31

1  A. Yes.
2  Q. Okay. And what do you recall about why you
3     became involved in that meeting?
4  A. I recall that I received a message from
5     Witness 10, the other resident assistant, via
6     GroupMe. He asked me if I wanted to take part
7     in a mediation because I was a relatively new
8     RA at the time and the conflict involved two of
9     my residents. As I understood it, it was more
10    as an observing capacity and as a support for
11    my own residents, but the people that had asked
12    him to conduct the mediation were his
13    residents, so he made it pretty clear that he
14    wanted to take the reins.
15 Q. Okay. And do you recall who attended the
16    mediation besides you and Witness 10, presuming
17    that he did take the reins and do that?
18 A. I can't remember specific names. I know that
19    both the -- sorry, I can't remember the
20    specific identifiers -- complainant, I think,
21    and respondent were both there and -- I know
22    that Witness 2 was there and Witness 3 was
23    there. Those are people that I remember
24    specifically. But the other names, I don't
25    remember being there, or couldn't tell you

32

1     specifically --
2  Q. Okay.
3  A. -- because I was unfamiliar with them.
4  Q. Thank you. And your Witness 9 and then the
5     other RA that you referred to as Witness 10, is
6     that correct?
7  A. Yes.
8  Q. Okay. I'm going to stop sharing for the
9     moment.
10       Did you have any conversations prior to
11    that mediation?
12 A. About the conflict?
13 Q. Yes, besides the one that you just referred to
14    with Witness 10 where he asked you to join him?
15 A. No. I hadn't heard of the issue.
16 Q. Okay. And did you review any documents about
17    it before you went in to this mediation?
18 A. No. Witness 10 kind of explained what was
19    happening, but most of the information I
20    received was the accounts given by the other
21    people that were involved in the mediation.
22 Q. And those accounts were given at the mediation,
23    is that right?
24 A. Yes.
25 Q. Okay. So why don't you -- strike.

33

1        I want to talk about the mediation at
2     this point. So you understood that it was a
3     mediation, that's right?
4  A. Yes.
5  Q. And what do you recall about that mediation?
6  A. I recall that it was in the business building.
7     We were very limited in where we could meet
8     during COVID, especially given the size of
9     group. So it was in the business building on
10    one of the floors kind of in a lounge area. I
11    remember it was a fairly large group. And I
12    hadn't previously met any of the other students
13    that weren't my residents.
14 Q. When you say "previous" -- strike.
15       And when you say "large group," do you
16    mean more than ten students?
17 A. I don't remember the specific number.
18 Q. Do you remember if it was more than five?
19 A. I would say so, yes.
20 Q. Okay. Do you recall how long the meeting
21    lasted?
22 A. Not specifically, but I would say around 30
23    minutes.
24 Q. I'm sorry, you cut out. How long did you say?
25 A. I said that I can't remember specifically, but

9 (Pages 30 to 33)

### Page 34

1    I would say it was around 30 minutes.
2        THE COURT REPORTER: 30 minutes?
3        THE WITNESS: Yes, 30 minutes.
4        THE COURT REPORTER: Thank you.
5        MS. FEDERICO: Thank you, Valerie.
6    BY MS. FEDERICO:
7    Q. So do you recall, and I can share the key one
8       more time, but do you recall who exactly shared
9       their account of the respondent's behavior at
10      the mediation from this list?
11   A. I remember the complainant spoke, Witness 3
12      spoke, and those are the two that I remember
13      specifically, but I know that other people did
14      speak as well, I just don't recall their names.
15   Q. Okay. And how would you say -- strike.
16       What did the complainant say during the
17      meeting?
18   A. I don't remember specific language. I just
19      remember, in general, there was a consensus
20      between the complainant and several of the
21      other students that there had been certain
22      boundaries set by the friend group that they
23      were a part of, that they felt that the
24      respondent was not adhering to.
25   Q. Okay. And what were those boundaries?

