

# SMITH REPORTING

## INDIANA COURT REPORTERS

400 North High Street, Suite 200, Muncie, Indiana 47305

800.700.3566   -   765.284.7836

**www.smithreporting.net**

███████████████

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

```
JOHN DOE,                      )
                               )
          Plaintiff,           )
                               ) CASE NO.
vs.                            ) 1:22-cv-01828-SEB-MG
                               )
BUTLER UNIVERSITY,             )
                               )
          Defendant.           )
```

THE DEPOSITION UPON ORAL EXAMINATION OF

████████████████,

DATE:     June 26, 2023

TIME:     12:01 p.m.

PLACE:    Location of the Witness
          NESENOFF & MILTENBERG, LLP
          363 Seventh Avenue
          New York, New York  10001

Called as a witness herein in accordance with the

Rules of Civil Procedure before Tonya J. Dunn, RPR,

CMRS, and Notary Public.

2

A P P E A R A N C E S


ON BEHALF OF THE PLAINTIFF:

Andrew T. Miltenberg, Esq.
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York  10001
212.736.4500
amiltenberg@nmllplaw.com


ON BEHALF OF THE DEFENDANT:

Liberty L. Roberts, Esq.
Cassie N. Heeke, Esq.
Sam Douthit, Summer Associate
CHURCH CHURCH HITTLE & ANTRIM
Two North Ninth Street
Noblesville, Indiana  46060
317.773.2190
lroberts@cchalaw.com
cheeke@cchalaw.com

*

6

1          we're going to have a transcript so that we can

2          read each question and each answer.  If we talk

3          over each other, that becomes very difficult for

4          us to make sense of the transcript later.  Does

5          that make sense?

6    A.    Yes.

7    Q.    Okay.  If at any point I ask you a question and

8          you don't understand the question that I've

9          asked, please let me know.  You can just say you

10         don't understand, and I can rephrase the

11         question.  I will ask it in another way to make

12         sure you do understand the question.  Is that

13         fair?

14   A.    Yes.

15   Q.    Okay.  If I do ask a question and you answer it,

16         I'm going to assume that you've understood the

17         question.  Is that fair?

18   A.    Yes.

19   Q.    Okay.  Your deposition could take a few hours

20         today.  If at any point you need a break, you are

21         free to take one.  The only rule is that I ask

22         that you answer the question that's pending

23         before you before you go take your break.  Once

24         you answer that question, then you can take a

25         break, take a bathroom break, get a drink, food,

7

1      speak with your lawyer, whatever you need to do

2      then.  All right?

3   A.   Yes.

4   Q.   Just so that we're aware, I know you said you

5      were testifying from New York City.  Are you in

6      your lawyer's office right now?

7   A.   Yes, I am.

8   Q.   Okay.  Who else is present there?

9   A.   Just me and Andrew.

10  Q.   Okay.

11  A.   Mr. Miltenberg.

12  Q.   And I see you look off to the side.  Are you

13     looking at Andrew then?

14  A.   Yes.

15          MR. MILTENBERG:  Yes, he is.

16  Q.   Okay.  Can you get -- do you currently live in

17     New York City?

18  A.   No, I do not.

19  Q.   Okay.  Did you go out to New York City just for

20     purposes of this deposition?

21  A.   Yes.

22  Q.   And what is your current address?

23  A.   911 West North Street, Indianapolis, Indiana.

24  Q.   How long have you lived there?

25  A.   About a month.

8

```
 1    Q.    Who do you live with?
 2    A.    I live in a residential hall that is being
 3          provided by my work, the NCAA.
 4    Q.    What, what campus are you on?  Are you on IUPUI's
 5          campus?
 6    A.    That's correct.
 7    Q.    And I assume then that you have graduated from
 8          Purdue; is that accurate?
 9    A.    I have graduated from Butler, correct.
10    Q.    I'm sorry.  Yes.  Correct.  From Butler.  When
11          did you graduate?
12    A.    This past May.
13    Q.    Do you know the day?
14    A.    May 5th and May 6th.
15    Q.    Did you go through ceremony on one of those two
16          days, or did you go on both?
17    A.    On both days.
18    Q.    Okay.  And why did you attend two days of
19          graduation?
20    A.    One was with the whole school, my whole
21          graduating class, and one was with my college,
22          College of Communication.
23    Q.    Okay.  And so May 5th and 6th of 2023; is that
24          right?
25    A.    Correct.
```

9

1   Q.   And what degree did you receive?

2   A.   I received a BA in sports media.

3   Q.   Did you have a minor or just a major?

4   A.   I minored in organizational communication and

5        leadership.

6   Q.   And then was your major actually sports media?

7   A.   Yes.

8   Q.   Do you know what your GPA was when you graduated?

9   A.   It was around a 3.7.

10  Q.   Congratulations.  Did you graduate with honors?

11  A.   Yes, I did, with distinction.

12  Q.   And then you mentioned that you're currently

13       employed by the NCAA; is that accurate?

14  A.   Correct.

15  Q.   What do you do there?

16  A.   I'm a seasonal intern there for a college

17       basketball academy camp they're running.

18  Q.   Is that a paid position?

19  A.   Yes, it is.

20  Q.   Is that a position with a set term?  You said

21       it's seasonal.  Do you know when your end date

22       is?

23  A.   August 4th.

24  Q.   And when did you start?

25  A.   May 15th or somewhere around that date.

10

1    Q.    Do you have plans for employment after

2          August 4th?

3    A.    I do not.

4    Q.    What's your ultimate employment goal at this

5          point?

6    A.    To work in college athletics.

7    Q.    Do you have any plans as to where -- what level

8          you want to work at?  College at the NCAA or at

9          a -- I want to say a division.  That's not the

10         word I'm looking for but...

11   A.    I would like to work at all three levels, campus;

12         national, the headquarters; and conference.

13   Q.    Thank you.  That was the word I was looking for.

14             And do you currently -- are you currently

15         looking for employment that would start after you

16         finish your seasonal internship on August 4th?

17   A.    Yes, I am.

18   Q.    Has anything that relates to this lawsuit

19         hindered you in any way in finding employment

20         since you graduated about six weeks ago?

21   A.    No, it has not.

22   Q.    And do you have plans for any further education?

23   A.    Not of now.

24   Q.    Are you originally from Indiana?

25   A.    No, I am not.

11

1   Q.   Where are you from?

2   A.   Seattle, Washington.

3   Q.   What high school did you attend?

4   A.   Seattle Academy of Arts and Sciences.

5   Q.   Did you look at colleges or universities other

6        than Butler?

7   A.   Yes, I did.

8   Q.   Why did you ultimately select Butler?

9   A.   The major appealed to me of sports media, and it

10       was a small school like my high school.

11  Q.   When you went to Butler, were you involved in any

12       organizations there on campus?

13  A.   Yes, I was.

14  Q.   What were you involved in?

15  A.   I was the student mascot for my first two years

16       at Butler.

17  Q.   So for your freshman and sophomore year?

18  A.   Correct.

19  Q.   Did you do it at all during your junior or senior

20       year?

21  A.   Around half of my senior year I was mascot also.

22  Q.   Any other organizations you were involved in on

23       campus at Butler?

24  A.   I was in a fraternity my first few years as well.

25  Q.   What was the fraternity?

12

```
1    A.    Phi Delta Theta.

2    Q.    And did you ultimately depledge Phi Delta Theta?

3    A.    Yes, I did.

4    Q.    When did you do that?

5    A.    In the summer of 2021.

6    Q.    Why did you make the decision to depledge?

7    A.    Some of the members of this cohort were also in

8          the fraternity as well.

9    Q.    Okay.  Just so our record's clear, when you say

10         the members of this cohort, are we talking about

11         some of the people that ultimately ended up

12         participating in this investigation?

13   A.    Correct.

14   Q.    All right.  And I would generally use the name --

15         the term roommates for them.  Is that not a

16         correct term?

17   A.    There were some members who were my roommates,

18         but some were just in the friend group in

19         general.

20   Q.    Okay.  Did you have more than one roommate?

21   A.    Yes, I did.

22   Q.    Okay.  And sorry.  I should clarify my question.

23         I'm looking specifically at March of 2021.  Did

24         you have more than one roommate then?

25   A.    Yes, I did.
```

13

1    Q.    Okay.  Have you ever seen Butler's student

2          handbook?

3    A.    Yes, I have.

4    Q.    Do you have a copy of it?

5    A.    I don't recall.

6    Q.    Okay.  Do you know when you first saw the

7          handbook?

