# TITLE IX FINAL DETERMINATION REPORT

Complainant, ▮▮▮▮▮▮ | Respondent, ▮▮▮▮▮▮
Butler University | Hearing Date: October 13, 2021
Jodie L. Ferise, JD, Decision Maker

## Nature of Complaint and Parties

On March 9, 2021, Butler University (Butler) Title IX Coordinator, Maria Kanger, received a formal complaint via email from Complainant, ▮▮▮▮▮▮. In it, Complainant alleged that Respondent, ▮▮▮▮▮▮, had engaged in stalking behavior against her, in violation of Butler's Sexual Misconduct Policy.

Complainant, ▮▮▮▮▮▮ is a female student who is currently enrolled at Butler University, taking classes in the fall of 2021. In the academic year 2020-2021, Complainant was a resident of Fairview House, a campus residence hall.

Respondent, ▮▮▮▮▮▮, is a male student who is currently enrolled at Butler University, taking classes in the fall of 2021. In the academic year 2020-2021, Respondent was a resident first of a fraternity house on campus, and then of Fairview House, a campus residence hall.

## Allegations

Complainant alleges that Respondent has engaged in a course of conduct that constituted stalking under the Butler University Sexual Misconduct Policy. Specifically, her complaint states:

> I was explaining to my professor that I have been to [sic] emotionally exhausted to do the assignments this past week, because over the weekend I found out that someone who I thought was my friend has been tracking our friend group since freshman year, has watched from the window of his pod to see when member's [sic] of our pod at fairview [sic] come and go (he lives directly across from us), has broken into the general area of our pod while we were not there (searching for us), and has gone into my room without permission while I wasn't there. Throughout the week I have had meetings with CAs, and our my [sic] podmates and friends had a mediation with him and the CAs, where we terminated our friendship. There is more to the story, but this is the general gist.

A copy of the Formal Complaint is attached as **Exhibit A**.

## Policies at Issue and Standard of Proof

Butler University Sexual Misconduct Policy (the Policy) specifically defines and prohibits stalking. The Policy, states, in relevant part:

**STALKING:** Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others or to experience substantial emotional distress.
> 1. "Course of conduct" means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.
> 2. Substantial emotional distress means significant mental suffering or anguish.

Under the Policy, determinations of responsibility are to be made using the preponderance of the information standard. That is, the available, relevant evidence must show that it is more likely true than untrue that Respondent engaged in a course of conduct that constituted stalking of the Complainant, as defined by the Policy.

A copy of the Butler University Sexual Misconduct Policy is attached as **Exhibit B**.

## Procedural Steps Taken

Complainant's Formal Complaint was submitted on March 9, 2021, to Butler's Title IX Coordinator, Maria Kanger.

On March 11, 2021, Coordinator Kanger met with Respondent. That same day Coordinator Kanger sent formal Notice of Allegations, via email, to both parties.

Coordinator Kanger met with Respondent again on March 22, 2021. During that meeting Kanger shared information about the grievance process and answered questions from Respondent and his advisor.

On March 24, 2021, Coordinator Kanger notified both parties that Kody Rother, Assistant Dean of Students, had been appointed as Investigator in the matter. Each party was given an opportunity to challenge the appointment of Rother as Investigator and, when neither objected by the deadline, Rother was confirmed as Investigator on March 30, 2021. Notice of the confirmation was sent to both parties on that date and Rother proceeded with the investigation.

Investigator Rother met with Complainant on April 6, 2021, again on May 13, 2021, and again on May 19, 2021.

Investigator Rother met with Respondent on April 15, 2021, and again on May 20, 2021.

Thereafter, Investigator Rother met with witnesses identified by the parties, as follows:
- Witness 1 on April 22, 2021, and again on May 10, 2021

- Witness 2 on April 23, 2021
- Witness 3 on April 23, 2021, and again on May 21, 2021
- Witness 4 on May 7, 2021
- Witness 5 on April 26, 2021, and again on May 12, 2021
- Witness 6 on April 27, 2021
- Witness 7 on April 28, 2021
- Witness 8 on May 7, 2021
- Witness 9 on May 5, 2021
- Witness 10 on May 7, 2021
- Witness 11 on May 19, 2021

On June 24, 2021, the Preliminary Investigation Report (sometimes referred to as an "Evidence Review") was provided to both Complainant and Respondent. This Preliminary Investigation Report contained all evidence considered by Investigator Rother to be relevant in the matter and provided both parties an opportunity to review that evidence and provide a response thereto. The parties were initially given until July 9, 2021, to submit a response. That deadline was later extended, for both parties, to July 16, 2021.