### Page 35

1    A. From my understanding, there had been a
2       conversation, before I was an RA, about the
3       respondent coming into their room and spending
4       a lot of time there. And that was kind of the
5       crux of the argument, that he was spending too
6       much time in their room, and that was it.
7    Q. And do you recall the mood of the complainant
8       during the mediation?
9    A. I would say it was just kind of like fed up,
10      kind of an annoyance, an exhaustion, I guess.
11   Q. Okay. And you said that Witness 3 also shared
12      her thoughts during this mediation as well?
13   A. Yes.
14   Q. And what do you recall about what Witness 3
15      shared?
16   A. It mostly seemed to be in support of the
17      complainant and other people that had spoken,
18      just kind of reiterating their thoughts.
19   Q. Did Witness 3 also speak about boundaries?
20   A. Not that I remember specifically.
21   Q. Okay. And what was re- -- strike.
22       What was the mood of Witness 3 during the
23      meeting?
24   A. I think just supportive of the other people
25      involved in the meeting.

### Page 36

1    Q. And what do you recall about the respondent
2       during this meeting?
3    A. I know that he was very upset. At one point he
4       did cry. But mostly apologetic.
5    Q. What did the respondent say during the meeting,
6       to the best of your recollection?
7    A. I know that there were a lot of comments made
8       about feeling as though their -- like the
9       complaints of the other people in the meeting
10      weren't shared as freely as the respondent had
11      hoped; that a lot of his understanding of the
12      situation was that they were asking him to pick
13      up on social cues and that that was something
14      that was hard for him; I remember him saying
15      that.
16   Q. And would you characterize him as being upset
17      during the meeting?
18   A. Yes.
19   Q. And did you speak with him after the meeting in
20      any capacity, one on one? And I should
21      clarify, when I say "after the meeting," I mean
22      directly after, like that day.
23   A. Yes. I stayed with him after people had left
24      and we walked out together.
25   Q. And what do you recall about the time where you

### Page 37

1       stayed with him and then you walked out
2       together?
3    A. I remember that he was upset.
4    Q. And did he share anything with you?
5    A. Not that I specifically remember. He was
6       mostly just upset and was shedding tears.
7    Q. Do you recall anything else about the mediation
8       that we haven't discussed that you want to
9       share with me now?
10   A. No.
11   Q. You mentioned earlier that the respondent came
12      to your room several times to talk about
13      things. Can you tell me a little bit about
14      those conversations that you had with the
15      respondent?
16   A. Yes. So I believe the respondent came to my
17      room two additional times during this process,
18      and both times it was mostly in capacity of I
19      guess trying to gain more information of the
20      situation. I felt as if he was looking for
21      support. I know a lot of the time, kind of
22      just asking in general about how other people
23      that were involved in the mediation were
24      feeling, which I couldn't tell him, and
25      couldn't like divulge that information to him.

**38**

1  It mostly seemed as if he was kind of looking
2  for validation in terms of like how the
3  original mediation had went and kind of the
4  aftermath.
5  Q. Did he ever express that he was very upset
6  during these other conversations with you?
7  A. Yes.
8  Q. Did he ever express that he felt ostracized in
9  any way to you?
10 A. He expressed that he felt like the friend group
11 was against him, yes.
12 Q. Did he ever express that he felt like an
13 outsider at any time?
14 A. Other than expressing that he felt like the
15 friend group was kind of, again, wanting to
16 step away from him, that was like the only
17 language that he used.
18 Q. Okay. And did he ever express to you why he
19 thought they were trying to separate from him?
20 A. Other than the original complaints about
21 boundaries, no.
22 Q. Do you have any other perceptions about why
23 that friend group wanted to separate from John
24 Doe?
25     MS. ROBERTS: Objection as to form and

**39**

1  foundation.
2     THE WITNESS: Do I have still have -- I
3  have to answer that? Sorry.
4  BY MS. FEDERICO:
5  Q. Yes.
6  A. Okay. No. Like I didn't have any personal
7  perception of -- I was very outside of the
8  friend group, didn't know the other people
9  personally, and also was not involved with them
10 in any other capacity as RA, so I wouldn't have
11 known any other information other than what
12 they had provided.
13 Q. I'm now going to open up the investigation
14 report once again, which the defendants have
15 labeled as Exhibit 102, and I believe for this,
16 we've labeled it as Exhibit 1. So I'm going to
17 pull that up quickly. And I've scrolled to
18 page 52 of this document, and I kind of want to
19 go through this a little with you. And I'll
20 let you read it. But do you see the part where
21 it says, "Investigator meeting with Witness 9:
22 May 5, 2021," do you see that?
23 A. Yes.
24 Q. Okay. Do you see on the first line where it
25 says, "Rother met with Witness 9 on May 5,