8    A.    I first saw it in my freshman year.

9    Q.    How did you get a copy of it?

10   A.    By email.

11   Q.    Was there a copy available on the website that

12         you could go access as well?

13   A.    Yes, there was.

14   Q.    Okay.  And the one that was provided to you by

15         email, was that an actual document or attachment

16         to an email or was it a web link that you could

17         go to?

18   A.    I do not recall.

19   Q.    Throughout your time at Butler, if you ever

20         needed to go look at the handbook, how would you

21         access it?

22   A.    I would access it online on the Butler web page.

23   Q.    Okay.  I'm going to try to share my screen with

24         you in just a moment here.  I think it might be

25         this one.  Well, it was that one.  Sorry.  My

1    apologies.  All right.  ███, can you see what I

2    have up on the screen here?

3 A.  Yes.

4         (Exhibit 114, Butler Student Handbook, was

5         introduced.)

6 Q.  Okay.  I'm looking at a page that says Butler

7    University, and then right underneath that on the

8    left-hand side it says, Home, slash, Student

9    Life, slash, Student Handbook.  Is that what you

10   see as well?

11 A.  Yes.

12 Q.  I'm going to identify this as Exhibit 114.

13   Looking at this document -- and tell me if you

14   need me to stop at any particular point -- is

15   this what you would see when you went to the

16   website to view the handbook?

17 A.  Yes.  To the best of my knowledge.

18 Q.  Okay.  It's a page that at least looked like

19   this; is that accurate?

20 A.  Correct.

21 Q.  Okay.  And so you first got a copy of this your

22   freshman year.  So you had already enrolled in

23   Butler; is that right?

24 A.  Yes.

25        MR. MILTENBERG:  Objection.  You can answer.

15

1    A.    Yes.  Correct.

2    Q.    And had you seen -- well, when you received a

3          copy of this, did you read it from front to back?

4    A.    I do not recall.

5    Q.    Okay.  Do you know when you first saw the Student

6          Code of Conduct Policy that's within the

7          handbook?

8    A.    I don't recall.

9    Q.    Do you know when you first saw the Sexual

10         Misconduct Policy that's in the handbook?

11   A.    I do not.

12   Q.    What sort of information would you generally pull

13         up the handbook to find?

14         MR. MILTENBERG:  Objection.  You can answer.

15   A.    Generally I would look it up to find information

16         about the university and how things are dealt

17         with.

18   Q.    Were there any particular policies that you

19         recall having to go to the handbook for other

20         than the Sexual Misconduct Policy?

21         MR. MILTENBERG:  Objection.  You can answer.

22   A.    At the beginning of my freshman year, we went

23         through a course based on alcohol usage at the

24         university.

25   Q.    And was the information for that provided in the

1          handbook?

2    A.    To the best of my knowledge, yes.

3    Q.    Do you remember anything else specifically that

4          you had to go to the handbook to look up?

5    A.    No, I do not.

6                (Exhibit 108, Sexual Misconduct Policy,

7                 PLTF000398-426, was introduced.)

8    Q.    I'm showing you what we're identifying as

9          Exhibit 108.  I'll scroll down to the bottom so

10         you can see these little initials down at the

11         bottom.  The first page down on the right-hand

12         side, it says PLTF000398.  Do you see that?

13   A.    Yes, I do.

14   Q.    Okay.  I will represent to you that the documents

15         that have that little stamp at the bottom were

16         provided to me by your counsel in response to

17         discovery requests.

18             Looking here at Exhibit 108, are you familiar

19         with this document?

20   A.    Yes.

21   Q.    And do you know when you first saw this document?

22   A.    I do not recall.

23   Q.    Okay.  Looking at the top in the very beginning,

24         there's sort of the small -- underneath where it

25         says Sexual Misconduct Policy, there are a few

17

1        small lines.  The last line says, Revision Date.

2        Do you see that?

3    A.  Yes, I do.

4    Q.  What's the date?

5    A.  August 14, 2020.

6    Q.  Okay.  And were you involved in any complaints

7        related to the Sexual Misconduct Policy prior to

8        August 14, 2020?

9    A.  No, I was not.

10   Q.  Okay.  As of August 14, 2020, where were you in

11       your education at Butler?  What year were you in?

12   A.  I was in the, in the fall of my sophomore year.

13            (Exhibit 109, Sexual Misconduct Policy,

14             PLTF000427-452, was introduced.)

15   Q.  I'm going to show you now a document -- well, I

16       thought I was.  Oh, there it is.

17            Showing you a document now that's labeled as

18       Exhibit 109.  Down at the very bottom of this on

19       the right-hand side, there are little numbers

20       that are PLTF000427.  Do you see that?

21   A.  Yes, I do.

22   Q.  Okay.  Looking at this document that's labeled as

23       Exhibit 109, it shows it's a Sexual Misconduct

24       Policy, and the revision date here reflects

25       December 18, 2020.  Is that what you see as well?

18

1    A.    Yes.

2    Q.    Okay.  Do you know when you first saw this

3          policy?

4    A.    I do not recall.

5    Q.    The issue that is raised in the lawsuit that you

6          have filed relates to a complaint that was filed

7          in March of 2021; is that accurate?

8          MR. MILTENBERG:  Objection.  You can answer.

9    A.    To the best of my knowledge, yes.

10   Q.    Okay.  And is it your understanding that the

11         policy we're looking at here as Exhibit 109 is

12         the Sexual Misconduct Policy that was in place as

13         of March of 2021?

14         MR. MILTENBERG:  Objection.  You can answer.

15   A.    I do not see that date on this document.

16   Q.    Okay.  Are you aware of any other Sexual

17         Misconduct Policy that was put in place between

18         December 18, 2020, and March of 2021?

19         MR. MILTENBERG:  Objection.  You can answer.

20   A.    No, I am not.

21   Q.    Okay.  To your knowledge, were you provided --

22         well, representing to you that this document was

23         provided to you -- or provided to me by your

24         counsel in response to discovery, do you know how

25         you obtained a copy of this particular document

1        that's listed as Exhibit 109?

2             MR. MILTENBERG:  Objection.  You can answer.

3   A.   I do not.

4   Q.   Before I put this document up on the screen

5        today, had you seen it?

6   A.   I do not believe so.

7   Q.   During your time at Butler, had you ever gone out

8        to check and see if the Sexual Misconduct Policy

9        was revised?

10            MR. MILTENBERG:  Objection.  You can answer.

11  A.   I do not recall.

12  Q.   ████, I'm going to ask you some questions

13       specific to this breach of contract theory that

14       you've alleged in your complaint.  If it's of

15       assistance, I can actually show you the complaint

16       as I refer to certain things.  I've hit "resume

17       share," but I don't have my little green

18       highlighter on this.  Can you see my screen as I

19       scroll through this document?

20  A.   I can't.

21  Q.   Yeah.  I don't know.  It says -- let me stop and

22       go back to it.  There we go.  Now I got my little

23       green line.

24            All right.  I'm showing you a document that

25       is titled John Doe versus Butler University in

1          Case Number 1:22-cv-1828.  Do you see that here

2          at the top?

3    A.    Yes, I do.

4    Q.    Okay.  I'm going to ask you -- I'm here on

5          page 30.  In your complaint you have alleged in

6          Paragraph 150, subparagraph A, Butler failed to

7          properly screen J.F.'s complaint, wrongly

8          classifying it as a stalking claim even though

9          the allegations made by J.F., if true, would not

10         constitute stalking as defined by the SMP.  Do

11         you see that?

12   A.    Yes.

13   Q.    Okay.  Here where you talk about J.F.'s

14         complaint, can you tell me what you're referring

15         to?

16   A.    I am referring to J.F.'s initial complaint

17         against me of stalking.

18             (Exhibit 100, 3-11-2021 Kanger letter to

19             ███████, was introduced.)

20   Q.    Let me show you what's been labeled as

21         Exhibit 100.  Do you recognize this document?

22   A.    I do not recall.

23   Q.    Okay.  As I scroll through here, does that look

24         familiar to you at all?

25   A.    I still don't recall.

**Luke Casey Allen -  - June 26, 2023**
**Doe v. Butler University**

21

1    Q.    Okay.  As you sit here today, do you have any way

2          of knowing if, in fact, this Exhibit 100 is the

3          information that was provided to you regarding

4          the complaint J.F. filed against you?

5    A.    I would imagine it is in my Butler email.

6    Q.    Okay.  Do you still have access to your Butler

7          email?