On August 2, 2021, the Final Investigation Report was provided to both Complainant and Respondent. Both parties were notified of the Final Report's availability and given until August 16, 2021, to provide a response thereto.

Butler appointed Jodie Ferise, JD, Vice President and General Counsel of the Independent Colleges of Indiana as Decision Maker in this case. Both parties were given the opportunity to challenge the appointment of Decision Maker Ferise based on bias or conflict of interest. Neither party challenged the appointment.

Hearing in the matter was originally scheduled for September 2, 2021. Potential witnesses, the names of which had been provided by the parties, were contacted and invited to participate in the hearing. On the morning of the hearing, September 2, 2021, both parties and their advisors, as well as Decision Maker Ferise, were notified that Investigator Rother had resigned from Butler University, effective immediately. As a result, the hearing was postponed. After exploring the options for proceeding after Rother's departure, Butler determined that that matter would move forward to hearing and that Decision Maker Ferise would not consider Rother's Final Investigation Report in determining responsibility. The parties and their advisors were notified on October 1, 2021, that a new hearing date had been set for October 13, 2021. Potential witnesses were notified of the rescheduled hearing date and given the opportunity to participate at that time.

On October 13, 2021, hearing in this matter was held using the Zoom platform. Complainant attended with her advisor, Jules Grable. Respondent attended with his advisor, Marybeth Sydor. Also present at hearing was Butler Title IX Coordinator, Maria Kanger, and Decision Maker,

Jodie Ferise. The hearing was recorded, and the parties were notified that the recording would be made available to them at their request. At the hearing, Complainant and Respondent presented statements and submitted to questioning from the Decision Maker and the parties' advisors. The following witnesses appeared at the hearing and submitted to questioning:

1. ■
2. ■
3. ■

## Determination Regarding Responsibility

Respondent is not responsible for conduct that violates Butler's Sexual Misconduct Policy.

For reasons discussed specifically below, the evidence in this case did not show by a preponderance of the information that the Respondent's behavior violated the Policy. That is, the relevant evidence available to the Decision Maker did not show that it was more likely true than untrue that Respondent had engaged in stalking behavior directed toward Complainant.

## Findings of Fact/Hearing Testimony Relevant to Determination

Complainant and Respondent became friends in the fall of 2019. The two were part of a "friend group" which, according to Complainant, consisted of approximately 13 to 16 individuals during their freshman year, but had shrunk to approximately 10 to 13 individuals during sophomore year. The parties remained friends until Complainant requested and was granted a mediation, facilitated by Butler University, on March 3, 2021, during which she "formally terminated" the friendship.

The parties "hung out as friends" and Complainant thought Respondent "was a sweet guy". They spent time together, always with other members of the friend group present, both on and off campus. At the invitation of Complainant, Respondent had been part of a group of nine friends who took a trip to Complainant's two-bedroom, one-bathroom, family cabin. During that trip, Complainant and her boyfriend shared one bedroom while the other seven individuals shared the other bedroom. All nine friends shared the one bathroom, taking turns as needed, with no one asking permission.

During the academic year 2020-2021, the period relevant to this Complaint, Complainant lived in Fairview House, in a "pod" style dormitory with four roommates, all of whom were male. Complainant had a bedroom and bathroom to herself while her four male roommates shared the other two bedrooms and bathrooms. Each room had a door that could be locked from the outside. Complainant's bathroom was in a "small hallway" to her bedroom, where she kept her shoes and other items. The pod also featured a main living area with couches and a door to the outside hallway.

The main door to the pod could be locked but Complainant testified that she and her roommates often left the door unlocked because locking the door and remembering to take a key was "inconvenient". Complainant also indicated that she had certain boundaries in relation to the pod including an expectation of privacy in her bedroom, a certain beanbag chair that no one was allowed to sit upon, and a strong desire that no one use her bathroom. Complainant indicated that she had shared those boundaries with her roommates and her friends.

In November of 2020, Complainant was talking with a friend near the firepits on Butler's campus, when she took a photo of the sunset using Snapchat and added it to her "Snap Story". Complainant had "a lot" of friends on Snapchat, possibly as many as "4,000". Respondent was among Complainant's friends on the Snapchat app.