**40**

1  2021"?
2  A. Yes.
3  Q. Okay. And to be clear, you understood yourself
4  to be Witness 9 in this investigation?
5  A. Yes.
6  Q. Okay. Do you recall discussing with Kody
7  Rother the situation regarding John Doe at any
8  point?
9  A. No. May 5th was when I received my COVID
10 vaccine and drove home from Butler, so I don't
11 remember that.
12 Q. Was May 5th at the end of finals or what
13 precipitated you driving home?
14 A. Yes, it was at the end of finals. May 5th was
15 the last day that RAs had to be in the building
16 to do room checks. And after I did the room
17 checks, I got my COVID vaccine and went home.
18 Q. Thank you for that information.
19     So what I'm going to do is I'm going to
20 ask you now to read the portion that says
21 "Investigator Meeting with Witness 9." And I
22 can scroll it down and, as you'll see, it
23 continues through the next page and stops
24 around page 54. So I'm going to have you read
25 from the top, and just let me know, like I

**41**

1  said, exactly when you want me to scroll, and
2  we can go from there and then we can talk about
3  this a little.
4  A. Okay. You can scroll. You can scroll. You
5  can scroll. You can scroll. You can scroll.
6  Okay.
7  Q. Okay, thank you. Now, after reviewing this
8  summary of a meeting that you had with the
9  investigator, is this consistent with your
10 recollection of what occurred with the John Doe
11 situation?
12 A. You mean during the mediation?
13 Q. Yes.
14 A. Yes.
15 Q. Okay. And do you see here on page 53 of this
16 document, it says, "Witness 9 said that
17 Witness 3, Witness 2, and the complainant came
18 to speak with her after the mediation.
19 Witness 3 mentioned she did not share a lot of
20 her own experience and concern during the
21 mediation." Do you see that part?
22 A. Yes.
23 Q. What do you recall about Witness 3, Witness 2,
24 and the complainant coming to speak with you
25 after the mediation?

Tarryn Harris
August 11, 2023

## 42

1  A. Just that they came to my room. I was kind of
2     surprised because other than the mediation, I
3     hadn't had any interaction with them. So I
4     thought it was strange that they would come to
5     me, especially because Witness 3 was the only
6     one that was my resident. So I thought that
7     that was strange, but offered to, you know, be
8     an ear to their concerns. And that was
9     basically it.
10        I remember all of them being pretty
11    upset. Witness 2 was there more in a
12    supporting capacity. And like as mentioned in
13    the document, Witness 3 started to open up a
14    bit more about her own experiences that weren't
15    shared during the mediation itself.
16 Q. And approximately how long did that discussion
17    last?
18 A. I couldn't tell you for sure. Probably less
19    than 30 minutes.
20 Q. Thank you. At any point did you have any
21    concern for John Doe's general well-being?
22 A. No.
23        (WHEREUPON, Deposition Exhibit 3 was
24    marked for identification.)
25    BY MS. FEDERICO:

## 43

1  Q. Okay. I'm going to stop sharing this screen at
2     the current moment, and I'm going to pull up a
3     couple other documents. I'm not sure if you've
4     seen these before, but I'm going to ask if you
5     have. So just bear with me a moment.
6         Sorry, I'm having a little bit of a
7     technical issue. I apologize for the delay.
8         Okay. I'm now going to introduce into
9     the record Exhibit 121, as the defendants that
10    have identified it. And just to be clear, it
11    is Bates labeled with the start of
12    DEFT RESP_679.
13        Miss Harris, I'm going to give you a
14    moment to kind of look through this briefly,
15    and I'm not going to be asking you too many
16    specific questions of it. But do you recall
17    ever seeing this training before?
18 A. I recognize like the general, like, Butler
19    PowerPoint presentation, but I can't remember
20    like what -- the specific date or time frame if
21    I'd seen this.
22 Q. Okay. I'm going to scroll through it in just a
23    moment, but do you know who Maria Kanger is?
24 A. Yes.
25 Q. What do you know about Maria Kanger?

## 44

1  A. I know that she's the Title IX coordinator.
2  Q. And did you ever deal with her directly?
3  A. Not that I can recall.
4  Q. Okay. I'm going to just scroll through this
5     document just to see if you've ever seen it
6     before. If you need me to go faster or slower,
7     please let me know.
8  A. You can continue to scroll.
9  Q. Sure. And that's the end of the document. Do
10    you see that?
11 A. Yes.
12 Q. Do you ever recall seeing this document before?
13 A. I recall some of the language that was present,
14    so I'm sure I've seen it at some point.
15 Q. Okay. And do you -- strike.
16        Did you ever have to report anything in
17    your capacity as a mandatory reporter in terms
18    of sexual harassment?
19 A. No.
20 Q. Did you ever have to report anything in
21    terms -- or strike.
22        Did you ever have to report anything in
23    your capacity as a mandatory reporter in
24    general bullying?
25 A. No.