8    A.    Yes, I do.

9    Q.    I'm going to look at the second paragraph here on

10         Exhibit 100.  It says, It is alleged that you

11         (Respondent) have engaged in a course of conduct

12         towards J.F. (Complainant) that includes the

13         following:  tracking her location via social

14         media throughout the course of your friendship;

15         watching from the window of your pod to see when

16         members of Complainant's pod at Fairview come and

17         go; coming into her pod on multiple occasions

18         without asking first; entering the general area

19         of Complainant's pod on multiple occasions while

20         she and her roommates were not present in the

21         pod, searching for them; and entering

22         Complainant's individual room without

23         Complainant's permission when she wasn't there

24         and using her bathroom.

25              What I just read, is that what you're

22

```
 1            referring to in your complaint when you talk
 2            about J.F.'s complaint?
 3                 MR. MILTENBERG:  Objection.  You can answer.
 4     A.     Yes.
 5     Q.     Okay.  And as you sit there today, do you recall
 6            how you first learned about her complaints?
 7     A.     I had first learned about her complaint from an
 8            email from Mrs. Kanger on March 13th of 2021.
 9     Q.     And to your recollection, was a document such as
10            this attached to that email?
11     A.     I do not recall.
12     Q.     In that email from Ms. Kanger, did you -- how did
13            she advise you of the allegations that J.F. had
14            made?
15     A.     Ms. Kanger had emailed me asking to meet with me
16            on a Zoom call, and I had found out the
17            allegations from Ms. ███████ on that Zoom call.
18     Q.     Who else participated in that Zoom call?
19     A.     My mother, me, and Ms. Kanger.
20     Q.     And do you remember the date of that call?
21     A.     I believe that was March 13th, 2021.
22     Q.     Do you have any way of knowing what information
23            J.F. originally provided to Butler at the time
24            she made her complaint?
25     A.     I don't recall.
```

23

1    Q.   Were you ever provided with a copy of her

2        complaint?

3    A.   I don't recall.

4    Q.   Everything that we talked about there in

5        Paragraph 2 of Exhibit 100 regarding her

6        allegations, are those things you had heard

7        before today?

8    A.   Yes, I have.

9    Q.   I'm going to move on to paragraph Number 3 of

10       Exhibit 100.  It says, It is also alleged that at

11       the beginning of the academic year, Complainant

12       made it clear that her individual room was

13       private and that access to her room is definitely

14       something that you have to ask for.

15          Were you advised that that was one of the

16       complaints that J.F. had made?

17    A.   Yes, I believe I was.

18    Q.   Okay.  The next sentence says, Complainant said

19       that she made a big enough deal about this that

20       everyone is aware, and people would joke about

21       needing written permission to enter Complainant's

22       room.

23          Were you aware that that's an allegation that

24       she had made in this process as well?

25    A.   Yes, I was.

24

1   Q.   Okay.  The next sentence says, Further,

2        Complainant alleged that you, in particular, were

3        very aware that Complainant had experienced a

4        break-in of her cabin, that things were stolen,

5        and that it was a huge fear of Complainant's that

6        other people may enter her space and hurt her.

7            Were you aware that that was an allegation

8        that J.F. had made as well?

9   A.   Yes, I was.  But that statement is untrue.

10  Q.   Okay.  And then the next sentence says,

11       Additionally, it is alleged that Complainant and

12       her roommates spoke with you about three weeks

13       before the end of Fall 2020 semester establishing

14       their boundaries.

15           Were you aware that that was an allegation

16       that was made as part of this complaint?

17  A.   Yes, I was.

18  Q.   Okay.  Then the last sentence says, It is alleged

19       that you were very -- I'm sorry -- is alleged

20       that they were very specific with you about these

21       boundaries, including things like the hours that

22       you could visit their room.

23           Were you aware that that was also an

24       allegation made in the complaint?

25  A.   Yes, I was.

25

1    Q.    Moving on to the fourth paragraph, starting with

2           the first sentence, it says, Complainant also

3           provided information regarding the impact of the

4           alleged course of conduct.  She stated that your

5           presence in the general area of her pod,

6           including at times when she and her roommates

7           were not present, caused her to feel very

8           uncomfortable.

9               Were you aware that that was an allegation

10          that J.F. was making?

11   A.    Yes, I believe I was.

12   Q.    When she learned that you were present in the

13          general area of her pod on the night you

14          allegedly entered her individual space and used

15          her bathroom, she became extremely stressed out

16          because she was aware from campus -- I'm sorry --

17          she was away from campus and had forgotten to

18          lock the door in her individual room.

19              Were you aware that that was an allegation

20          that J.F. made in this process?

21   A.    Yes.

22   Q.    Next sentence says, Later when a friend who was

23          present in the pod that night told her that you

24          had entered her individual space and used her

25          bathroom, she was very distraught.

26

1         Were you aware that that was also an

2         allegation that J.F. made in this complaint

3         process?

4    A.   Yes, I was.

5    Q.   Next sentence says, She said that when she

6         confronted you about it via text, you said that

7         the friend had given her permission -- I'm sorry.

8         Yeah -- you said that the friend had given you

9         permission to use the bathroom.

10        Were you aware that that was an allegation

11        that J.F. made in this complaint?

12   A.   Yes.

13   Q.   Next sentence says, Complainant said that she was

14        upset -- I'm sorry.  Complainant said that this

15        upset her because she had spoken to the friend

16        and knew that this was not true and because she

17        felt that was a terrible excuse, as the friend

18        was not a resident of the Complainant's room.

19        Were you aware that that was an allegation

20        that J.F. made in this complaint?

21   A.   Yes.

22   Q.   Next sentence says, After this, Complainant

23        stated that she was -- I'm sorry -- that she had

24        a really bad mental breakdown.

25        Were you aware that that was an allegation

27

1        that J.F. made with her complaint?

2    A.    Yes.

3    Q.    The last sentence there in that paragraph says,

4        Further, Complainant said that finding out things

5        such as that you were tracking her via social

6        media felt like the TV show "You," when someone

7        pretends to be a friend in order to get

8        information about the person they have

9        befriended.

10        Were you aware that that was an allegation

11        that J.F. made in the complaint?

12    A.    Yes.  This was in the allegation.

13    Q.    Okay.  So even though you don't necessarily

14        recognize this document itself, the allegations

15        that we just talked about you were made aware of

16        throughout the complaint process; is that

17        accurate?

18    A.    Correct.

19    Q.    Okay.  And if you wanted to go back and see if

20        you had a copy of this document in your

21        possession, how would you go about that?

22    A.    I would look back in my Butler email and look for

23        the date it was sent.

24    Q.    Switching over here, you should be able to see

25        the complaint again.  Is that the document you

28

1        can see on your screen?

2    A.   Yes.

3    Q.   Going down to Paragraph 150b that says, Butler

4        did not provide plaintiff with meaningful access

5        to the information gathered during the

6        investigation, including by overredacting the

7        records to such an extent that they were

8        virtually inscrutable and repeatedly refusing to

9        ameliorate the issue despite numerous requests

10       from plaintiff.

11            I'm going to ask you some questions about

12       that particular allegation.  When you talk about

13       redactions, can you tell me what was redacted?

14   A.   In almost --

15            MR. MILTENBERG:  Objection.  You can answer.

16   A.   In some certain documents it would say Witness

17       Number 1 through 10, and we would have to comb

18       back through the documents to put together who

19       that exactly was.

20   Q.   Was it generally -- to your recollection, was it

21       generally witness names that were redacted?

22   A.   Yes.

23

24            MR. MILTENBERG:  Objection.  You can answer.

25   A.   As well as -- yes.

29

1    Q.    As well as what?

2    A.    As well as some certain other information.

3    Q.    You talk about -- let's make sure we know what

4          particular documents we have here.  I'll

5          represent to you that these documents were

6          provided by your counsel in response to

7          discovery.

8              (Exhibit 102, Final Investigation Reporter,

9              PLTF000001-118, was introduced.)

10   Q.    You should see what's been labeled as

11         Exhibit 102.  In the left-hand corner it says

12         Butler University, and then the caption, the heading,

13         first sentence -- or the first line says, Final

14         Investigation Report.  Is that what you're seeing?

15   A.    Yes.

16   Q.    Okay.  Scrolling down to the bottom of this page,

17         the number that's Bates stamped in the far

18         right-hand corner is PLTF000001.  Do you see that

19         as well?