The photograph Complainant had posted was "predominantly of the sunset" but Complainant acknowledged the firepits were visible in the background. When asked whether people in the campus community would recognize that location, Complainant replied "sure, maybe."

Sometime after Complainant posted the photograph on her "Snap Story", Respondent came to the location near the firepits where Complainant was visiting with her friend. Complainant acknowledged that she considered Respondent to be a friend at that time but said that he was "not invited" to engage with her at that time and that her friends expected to be invited "if they want to speak with me." Complainant indicated that Respondent's appearance and attempt to talk with her near the firepits that day was "creepy".

Complainant knew that it was possible to share location on Snapchat but had intentionally adjusted her settings to not do so. Thus, she was not sharing her location via the Snapchat app on the day that Respondent visited her at the Butler firepits. Complainant acknowledged that there were others in her friend group who did share their location and indicated that she, herself, had checked her boyfriend's location on occasion.

Complainant believed that at times Respondent would check the location of members of their friend group who were sharing their locations on the app. Complainant stated that she believed Respondent was "obsessed with being able to locate his friends." When asked whether Respondent's viewing of the publicly shared location of other friends was specifically done to determine Complainant's whereabouts, Complainant admitted that she "never said it was".

Throughout the fall of 2020, Respondent, frequently accompanied by ▮▮▮▮▮▮▮, often visited the pod shared by Complainant and other members of their friend group. Complainant began to feel that Respondent and ▮▮▮ were overstaying their welcome. Respondent and ▮▮▮ would sometimes come to the room without invitation and would sometimes stay in the pod, continuing to watch television in the main living area, when Complainant and her roommates left or went to bed.

On one occasion described by Complainant, Respondent came to the door of Complainant's pod where Complainant and her roommates were watching television. Respondent was carrying take-out food which he apparently hoped to consume in Complainant's pod. Respondent asked twice if he could come into the room and eat with Complainant and her roommates. While the

roommates did not respond affirmatively, they also did tell Respondent no. Rather, all the roommates were "silent". Respondent the entered the room, "sat down, and ate."

Complainant believed that at times Respondent would intentionally leave items in her pod so that he would have reason to return and retrieve them, thereby forcing a visit with Complainant and her roommates. During the election coverage in early November 2020, Respondent and ▮▮▮▮ were in Complainant's pod watching election coverage. Complainant indicated that the residents of her room were very "conservative" and that they found Respondent and ▮▮▮▮ "annoying". They left the pair in their room watching the television coverage and walked to their car, with "everyone sharing gripes" about Respondent and ▮▮▮▮.

Shortly thereafter, Complainant and her roommates had a discussion with Respondent about respecting their boundaries. Approximately two weeks later, before Thanksgiving 2020, Respondent went home due to a COVID-19 outbreak on campus, and Complainant did not see him again until at least January 20, 2021.

On February 26, 2021, Complainant left her pod but did not lock the door to her room. She spent the night off-campus and returned the following day. When Complainant returned to campus, her friend, ▮▮▮▮▮▮▮▮, notified Complainant that Respondent had used Complainant's bathroom in her absence. Immediately, Complainant experienced a "mental breakdown" during which she became "distraught", "crying uncontrollably, rocking back and forth", and expressing extreme fear and anger. Complainant "felt so betrayed" that Respondent had used her bathroom, because she had told him she was "terrified of intruders" following a break-in at her family's cabin.

Despite the dustup caused by the unauthorized use of her bathroom, Complainant proceeded to ask Respondent to share with her an essay he had written for a class that she was also taking. She indicated that she was having difficulty understanding the expectations of the professor and wanted to see Respondent's essay while working on her own. When asked whether she still considered Respondent a friend at that time, Complainant responded, "yes, but if I'm honest, I just needed the answer, so I reached out".

On March 1, 2021, Complainant sent a "blob of text" to Respondent via Snapchat in which she "outlined expectations if he was to remain friends" with the remainder of the friend group.

On March 3, Complainant and Respondent participated in a mediation that was facilitated by Butler staff. Complainant requested that mediation in order to "safely end" her friendship with Respondent and also to "put a spotlight on" Respondent.

Complainant testified that she wondered "why Respondent wouldn't leave [them] alone after the mediation". Complainant indicated that the last time she spoke to Respondent was at mediation on March 3. Both Complainant and Respondent shared that Respondent has not contacted Complainant in any way - not in person, by telephone, or on social media - since the date of the mediation.