## 45

1  Q. Did you ever have to report anything in your
2     capacity as a mandatory reporter regarding
3     Title IX?
4  A. No.
5  Q. Did you ever have to report anything in your
6     capacity as a mandatory reporter regarding
7     harassment?
8  A. No.
9  Q. Did you ever have to report anything in your
10    capacity as a mandatory reporter with respect
11    to stalking?
12 A. No.
13 Q. Okay. Give me just a moment and I can review
14    my notes, but I think we're just about to wrap
15    up unless Ms. Roberts has some additional
16    questions for you.
17        MS. FEDERICO: I have no further
18    questions. Thank you so much, Miss Harris.
19        THE WITNESS: Yep, no worries.
20        MS. ROBERTS: Hi, Tarryn. My name is
21    Libby Roberts. I represent Butler University
22    in this lawsuit. I have just a few questions
23    for you.
24    CROSS-EXAMINATION,
25    QUESTIONS BY MS. ROBERTS:

12 (Pages 42 to 45)

46

1  Q. I will represent to you that in the complaint
2     that was filed in this case, it indicates that
3     the mediation that was conducted was an
4     ambush-style mediation. Have you ever used
5     that term to describe the mediation?
6  A. No.
7  Q. Okay. Based upon the training that you
8     received to be an RA, do you believe the
9     mediation went according to the process that it
10    was supposed to?
11 A. Yes.
12 Q. And were both groups of individuals, meaning
13    from the people who were not your residents as
14    well as the people who were your residents,
15    were both of them allowed an opportunity to
16    speak during the mediation?
17 A. Yes.
18 Q. And at any time during the mediation, did you
19    experience anyone harassing the respondent
20    based upon his sexual orientation?
21 A. No.
22 Q. At any time during the meeting, did you witness
23    anyone who was discriminating against the
24    respondent based upon his sexual orientation?
25       MS. FEDERICO: Objection.

47

1  A. No. His sexual orientation was not mentioned
2     at all during the mediation.
3        BY MS. FEDERICO:
4  Q. And you identified yourself as a mandatory
5     reporter of various things, such as bullying,
6     sexual harassment, harassment, and
7     discrimination. Did you ever witness anything
8     for which you were a mandatory reporter, but
9     yet failed to report it?
10 A. No.
11 Q. Do you still have access to your Butler e-mail?
12 A. Yes, I do.
13 Q. Do you recall if you sent an e-mail -- well,
14    let me back up.
15       Do you recall if someone made notes
16    during the mediation?
17 A. I don't recall, no.
18 Q. Do you recall -- do you know who Shannon
19    Mulqueen is?
20       MS. FEDERICO: Objection.
21 A. I know -- I know that she was one of the
22    graduate assistants for -- she was one of like
23    the supervisors. I don't know her exact title.
24    But, yes, I know who she is.
25       BY MS. ROBERTS:

48

1  Q. Okay. Do you ever recall sending an e-mail to
2     Shannon Mulqueen about the mediation or your
3     discussions regarding the mediation?
4  A. I don't believe that I ever sent her an e-mail
5     specifically. I do recall that Witness 10
6     filled out some sort of Google form that was
7     required for different mediations, but because
8     I wasn't the RA that was asked for the
9     mediation, I didn't have to fill out a form,
10    and I believe Witness 10 gave me the courtesy
11    of reviewing it, but I didn't have any notes
12    and so I might have been copied in whatever
13    e-mail he sent to Shannon about the mediation,
14    but I never sent an e-mail specifically, I
15    don't believe.
16 Q. And what you just described as a "form," did
17    you actually see the Google form itself or did
18    you just see a narrative?
19 A. I don't recall which one it was. I do remember
20    like making comments on it to Witness 10,
21    basically giving my okay for what was
22    presented, but I don't remember if it was the
23    form specifically or a summary of what he had
24    written.
25 Q. Okay. So if Witness 10 provided a summary, you