20   A.    Yes.

21   Q.    Okay.  Up here in the top, you can see that this

22         is page 1 of 118 pages.  I'm happy to scroll

23         through this document as much as you need.  You

24         let me know how much you want to see.  My

25         question to you is:  Is this a report that you

30

1              received from Butler?

2    A.     Yes, it is.

3                   (Exhibit 103, Final Investigation Report

4                   Appendix, PLTF000130-366, was introduced.)

5    Q.     Okay.  You should see on your screen Exhibit 103.

6           The top line of that document says Final

7           Investigative Report Appendix.  Do you see that?

8    A.     Yes, I do.

9    Q.     Scrolling down to the bottom, the number in the far

10          right-hand corner is PLTF000130.  Do you see that?

11   A.     Yes.

12   Q.     Okay.  Again, I'll represent to you, as shown in

13          the top corner here, this is page 1 of 237 pages.

14          Are you familiar with this document?

15   A.     Yes, I am.

16   Q.     Do you know how you received that document?

17   A.     To the best of my knowledge, I received this from

18          an email from Mrs. Kanger.

19   Q.     And is this a document that you reviewed prior to

20          today?

21                  MR. MILTENBERG:  Objection.  You can answer.

22   A.     Yes, it is.

23                  (Exhibit 104, Final Investigation Report:

24                  Information Directly Related to the

25                  Allegations, was introduced.)

31

1    Q.    Showing you what's been labeled as Exhibit 104,

2          the first line of this says, Final Investigative

3          Report, and down at the bottom -- oh, we don't

4          have a Bates stamp here.  The next line says,

5          Information Directly Related to the Allegations.

6          Is that the document you're seeing on your

7          screen?

8    A.    Yes.

9    Q.    Okay.  Have you seen this document before?

10   A.    Yes.

11   Q.    Okay.  And do you know how you received a copy of

12         it?

13   A.    To the best of my knowledge, I received this from

14         Ms. Kanger as well.

15   Q.    Okay.  And prior to today, have you looked

16         through this document?

17               MR. MILTENBERG:  Objection.  You can answer.

18   A.    Yes.

19               (Exhibit 105, Final Investigation Report:

20               Information Not Directly Related to the

21               Allegations, PLTF000119-129, was

22               introduced.)

23   Q.    I think we have one more that goes with this set.

24         Yep.  You should be seeing on your screen what's

25         labeled as Exhibit 105.  First line of this

36

1      to you is:  Looking at your complaint, when you

2      talk about Butler not providing meaningful access

3      to the information that was gathered during the

4      investigation, that particular allegation, are

5      you encompassing in that the document that we

6      looked at labeled as Exhibit 101 -- I'm sorry --

7      102?  And I will share that with you again.

8           Well, let's try this share again.  102, do

9      you see that document on your screen now?

10  A.   Yes.

11  Q.   Okay.  So when you talk about the information --

12       not having meaningful access to the information

13       gathered during the investigation, is Exhibit 102

14       one of the documents you're talking about?

15  A.   Can you repeat the question, please?

16  Q.   Yes.  You make an allegation that Butler did not

17       provide you with meaningful access to the

18       information gathered during the investigation.

19       In that allegation, is Exhibit 102 one of the

20       documents you're referring to?

21  A.   During the investigation there were multiple

22       versions of documents that were sent to me that

23       had many redactions much like this.

24  Q.   Okay.  So you have received versions other than

25       Exhibit 102 through 105 that we just looked at?

37

1   A.   To the best of my knowledge, at some point I

2        might have.

3   Q.   Okay.  I will represent to you that in discovery

4        you did not provide me with any other documents

5        or reports from Butler.  Do you believe you have

6        others in your possession?

7   A.   I don't recall.

8   Q.   Okay.  For purposes of producing documents for

9        discovery, how did you obtain this exhibit that's

10       on the screen right now identified as

11       Exhibit 102?

12  A.   I believe I would have gotten that from

13       Ms. Kanger.

14  Q.   Okay.  But in order to produce it as an exhibit

15       in this lawsuit, how did you go about finding

16       this document?

17  A.   I had documents from this -- these allegations in

18       my possession, and I saved them to my computer as

19       I received them.

20  Q.   Okay.  And in order to provide a copy to me in

21       response to discovery, did you then go search

22       your computer for the documents?

23  A.   Yes.

24  Q.   Okay.  Did you provide all of the documents that

25       you found?

38

```
 1              MR. MILTENBERG:  Objection.  You can answer.
 2    A.    To the best of my knowledge, I believe I did.
 3    Q.    Okay.  So you just gave an answer a few moments
 4          ago saying that you received variation documents
 5          throughout this process that were redacted.  Are
 6          you aware, as you sit there today, of other
 7          documents that we have not looked at on these
 8          Exhibits 102 through 105 which were redacted?
 9              MR. MILTENBERG:  Objection.  You can answer.
10    A.    I don't recall.
11    Q.    Do you recall receiving a preliminary
12          investigation report?
13    A.    Yes, I do.
14    Q.    Okay.  Do you still have a copy of that report?
15    A.    I believe I do.
16    Q.    Okay.  I will represent to you that in the
17          documents provided in discovery, you did not
18          provide the preliminary investigation report.
19              Do you know why you would have not provided
20          that?
21    A.    I do not recall.
22    Q.    Would you have destroyed that document?
23              MR. MILTENBERG:  Objection.  You can answer
24              if you know.
25    A.    I would not have destroyed that document.
```

39

1    Q.    Okay.  So if that's something you had, at least

2          to your knowledge, that's a document you would

3          still have in your possession, correct?

4              MR. MILTENBERG:  Objection.  You can answer.

5    A.    Yes, I believe so.

6    Q.    Okay.  And if you wanted to go search for that

7          document, how would you find it and identify it

8          to produce it?

9    A.    I would look through the saved downloads on my

10         computer.

11   Q.    You were provided with Exhibit 102 that's

12         118 pages; is that accurate?

13             MR. MILTENBERG:  Objection.  You can answer.

14   A.    Yes.  To the best of my knowledge, I had.

15   Q.    Okay.  And if this was produced to us by your

16         counsel, is this a document you would have

17         provided to your counsel?

18             MR. MILTENBERG:  Objection.  You can answer.

19   A.    Yes, I believe so.

20             (Exhibit 101, Key of Participants,

21             PLTF000368, was introduced.)

22   Q.    I'm sharing my screen so you can see a document

23         that's labeled as Exhibit 101.  Up in the

24         left-hand corner it says Butler University, and

25         then the first title of the document says, Key of

40

1           Participants.  Do you see that document?

2     A.    Yes.

3     Q.    Okay.  Did you receive a copy of this?

4     A.    Yes, I did.

5     Q.    Do you know when you received this document?

6     A.    I do not recall a specific date to when I would

7           have received this.

8     Q.    Okay.  You had testified earlier that -- I'll

9           have to look at my notes here -- that some

10          witnesses -- when you talked about redactions,

11          some witnesses' names were taken out and

12          identified with things such as Witness Number 1.

13          Does that sound correct?

14    A.    Yes.

15    Q.    Okay.  And at the time you received a report that

16          referred to Witness Number 1, did you also

17          receive this Exhibit 101 that told you who

18          Witness Number 1 was?

19    A.    Yes, I believe so.

20    Q.    Were you given an opportunity to provide a

21          response to the preliminary investigation report?

22    A.    Yes, I was.

23    Q.    Okay.  Did you take advantage of that opportunity

24          and actually provide a response?