Following the mediation, Complainant had hoped that Respondent would apologize, but he did not. Complainant indicated she considered Respondent to be "just an unintelligent little puppy

dog". Complainant stated that Respondent had "terrorized her", that he "sounds crazy", that she "questions his mental stability", that he is "not a reasonable person", and that he "scares the living shit out of" her. ▬▬▬▬▬▬ who described herself as Complainant's best friend, indicated that Complainant is now afraid of "skinny white boys". The entire situation reminded Complainant of the television show "You" in which a young man stalks, imprisons, and kills his love interest.

Complainant indicated she has a "mini heart attack" every time someone knocks on the door, regardless of who it is, though she acknowledged that she was "already unsettled by knocks on the door." Complainant has been in therapy "because of [Respondent's] stalking". She took a women's rights class but found it to be "triggering" and she failed it, though she also stated that fortunately her "GPA could afford to take the hit." She now experiences terrifying nightmares which she attributes to trauma stemming from the Respondent's behaviors. Most of the time, Respondent is not present in those nightmares.

Complainant indicated that the behaviors of Respondent which troubled her were directed "toward the entire friend group". Respondent said he "never directed anything" toward Complainant. Each of the other three testifying witnesses indicated they never saw Respondent track, follow, target, or direct threatening behavior toward Complainant. Complainant stated that Respondent never threatened her and that she had never seen him be violent toward her or anyone else.

Complainant indicated that after the mediation she decided to file a Title IX complaint because she "does not want this to happen to someone else" and that she feels it is her responsibility to "protect the entire Butler community." She further indicated that no one was holding Respondent accountable for his behaviors. Specifically, Complainant felt that Respondent's "parents were not holding him accountable" which she believed was evidenced because he "got to go on spring break." She said that she felt he would "do it again" if no one does anything to stop him.

## Conclusions

Based on evaluation of the relevant evidence presented at the hearing, and application of a preponderance of the information standard of proof, Respondent is not responsible for conduct that violates the Butler University Sexual Misconduct Policy.

The following facts are undisputed in this case:

1. The parties were friends from their freshman year until March 3, 2021.
2. Complainant lived in a pod in Fairview House with four male roommates.
3. Complainant had a single room with a door that could be locked from the outside.
4. Neither Complainant nor her roommates consistently locked the door to their pod.
5. Respondent sometimes viewed his friends' publicly shared locations on Snapchat.

6. Complainant did not share her location publicly on Snapchat, so Respondent could not and did not view Complainant's location via Snapchat maps.
7. In the fall of 2020, Respondent approached Complainant, near the firepits at Butler, a location where he believed she and another friend would be after seeing an identifiable photo Complainant had posted on her Snap Story.
8. On at least one occasion, Respondent asked if he could eat in the Complainant's pod where she and her roommates were present and, after receiving no reply, entered the pod and ate his food.
9. Complainant told Respondent to do a better job observing boundaries of the pod in which she lived with her four male roommates.
10. The parties and seven other friends had shared a two-bedroom, one-bathroom cabin, owned by Complainant's family, at which they freely shared a bathroom without permission and without incident.
11. On February 26, 2021, while Complainant was spending the night off campus, Respondent used the toilet in Complainant's bathroom.
12. On February 27, 2021, Complainant was told by a friend that Respondent had used the toilet in her bathroom the previous evening.
13. Complainant was demonstrably distraught over the knowledge that Respondent had used the toilet in her bathroom while she was away.
14. After Complainant learned of Respondent using her toilet without her permission, Complainant asked Respondent for help with a homework assignment.
15. On March 1, 2021, Complainant sent Respondent a lengthy message on Snapchat advising him of certain expectations if Respondent was to remain a part of their friend group.
16. On March 3, 2021, at Complainant's request, the parties submitted to mediation, facilitated by Butler staff, at which Complainant "formally terminated" her friendship with Respondent.
17. Respondent has not contacted Complainant in person, by phone, by text message, by social media, or in any other way since the date of the mediation at which their friendship was terminated.
18. Respondent did not track, follow, target, threaten, or monitor Complainant specifically, nor did he direct any of his behaviors specifically toward Complainant.

As will be discussed in more detail below, the undisputed facts above are dispositive in this matter and require a finding that Respondent is not responsible for a violation of the Policy.