49

1     were able to review it and you agreed with
2     Witness 10's account, is that right?
3  A. Yes.
4        MS. ROBERTS: I don't have any other
5     questions for you, Tarryn.
6        THE WITNESS: Okay.
7        MS. FEDERICO: Awesome. Tarryn, thank
8     you so very much. I really appreciate you
9     being here. I hope you're enjoying life
10    post-graduate, and have a great rest of your
11    summer.
12       THE WITNESS: All right. Thank you.
13       MS. ROBERTS: Tarryn, we have one
14    administrative thing for you. Under the rules,
15    you have an opportunity to receive a copy of
16    the transcript that the court reporter is
17    preparing. You can review that and make sure
18    everything is accurate. If there's anything
19    that she heard wrong or didn't get something
20    down correctly, there's a sheet on which you
21    can make those changes and then you send that
22    back to the court reporter. It is completely
23    up to you as to whether or not you want the
24    opportunity to review it, or you can say you
25    waive your right to do so.

Tarryn Harris
August 11, 2023

---

**50**

    1          THE WITNESS:  No, I would like to review
    2     it, please.
    3
    4          (Deposition concluded at 3:34 p.m.)

---

**51**

    1                DEPOSITION ERRATA SHEET
    2
    3     Page No._____Line No._____
    4     Change to:_____
    5     Reason for change:_____
    6
    7     Page No._____Line No._____
    8     Change to:_____
    9     Reason for change:_____
   10
   11     Page No._____Line No._____
   12     Change to:_____
   13     Reason for change:_____
   14
   15     Page No._____Line No._____
   16     Change to:_____
   17     Reason for change:_____
   18
   19     Page No._____Line No._____
   20     Change to:_____
   21     Reason for change:_____
   22
   23     Page No._____Line No._____
   24     Change to:_____
   25     Reason for change:_____

---

**52**

    1     Page No._____Line No._____
    2     Change to:_____
    3     Reason for change:_____
    4
    5     Page No._____Line No._____
    6     Change to:_____
    7     Reason for change:_____
    8
    9     Page No._____Line No._____
   10     Change to:_____
   11     Reason for change:_____
   12
   13     Page No._____Line No._____
   14     Change to:_____
   15     Reason for change:_____
   16
   17     Page No._____Line No._____
   18     Change to:_____
   19     Reason for change:_____
   20
   21     Page No._____Line No._____
   22     Change to:_____
   23     Reason for change:_____

---

**53**

    1           ACKNOWLEDGMENT OF DEPONENT
    2
    3          I, TARRYN HARRIS, do
    4     hereby certify that I have read the
    5     foregoing pages, and that the same is
    6     a correct transcription of the answers
    7     given by me to the questions therein
    8     propounded, except for the corrections or
    9     changes in form or substance, if any,
   10     noted in the attached Errata Sheet.
   11
   12
   13     _____
   14     TARRYN HARRIS              DATE

14 (Pages 50 to 53)

54

```
 1   STATE OF INDIANA   )
 2                      ) SS:
 3   COUNTY OF JOHNSON  )
 4
 5              CERTIFICATE
 6
 7      I, Valerie Fillenwarth, RPR, a Notary
 8   Public in and for the County of Johnson, State
 9   of Indiana, maintaining an office in Johnson
10   County, Indiana, do hereby certify the
11   following:
12
13      That the witness herein, TARRYN HARRIS,
14   was first duly sworn to tell the truth, the
15   whole truth and nothing but the truth in the
16   foregoing deposition;
17
18      That all testimony was taken down in
19   stenographic notes and afterward reduced to
20   typewritten form under my direction and then
21   presented to counsel for the purpose of
22   obtaining the deponent's signature;
23
24      That I recorded and transcribed any and
25   all objections made by counsel and the reasons
```

55

```
 1   therefore; and
 2
 3      That I am not a relative or employee,
 4   attorney or counsel of any of the parties, nor
 5   a relative or employee of such attorney or
 6   counsel, nor am I financially interested in
 7   this action.
 8
 9      IN WITNESS HEREOF, I have hereunto set my
10   hand and affixed my Notarial Seal this 31st day
11   of August 2023.
12
13
14
15
16         Valerie Fillenwarth, RPR
17         Notary Public
18         (Electronically signed)
19
20
21
22
23   Commission Number:  NP0749965
24   County of Residence:  Johnson
25   My Commission Expires on:  July 5, 2031
```