25    A.    I do not believe I did.

41

```
 1              (Exhibit 106, 7-16-2021 Response to the
 2              Preliminary Investigative Report and
 3              Evidence, was introduced.)
 4    Q.    Sharing my screen here to show you a document
 5          that's been labeled as Exhibit 106.  Have you
 6          seen this document before?
 7    A.    Yes, I have.
 8    Q.    Okay.  Is this a -- and I'll represent to you
 9          that I'm showing you currently page 1 of 8.  I'm
10          happy to scroll through for you to see the entire
11          document.  Please let me know if you need that.
12          Is this a document that you prepared?
13    A.    Yes, it is.
14    Q.    And the heading of this, so to speak, that's in
15          bold print and underlined says, Response to
16          Preliminary Investigative Report and Evidence.
17          Do you see that?
18    A.    Yes, I do.
19    Q.    Is that an appropriate title for what this
20          document represents?
21              MR. MILTENBERG:  Objection.  You can answer.
22    A.    Yes, it is.
23    Q.    Okay.  Did you, in fact, prepare this document as
24          your response to the preliminary investigative
25          report?
```

42

```
1    A.    Yes, I did.
2    Q.    And then did -- after preparing this, did you
3          submit this to Butler?
4    A.    Yes, I did.
5    Q.    I'm going to flip down to page 5 here of your
6          report -- I'm sorry -- of your response, I should
7          say.  In the first paragraph on page 5 here, do
8          you see where you make reference to Witness 2 and
9          Witness 5?
10   A.    Yes, I do.
11   Q.    Okay.  If you look at that paragraph and what
12         you're referring to with Witness 2 and Witness 5,
13         I'm going to show you Exhibit 101 and ask you
14         some questions.  So if you'll just read that for
15         a moment.  Are you good or do you need more time?
16   A.    Yes, I'm good.
17   Q.    I'm sorry.  You're good?  Okay.
18   A.    Yeah.
19   Q.    I'm just going to switch here.  So Witness 2 and
20         Witness 5 are the two I'm looking at.  Going back
21         here to Exhibit 101, based upon what you read in
22         your response to the preliminary investigation,
23         does your reference to Witness 2 and Witness 5
24         align with the individuals identified on
25         Exhibit 101?
```

43

1    A.    Yes, I believe it does.

2    Q.    Okay.  So at the time you wrote your report --

3          your response to the preliminary investigative

4          report, do you believe you had the information

5          available to be able to identify who Witness 2

6          and Witness 5 were?

7    A.    Yes.

8    Q.    Going back to show you Exhibit 106, there are

9          parts of your response, particularly starting

10         here in Paragraph 2 on page 5, where it refers to

11         witnesses by name.  Do you see that as well?

12   A.    Yes, I do.

13   Q.    Were you -- when you're referring to witnesses by

14         name, can you tell me how you were able to

15         identify who those witnesses were?

16   A.    Can you repeat that question again?

17   Q.    Sure.  So in the first paragraph, you referred to

18         the individuals as Witness 1 and Witness 5.  Then

19         the next paragraph you used names instead of

20         those identifiers.  So far does that make sense

21         in what I'm pointing out?

22   A.    Yes.

23   Q.    Okay.  So based upon that, my question is:  How

24         were you able to identify who the individuals

25         were so that you could call them by name in

44

1          Paragraph 2 instead of by their identifiers?
2              MR. MILTENBERG:   Objection.   You can answer.
3    A.    I don't recall.
4    Q.    Okay.   When you first received the preliminary
5          investigative report, do you recall if it could
6          be viewed only online?
7    A.    I don't recall.
8    Q.    Okay.   Do you recall if you were ultimately able
9          to download a copy of that preliminary report?
10   A.    I do not recall either.
11             (Exhibit 110, June-July 2021 email chain,
12             was introduced.)
13   Q.    Sharing my screen with you to show you an exhibit
14         that's labeled as Exhibit 110.   I'll represent to
15         you that, as shown on the upper left-hand corner,
16         this is page 1 of eight pages.   The first
17         individual on this is Kody Rother.   Do you know
18         who Kody Rother is?
19   A.    Yes, I do.
20   Q.    Okay.   Who is that?
21   A.    Mr. Rother was the investigator.
22   Q.    And then the individual who's sending this email
23         that's at the top of page 1 is Marybeth Sydor.
24         Do you know who Marybeth is?
25   A.    Yes, I do.

45

1   Q.   Who's Marybeth?

2   A.   Ms. Sydor, one of my lawyers.

3   Q.   Did she assist you throughout the investigation

4        process and hearing at Butler?

5   A.   Can you repeat that?

6   Q.   Sure.  Did Marybeth Sydor assist you during the

7        investigation, hearing, and that process at

8        Butler?

9   A.   Yes, she did.

10  Q.   During the Sexual Misconduct Policy investigation

11       that took place, were you allowed to have an

12       advisor?

13  A.   Yes, I was.

14  Q.   Okay.  And was Marybeth Sydor the individual you

15       identified as your advisor?

16  A.   Yes, she was.

17  Q.   Taking you to page 4 of Exhibit 110, the message

18       that's on the screen there, which is -- I'm

19       showing you an email from Kody Rother to Marybeth

20       Sydor dated June 30, 2021.  Is that what you're

21       seeing as well?

22  A.   Yes.

23  Q.   Okay.  You're cc'd on this email.  Do you recall

24       seeing this previously?

25  A.   Yes, I do.

46

1    Q.    Okay.  And as you read through that email that's

2          on the screen, does that tell you if you were

3          able to at some point be able to download the

4          preliminary investigative report?

5          MR. MILTENBERG:  Objection.  You can answer.

6    A.    Yes, it does.

7    Q.    Okay.  And based upon what you're seeing here in

8          Exhibit 110 and your recollection of what you

9          were able to do, did you, in fact, download a

10         copy of that report?

11        MR. MILTENBERG:  Objection.  You can answer.

12    A.   I don't recall.

13    Q.   Okay.  Do you recall at the time you received the

14        preliminary report if you also received an

15        appendix with it?

16    A.   Yes, I believe I did.

17    Q.   Okay.  And did that appendix include the

18        investigator's notes and summaries?

19    A.   Yes, I believe it did.

20    Q.   We talked about the redactions that were on the

21        documents that you received from Butler.  Do you

22        know if J.F. received documents with the same

23        redactions?

24    A.   I do not.

25    Q.   Okay.  Do you have any personal knowledge as to

47

```
 1            what the documents looked like that J.F. received
 2            from Butler?
 3    A.      No, I do not.
 4    Q.      All right.  I've put back up on the screen for
 5            you Exhibit 106.  I'll scroll back to the top
 6            just so you know.  This is the document that was
 7            titled Response to the Preliminary Investigative
 8            Report and Evidence that you prepared.  Can you
 9            tell me in general, what sort of information did
10            you try to provide in that report?
11                 MR. MILTENBERG:  Objection.  You can answer.
12    A.      I believe I tried to provide my best accounts of
13            what happened.
14    Q.      Were you given any instructions from Butler as to
15            what you could or could not include in that
16            response?
17    A.      I do not recall.
18    Q.      Were you given any page limits?
19    A.      I do not believe so.
20    Q.      How did you decide what you would include in this
21            particular response?
22    A.      I do not recall.
23    Q.      Do you recall if there's any information that you
24            wanted to provide in this response but you felt
25            you were not able to?
```

48

| | | |
|---|---|---|
| 1 | | MR. MILTENBERG:  Objection.  You can answer. |
| 2 | A. | No, I do not. |
| 3 | Q. | Did you work with your advisor in preparing the |
| 4 | | response that we have here in Exhibit 106? |
| 5 | A. | I do not recall. |
| 6 | Q. | Is it your recollection that you actually |
| 7 | | prepared this document? |
| 8 | A. | Yes.  With my mother, I believe I did. |
| 9 | Q. | And is this a document that you believe you have |
| 10 | | on your computer? |
| 11 | A. | Yes. |
| 12 | Q. | Okay.  All right.  I'm sharing with you once |
| 13 | | again the complaint that was filed in this |
| 14 | | action.  We're on page 30 of it, looking |
| 15 | | specifically about Paragraph 150, subparagraph C, |
| 16 | | down at the bottom.  The allegation is Butler did |
| 17 | | not complete the investigation in a reasonably |
| 18 | | prompt time frame, but rather expanded the |
| 19 | | investigation above and beyond the relevant |
| 20 | | claims to become an aimless evaluation of |
| 21 | | plaintiff's personality and friendships as a |
| 22 | | whole. |
| 23 | | I want to ask you some questions about that |
| 24 | | particular allegation.  Okay?  I'm sorry.  Is |
| 25 | | that a yes? |

49

1  A.    Yes.

2  Q.    And, ███, I apologize.  I should have said that

3        at the beginning.  I know in common-day

4        communication we often nod and shake our head to

5        indicate yes or no.  The court reporter is not

6        able to pick that up on the record.  And so if I

7        say to you is that a yes or is that a no, please

8        know I'm just trying to make a record.  I'm not

9        trying to be rude.  I do understand that's the

10       way we would normally speak -- or we would

11       normally communicate.  It just doesn't translate

12       well to a deposition.  Okay?

13 A.    Yes.

14 Q.    Okay.  And this paragraph that I just read to

15       you, that first sentence, it says that the

16       investigation was not completed in a reasonably

17       prompt time frame.  What do you mean by

18       reasonably prompt?

19             MR. MILTENBERG:  Objection.  You can answer.

20 A.    What sticks out to me most is Mr. Rother

21       resigning 69 minutes before the first hearing

22       date on September 2, and that had to be postponed

23       until a month later on October 13th.