Pursuant to the Policy, a finding of Respondent responsibility requires the presentation of relevant evidence showing it to be more likely than not that each of the following elements occurred:

A. Respondent engaged in two or more acts in which he followed, monitored, observed, surveilled, or threatened Complainant, or interfered with Complainant's property; ***and***
B. Respondent's actions would have caused a reasonable person to fear for her safety or the safety of others or would have caused a reasonable person to experience substantial emotional distress; ***and***
C. Respondent's course of conduct was directed specifically at Complainant.

Taking each of those elements in turn, the conclusion is supported as follows.

### A. Course of Conduct.

There is no evidence that Respondent actively followed, monitored, or surveilled Complainant. At most, the evidence available to Decision Maker shows that Respondent may have at times overstayed his welcome in Complainant's pod or failed to read nonverbal cues that his friendship with the group was deteriorating. Respondent admitted to at times looking to see where his friends were, using either the publicly shared locations on Snapchat or identifiable locations in the photographs his friends, including Complainant, posted online. Because he considered these to be his friends, and because they were freely sharing location-specific information, Respondent's behaviors would not meet the usual definition of "follow", "monitor", or "surveille". The evidence presented showed that on multiple occasions, Respondent was in Complainant's pod, with the permission of Complainant and her roommates, and that at times they allowed him to remain in the room when they left or went to bed. While they may have been annoyed when his visits interfered with their study time, or frustrated by his lack of social boundaries, that does not equate to "following", "monitoring", or "surveilling" Complainant.

There is also no evidence that Respondent threatened Complainant. Complainant had not observed Respondent demonstrating violent or threatening behavior toward her or anyone else. The three supporting witnesses each indicated they had not observed any violent or threatening behavior on the part of Respondent.

Finally, there is no evidence that Respondent interfered with Complainant's property. Although Respondent admitted to using the toilet in Complainant's bathroom while she was gone and without her permission, there is no evidence that he used it for anything other than its normal usage or did anything to it that would make it unusable when she returned. There was no other evidence related to any property of Complainant.

Following the mediation at which the friendship was formally terminated, Respondent has refrained from contacting Complainant in any way. Thus, whatever conduct existed on the part of Respondent was done through the lens of a friendship. While that friendship may have been perceived differently by the parties, it unquestionably formed a part of the foundation upon which Respondent's actions were based.

### B. Reasonable fear or emotional distress.

While there can be little dispute that Complainant felt fear and experienced substantial emotional distress, such fear and distress is not reasonable in these circumstances.

As stated above, there is no evidence that Respondent demonstrated violent or threatening behavior toward Complainant. Complainant herself acknowledged that she was already unsettled by knocks at the door and that she had developed fear and anxiety following criminal break-ins at her family cabin. Those break-ins had nothing to do with conduct on the part of Respondent.

Although the evidence supported that Complainant was afraid of Respondent and, indeed, of all "skinny white" males, there is nothing to relate this fear specifically to the acts of Respondent. Growing distraught over a friend using one's toilet without permission would not be the anticipated or reasonable reaction to that particular admitted act of Respondent.

### *C. Conduct directed at Complainant.*

By Complainant's own testimony, none of Respondent's conduct was directed specifically toward her. She believed that he was obsessed not with her, but rather with being a part of their friend group and preserving his place in that group. Each testifying witness, including both parties and all three supplemental witnesses, agreed that none of Respondent's actions were directed specifically toward Complainant. Indeed, Complainant testified that she had never claimed any of Respondent's conduct was directed toward her. Thus, even if all other elements were present, Respondent must necessarily be found not responsible in this matter since the definition of stalking found in the Policy requires conduct directed at a specific individual.

For all these reasons, and based on the undisputed facts above, Respondent is not responsible for a violation of Butler's Sexual Misconduct Policy in this matter.

## Appeal Rights

Under the Policy both parties have the opportunity to appeal this outcome on the following grounds:

1. Procedural error that significantly impacted the outcome of the case;
2. Availability of new information that could significantly impact the outcome of the case; and/or
3. Conflict of interest or bias on the part of the Title IX Coordinator, Investigator, or Hearing Panel/Decision Maker.

**Any appeals must be submitted in writing to Dr. Frank Ross, Vice President for Student Affairs, by no later than 5:00 p.m. Eastern Time on Friday, November 5, 2021.**

You may submit your appeal via email to FEROSS@BUTLER.EDU . Please refer to the Policy for additional information regarding the appeals process.

_____     _____
Date of Determination Letter        Jodie L. Ferise, JD
                                    Decision Maker