24 Q.    So as far as you're considered, the issue with

25       reasonably prompt has to do with the hearing and

70

1    A.    To the best of my knowledge, I do not believe so.

2    Q.    Okay.  And did J.F. ask you any questions?

3    A.    No, she did not.

4    Q.    Did you present any documents to the

5          decision-maker?

6              MR. MILTENBERG:  Objection.  You can answer.

7    A.    I do not recall.

8    Q.    As for the information you presented at the

9          hearing, other than the opening statement and

10         answering those questions, do you recall anything

11         else you did?

12   A.    I do not.

13   Q.    Do you recall anything else that was done on your

14         behalf at the hearing?

15   A.    I do not.

16   Q.    Okay.  Did J.F. present an opening statement?

17   A.    Yes.

18   Q.    Okay.  And did J.F. answer questions as well?

19   A.    Yes, I believe she did.

20   Q.    Do you recall who asked J.F. questions?

21   A.    I believe my advisor, Ms. Sydor, did.

22   Q.    Do you recall if anyone else asked J.F.

23         questions?

24   A.    No, I do not.

25   Q.    Do you recall if J.F. provided any documents or

71

```
 1          exhibits at the hearing?
 2   A.     I do not.
 3   Q.     Do you recall if J.F. presented any other
 4          witnesses?
 5   A.     I believe there were about three or four
 6          witnesses who testified.
 7   Q.     And did each of those witnesses answer questions?
 8              MR. MILTENBERG:  Objection.  You can answer
 9              if you know.
10   A.     Yes, they did.
11   Q.     Do you recall who asked them questions?
12   A.     My advisor, Mrs. Sydor, did.
13   Q.     Do you recall if anyone else asked those
14          witnesses questions?
15   A.     No, I do not.
16   Q.     Do you recall if any of those three or four
17          witnesses provided any documents to the
18          decision-maker?
19   A.     No, I do not.
20   Q.     Sharing my screen again with you, looking at
21          Exhibit 101, the Key of Participants.  Can you
22          identify by witness identifier who those three or
23          four witnesses were who testified at the hearing?
24   A.     I only remember Mr. ███ testifying, Witness
25          Number 6.
```

72

```
1    Q.   Thank you.  So if I understand correctly, it's
2         your recollection that there were other
3         witnesses, but you don't recall who those
4         individuals were?
5    A.   Correct.  The only other one I remember is
6         Witness 3, Ms. ███.
7    Q.   You believe that Witness 3 also testified at the
8         hearing?
9    A.   Yes, I do.
10   Q.   Okay.  Of all the individuals listed here on
11        Exhibit 1 in the Key of Participants, did you
12        want to call any of them as witnesses to testify
13        on your behalf?
14             MR. MILTENBERG:  Objection.  You can answer.
15   A.   I do not recall.
16   Q.   Okay.  Did you ask any of them to come to the
17        hearing to testify on your behalf?
18   A.   I did not.
19   Q.   Once you were found not responsible by the
20        decision-maker, was that the end of this
21        investigative process?
22   A.   Yes.
23             MR. MILTENBERG:  Objection.  If you know.
24   A.   I believe it was.
25   Q.   Okay.  Do you know if J.F. had an opportunity to
```

73

1    file an appeal?

2      MR. MILTENBERG:   Objection.   If you know.

3  A.  Yes.   She did file an appeal, and Butler did not

4    take it into account.

5  Q.  Do you believe you were advised -- did someone

6    provide you a copy of her appeal?

7  A.  I do not recall.

8  Q.  Is it your understanding that ultimately through

9    the hearing and the appeal process, the decision

10    that you were not responsible remains standing?

11  A.  Yes, to the best of my knowledge.

12  Q.  Showing you once again the complaint that's filed

13    in this case, I'll go back down to page 31.

14    Looking here at exhibit -- or I'm sorry --

15    Paragraph 150f, says, Butler failed to properly

16    address harassment by B.P. and, slash, or J.F.

17     What harassment are you referring to in that

18    paragraph of your complaint?

19  A.  I believe B.P. and J.F. made false allegations

20    against me to turn my friend group against me and

21    end all friendship with those people.

22  Q.  Were those false allegations that you just

23    mentioned in your answer part of this complaint

24    process?

25  A.  Yes, I believe they were.

74

1   Q.   What were the false allegations?

2   A.   I believe Ms. ███ or B.P. had said that I looked

3        out my window in Fairview to see when the other

4        members, including J.F., would be coming in; and

5        by a map of that Fairview house, it was not

6        possible that I could look through the window.

7        And that information is completely false.

8   Q.   And what were the other false allegations?

9   A.   I do not recall.

10  Q.   Why do you believe B.P. and J.F. made those false

11       allegations?

12            MR. MILTENBERG:   Objection.   If you know.

13  A.   I am not sure.

14  Q.   Okay.  Do you have any information as to what

15       their motive was?

16  A.   I do not.  After two years, I am still very,

17       very -- I have no idea why they did this to me.

18  Q.   Other than the information that was provided

19       within the context of this complaint process, was

20       there other harassment that you believe took

21       place?

22  A.   No, I do not.  I believe this investigation was a

23       form of harassment.

24  Q.   When you say the investigation, you believe that

25       the process was a form of harassment?

75

1    A.    Yes, I do.

2    Q.    Why do you believe that was a form of harassment?

3    A.    At the end of the mediation, Mrs. ████████ had

4          said that she would cut all -- the friends would

5          cut all contact with me.  I did not have any

6          contact with her or the other members of the

7          friend group, and she still decided to file this

8          complaint against me.

9    Q.    Let me know if I've got this correct.  You

10         believe that because she could have just cut

11         ties, but instead she opted to file the

12         complaint, that is another incident of

13         harassment?

14   A.    Yes, I believe so.

15   Q.    All right.  Did you file a written complaint with

16         the university regarding what you've identified

17         as harassment?

18   A.    I did not.

19   Q.    Did you ever speak with anyone at Butler about

20         potentially filing a formal complaint against

21         J.F.?

22   A.    I did not.

23   Q.    Going back to the complaint that should still be

24         on your screen, paragraph 150, subparagraph G, it

25         says, Butler failed to provide properly trained

76

```
 1            resident assistants and failed to ensure a safe
 2            and nonhostile living environment for Plaintiff.
 3                 With regards to that allegation, tell me what
 4            training you believe should have been provided to
 5            the residents -- I'm sorry -- take two.
 6                 Tell me what training you believe should have
 7            been provided to the resident assistants that was
 8            not provided?
 9    A.     I don't have specifics, but I know they should
10            have never escalated to this.  The resident
11            assistants told me, mine did, that this whole
12            situation would blow over; and it clearly did
13            not.
14    Q.     At the time your resident assistants told you
15            this whole situation should blow over, did you
16            believe that's what would happen too?
17    A.     I did not know what to think, but I trusted their
18            judgment being that they held some position at
19            the university.  And I was being harassed, so I
20            had to trust them to some extent.
21    Q.     And the resident assistant that you spoke with
22            didn't actually file a complaint against you, did
23            he?
24    A.     There were two resident assistants.  Mine was
25            Ms. Harris and theirs was another male.
```

██████████

77

1   Q.   Did Ms. Harris file a complaint against you?

2   A.   No, she did not.

3   Q.   And did the other resident assistant that you

4       just referred to as another male, did he file a

5       complaint against you?

6   A.   No, he did not.

7   Q.   Okay.  To your knowledge, did either one of them

8       tell J.F. to file a complaint against you?

9   A.   I do not recall.

10   Q.   When did your living environment become hostile?

11   A.   My living situation became hostile right after

12       the mediation.

13   Q.   Do you recall when the mediation took place?

14   A.   I believe -- I don't have the specific date, but

15       it was sometime in March of 2021.

16   Q.   Prior to the mediation, you didn't have any

17       concerns or complaints about your living

18       environment; is that right?

19          MR. MILTENBERG:  Objection.  You can answer.

20   A.   No, I did not.

21   Q.   And after the mediation, what particularly

22       changed to make your environment hostile?

23   A.   I was sharing a pod with Ms. ████ and she, she

24       told me hearsay all the time of the Butler police

25       department knows what you did.  And we shared a

                                                                78

 1          vent; and at one point in time, I was on a phone

 2          call with my mother.  And ███ had overheard and

 3          began yelling at me.

 4     Q.   And all of that happened after the mediation?

 5     A.   Correct.

 6     Q.   How long did you stay in the dorm after the

 7          mediation before you went back to your home in

 8          Seattle?

 9     A.   I had to go away from campus twice, and I believe

10          the last time was in mid April when I went home

11          for the summer.

12     Q.   Mid April of 2021?

13     A.   Correct.

14     Q.   Do you have any way of knowing when you first

15          went home to Seattle?

16     A.   I believe it was sometime in March.

17     Q.   Were you provided with the option of changing

18          housing?

19     A.   No, I was not.

20               (Exhibit 113, 4-5-2021 Kanger/███ email

21          chain, was introduced.)

22     Q.   Okay.  I'm sharing my screen here that shows

23          Exhibit 113.  I'll represent to you that this is

24          a two-page document.  I'll scroll down real

25          quick.  You can see the last page only has your

███████████

79

| 1 | | name on it.  Starting at the bottom, do you |
|---|---|---|
| 2 | | recognize what this document is? |
| 3 | A. | Yes, I do. |
| 4 | Q. | Okay.  What do you see there at the bottom of |
| 5 | | page 1, Exhibit 113? |
| 6 | A. | I see a email from Ms. Kanger to me. |
| 7 | Q. | What I'm looking at under where it says Original |
| 8 | | Message, it says from ████, comma, ███.  Is |
| 9 | | that what you're seeing as well? |
| 10 | A. | Oh, yes.  Sorry about that. |
| 11 | Q. | Okay.  Does that indicate that the message is |
| 12 | | from you? |
| 13 | A. | Yes. |
| 14 | Q. | Okay.  And is this message dated April 5, 2021? |
| 15 | A. | Correct. |
| 16 | Q. | And who is the message directed to? |
| 17 | A. | Ms. Kanger. |
| 18 | Q. | And what was she in relation to you at Butler? |
| 19 | A. | She was the head of the Title IX office at |
| 20 | | Butler. |
| 21 | Q. | Okay.  What were you reaching out to Ms. Kanger |
| 22 | | about? |
| 23 | A. | I believe I was reaching out to Ms. Kanger about |
| 24 | | seeing a counselor. |
| 25 | Q. | Your email says, There are no let's talk hours |

80

| | | |
|---|---|---|
| 1 | | today for Butler.  There are no quotes around it, |
| 2 | | but is the term "let's talk hours" something |
| 3 | | that's a term that's used on Butler's campus? |
| 4 | A. | I believe during COVID, this was a check-in for |
| 5 | | the RAs to communicate with their students in the |
| 6 | | residential houses. |
| 7 | Q. | And is that what you meant when you said, There |
| 8 | | are no let's talk hours? |
| 9 | A. | Yes, I believe so. |
| 10 | Q. | Okay.  You indicated to her that you needed to |
| 11 | | see a counselor; is that accurate? |
| 12 | A. | Yes. |
| 13 | Q. | Is the message we see at the top of page 1 here |
| 14 | | Ms. Kanger's response to your email? |
| 15 | A. | Yes. |
| 16 | Q. | Did she provide you with a contact for counseling |
| 17 | | at that time? |
| 18 | A. | I do not recall. |
| 19 | Q. | Okay.  If we look at the first paragraph there, |
| 20 | | if you read that, does that refresh your memory |
| 21 | | as to whether or not she provided you with a |
| 22 | | contact? |
| 23 | A. | Yes, it does. |
| 24 | Q. | Okay.  And then at that time, did Ms. Kanger ask |
| 25 | | you if you needed to change your housing |

81

| | | |
|---|---|---|
| 1 | | situation -- or yeah, housing situation? |
| 2 | A. | Yes. |
| 3 | Q. | Looking at her email, it indicates that she'd |
| 4 | | previously talked to you about changing your |
| 5 | | housing.  Do you recall that now? |
| 6 | | MR. MILTENBERG:  Objection.  You can answer. |
| 7 | A. | Yes. |
| 8 | Q. | Okay.  What do you recall about prior discussions |
| 9 | | on changing your housing? |
| 10 | A. | I recalled that I emailed the housing director of |
| 11 | | Fairview, Ms. Bucey, and she never -- I never |
| 12 | | ended up switching rooms. |
| 13 | Q. | Do you recall telling Ms. Kanger that as of |
| 14 | | Friday, April 4th, you didn't see a need to |
| 15 | | change your housing situation at that time? |
| 16 | A. | I do not recall that.  But seeing these emails... |
| 17 | Q. | Does seeing these emails refresh your memory |
| 18 | | about that at all? |
| 19 | A. | Yes, they do. |
| 20 | Q. | Okay.  What is it specifically that you recall |
| 21 | | now after seeing this email? |
| 22 | A. | I recall that I said I did not need housing |
| 23 | | anymore because nothing was getting done |
| 24 | | beforehand.  And I, I said to Ms. Bucey that this |
| 25 | | was very urgent, and I didn't hear back for |

83

1          hostile after the mediation.  I'd like to talk a

2          little bit about that mediation.  How did you

3          first learn that there was going to be a

4          mediation?

5     A.   I had received a text from Ms. Fulscher saying

6          that there would be a mediation on one -- at one

7          of the buildings on campus.

8     Q.   J.F. told you there was going to be a mediation?

9     A.   Correct.

10    Q.   Did she give you any additional information about

11         it at that time?

12    A.   I do not recall.

13    Q.   When you -- by the time you showed up at the

14         mediation, did you know who was going to be

15         there?

16    A.   I do not recall.

17    Q.   Do you know if you were told that it was going to

18         be a mediation?

19    A.   I do not recall.

20    Q.   Do you know if you were told the purpose of that

21         meeting?

22    A.   I do not.

23    Q.   Do you recall anything you were told in advance

24         of that mediation?

25              MR. MILTENBERG:  Objection.  You can answer.

████████████

84

```
 1    A.    I do not.

 2    Q.    Were you told that you had to attend the

 3          mediation?

 4    A.    I do not recall, but I went because Ms. ████████

 5          had texted me.

 6    Q.    Am I correct in saying that at that time, prior

 7          to the mediation, you and J.F. were still

 8          friends?

 9    A.    Correct.

10    Q.    Do you recall where the mediation was held?

11    A.    It was on the fourth floor of the Lacy School of

12          Business in a common area.

13    Q.    Do you know why it was held there?

14    A.    I do not.

15    Q.    Had you ever heard of any residents participating

16          in mediation before?

17    A.    I had not.

18    Q.    Do you know who requested this mediation?

19    A.    To the best of my knowledge, I believe it was

20          Ms. ████████.

21    Q.    Can you describe the mediation to me?

22                MR. MILTENBERG:  Objection.  You can answer.

23    A.    The mediation took place with Ms. ████████, along

24          with several other members of the cohort,

25          basically saying what I've done wrong the past
```

85

1          year and just verbally assaulting me.

2     Q.   Did people other than J.F. express concerns about

3          what you had done wrong prior year or the past

4          year?

5               MR. MILTENBERG:   Objection.   You can answer.

6     A.   Yes.  But I do not recall specifics.

7     Q.   Was there anybody who was present who was

8          speaking up on your behalf?

9     A.   No, there was not.

10    Q.   What role did the RAs play in the mediation?

11    A.   The RAs were --

12              MR. MILTENBERG:   Objection.   You can answer.

13    A.   The RAs were supposed to mediate the discussion

14         but merely just listened to the mediation.

15    Q.   When you say they were supposed to mediate the

16         discussion, what makes you believe that's what

17         role they were supposed to play?

18    A.   From mediation I assumed that the RAs would be

19         there to mediate the conversation.

20    Q.   That's an assumption that you're making just

21         based upon the word mediation?

22    A.   Yes.  I also believed that they had said at the

23         mediation what their role was.

24    Q.   As you sit here today, do you remember what they

25         said their role was?

86

1   A.   I do not in specific.

2   Q.   How did that mediation end?

3   A.   That mediation ended by them dismissing

4        Ms. ██████████ and the other members of the group,

5        and me crying and them trying to comfort me.

6   Q.   When you say them, do you mean both RAs?

7   A.   Yes, correct.

8   Q.   Do you recall anything they said to you?

9   A.   No, not in specific.

10  Q.   What were they doing to try to comfort you?

11  A.   I do not remember specifics, but I believe they

12       said something to the extent of:  It'll just blow

13       over.  It's not a big deal.

14  Q.   Did you discuss these issues with your RA at any

15       point after the mediation but before you learned

16       of J.F.'s complaint filed against you?

17  A.   I had discussed with my RA, Ms. Harris, and

18       I'm -- yes, I had.

19  Q.   When did you have those conversations with

20       Ms. Harris?

21  A.   I'm not sure the exact dates, but it would have

22       been within a week or a week and a half after the

23       mediation.

24  Q.   What did you discuss with her?

25  A.   I discussed with her how I was struggling with

87

```
 1          this and how to better deal with the situation
 2          because I was in shock and I was confused as to
 3          what specifically happened.
 4     Q.   Did she provide you with any assistance?
 5     A.   She said this whole issue would blow over, and it
 6          was not a big deal and it will work itself out.
 7     Q.   Did she provide you with any other assistance?
 8     A.   I don't recall.
 9     Q.   You testified that you were asking her how to
10          better deal with the situation.  Did she provide
11          you with any information on how to better deal
12          with it?
13               MR. MILTENBERG:  Objection.  You can answer.
14     A.   I don't recall specifics.
15     Q.   Outside of that conversation, did you have any
16          other conversations with the RAs between the
17          mediation and when J.F. filed a complaint?
18     A.   I do not believe so.
19     Q.   Did you have a good relationship with your RA?
20     A.   Yes.
21     Q.   Did you ever talk to your RA after you learned
22          that J.F. filed a complaint against you?
23     A.   I do not recall if it was before or after, no.
24     Q.   Do you ever recall having conversations with your
25          RA about the allegations that J.F. made in her
```

88

1     complaint?

2  A.  I do not.

3  Q.  You were finishing up the end of your sophomore

4     year at Butler when J.F. filed her complaint; is

5     that right?

6  A.  Yes, that's correct.

7  Q.  And I believe you testified at that time you were

8     already working on housing arrangements for your

9     senior year; is that right?

10 A.  Yes, that's correct.

11 Q.  Does that mean you had already locked in housing

12    arrangements for your junior year?

13 A.  At that time, I believe I had not.

14 Q.  Okay.  So you were working a year ahead, but you

15    didn't know where you were going to live your

16    junior year yet?

17 A.  At Butler, for senior housing, there are a number

18    of houses on campus or next to campus; and the

19    leases you have to sign two years in advance to

20    make sure you secure one.

21 Q.  Okay.  And so that's why you were focused on your

22    senior year, right?

23 A.  Yes.

24        MR. MILTENBERG:  Objection.  You can answer.

25 Q.  Then going back to your junior year, how was your

89

```
 1              housing going to be determined for that?
 2     A.       Junior housing was on campus, so I was with the
 3              other juniors where they house on campus.
 4     Q.       Okay.  And is there a lottery that you get into
 5              to determine where you're going to live and when
 6              you pick?
 7     A.       Yes.  There's a lottery on where the room will
 8              specifically be in the building.
 9     Q.       And had you already been through that lottery
10              process when J.F. filed her complaint in March of
11              2021?
12     A.       I had freshman year when I was not at the school
13              yet.
14     Q.       Okay.  But you hadn't been through the lottery
15              process in order to determine your junior year
16              housing?
17     A.       I don't recall --
18     Q.       Okay.
19     A.       -- where that was in the time line.
20     Q.       Okay.  At the time J.F. filed her complaint, do
21              you recall if you had any details locked in for
22              your next year's housing?
23     A.       I don't.
24     Q.       Okay.  Where did you live your junior year?
25     A.       I lived in a section of campus called Apartment
```

90

| | | |
|---|---|---|
| 1 | | Village with some other friends I had made. |
| 2 | Q. | And when did you make those arrangements to live |
| 3 | | with those friends in Apartment Village? |
| 4 | A. | I believe it was after Ms. ████████s complaint. |
| 5 | Q. | Did you have to change your original housing |
| 6 | | plans in order to go live with that new group of |
| 7 | | friends? |
| 8 | A. | No, I did not. |
| 9 | Q. | And what was your housing arrangement for your |
| 10 | | senior year? |
| 11 | A. | The original arrangement was with Ms. ████████ |
| 12 | | and two others in a senior house a block away |
| 13 | | from campus. |
| 14 | Q. | And when you say J.F. and two others, the two |
| 15 | | others that we're just identifying by a generic |
| 16 | | term there, were they part of the cohort that |
| 17 | | we've talked about? |
| 18 | A. | Yes, they were. |
| 19 | Q. | Okay.  Did they live in J.F.'s pod? |
| 20 | A. | Two -- there were actually three.  Two of them |
| 21 | | did -- or one of them did, and two of them did |
| 22 | | not. |
| 23 | Q. | Okay.  So it would have been you, J.F., and three |
| 24 | | others in your original senior housing plans? |
| 25 | A. | Correct. |

124

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


JOHN DOE,                          )
                                   )
          Plaintiff,               )
                                   ) CASE NO.
vs.                                ) 1:22-cv-01828-SEB-MG
                                   )
BUTLER UNIVERSITY,                 )
                                   )
          Defendant.               )


The deposition of ███████████, was taken in the
above-captioned case on June 26, 2023, and at the time
and place hereof.

It was requested that said deposition be transcribed
and reduced to typewritten form.

It was agreed by the deponent, all parties, and by
their respective counsel that the signature of the
deponent to the deposition be waived; said deposition
to be read with the same force and effect as if signed
by said deponent.

FURTHER THE DEPONENT SAITH NOT

(The reading and signing of the
deposition were waived by the
witness and all parties.)

_____
████████████████


                  SMITH REPORTING
         400 NORTH HIGH STREET, SUITE 200
              MUNCIE, INDIANA 47305
              info@smithreporting.net

125

C E R T I F I C A T E

    I, Tonya J. Dunn, a Notary Public, authorized to administer oaths and to take and certify depositions, do hereby certify that the above-named witness was by me, before the giving of their deposition, first duly sworn to testify the truth, the whole truth, and nothing but the truth to questions propounded at the taking of the foregoing deposition in a cause now pending and undetermined in said court.

    I further certify that the deposition above-set forth was reduced to writing by me by means of machine shorthand and was later transcribed from my original shorthand notes; that this is a true record of the testimony given by the witness; and that said deposition was taken at the aforementioned time, date, and place, pursuant to notice or stipulations of counsel.

    IN WITNESS WHEREOF, I have set my hand and seal this 12th day of July, 2023.



_____
Tonya J. Dunn, RPR, CMRS, and
Notary Public


# BUTLER STUDENT HANDBOOK



**STUDENT HANDBOOK MENU**

Rights & Responsibilities

University Rules of Conduct

Student Conduct System

Privacy Rights of Students

Campus Life Policies

Academic Policies

## Know your rights and responsibilities as a member of the Butler community.

The student handbook can serve as a map of the Butler University community—a reference guide covering a wide variety of topics. All Butler students are responsible to know and abide by the University rules, regulations, and policies that are referenced here. Additionally, this resource contains important information about the University's student conduct system. It is to your benefit to familiarize yourself with its content.

While this student handbook is intended to be a fair summary of certain matters of interest to students, its readers should be aware that it is not a complete statement of all procedures, policies, rules and regulations of Butler University; the University has the right to change without notice any procedures, policies or programs that appear in the student handbook; and the various colleges and departments of the University may have their own procedures and policies that apply to students. In addition, except where expressly noted herein, this student handbook is not, nor is it intended, to create a contract between any student and the University. The terms set forth in this student handbook do not create contractual or legal rights for students.

Various committees and staff members of the University are responsible for the areas covered in the student handbook and the affiliated websites. The University, these committees and officers have the right to make changes in University regulations, policies, procedures and other matters as deemed appropriate, with or without notice to students. Updates and changes to University rules and policies that occur after August are likely to be highlighted on the Butler App, on department websites, and/or sent directly to a student's Butler-assigned email addresses.

Butler students wishing further information concerning the topics dealt with in the student handbook are encouraged to contact the Office of the Dean of Students in Atherton Union, Room 311, 317-940-9470, and deanofstudents@butler.edu. Comments or concerns regarding the student handbook are welcome.

→ Rights and responsibilities

→ Policies and Procedures

## Policy quick links for students

Questions about Butler's policies and how they affect you as a student? Access them easily here.

Academic Policies →

Campus Life Policies →

→ Careers at Butler

**Legal**

Consumer Information

Website Feedback & Accessibility

Sexual Misconduct Resources

Incident of Bias

Privacy Policy

4600 Sunset Avenue
Indianapolis, IN 46208
800-368-6852

© 2023 Butler University    Para ver esta pagina en espanol, véala en el traductor de Google