Georgia Hensley
August 11, 2023

1

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF INDIANA

CIVIL ACTION NO. 1:22-cv-01828-SEB-MG

JOHN DOE,                    )
                             )
        Plaintiff,           )
                             )
V.                           )
                             )
BUTLER UNIVERSITY,           )
                             )
    Defendant.               )

     Deposition by Zoom of GEORGIA HENSLEY, a witness who appeared remotely before me, Valerie Fillenwarth, RPR, a Notary Public in and for the County of Johnson, State of Indiana, taken on behalf of the Plaintiff, with all parties appearing via Zoom, taken on August 11, 2023, commencing at 9:30 a.m., pursuant to all applicable rules, with Notice as to the time and place thereof.

FILLENWARTH REPORTING SERVICE
775 Hummingbird Lane
Whiteland, Indiana 46184
(317) 345-6179
vfillenwarth@gmail.com

Georgia Hensley
August 11, 2023

```
                                    2
 1           A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
             Mr. Jonathan C. Little
 4           SAEED & LITTLE, LLP
             133 West Market Street, #189
 5           Indianapolis, Indiana 46202
             317.721.9214 (Phone)
 6           jon@sllawfirm.com
 7
             Ms. Regina Federico
 8           NESENOFF & MILTENBERG, LLP
             101 Federal Street, 19th Floor
 9           Boston, Massachusetts 02110
             617.209.2188 (Phone)
10           Rfederico@nmllplaw.com
11
12
13   FOR THE DEFENDANT:
             Ms. Liberty L. Roberts
14           CHURCH CHURCH HITTLE & ANTRIM
             Two North Ninth Street
15           Noblesville, Indiana 46060
             317.773.2190 (Phone)
16           Lroberts@cchalaw.com
17
18
19
20
21
22
23
24
25
```

```
                                    3
 1   I N D E X   O F   E X A M I N A T I O N
 2
                                           Page
 3
     DIRECT EXAMINATION....................   4
 4       Questions by Mr. Little
 5
 6
 7
     (NO EXHIBITS WERE MARKED FOR IDENTIFICATION.)
 8
 9
10
...
25
```

```
                                    4
 1              GEORGIA HENSLEY,
 2   having been first duly sworn to tell the truth,
 3   the whole truth, and nothing but the truth,
 4   testified as follows:
 5   DIRECT EXAMINATION,
 6   QUESTIONS BY MR. LITTLE:
 7   Q.  Ma'am, can you state and spell your name for
 8       the record, please?
 9   A.  Georgia, G-E-O-R-G-I-A, Hensley, H-E-N-S-L-E-Y.
10   Q.  Okay.  Ms. Hensley, how are you currently
11       employed?
12   A.  I am the director of Institutional Equity and
13       Title IX coordinator at Butler University.
14   Q.  And how long have you had that position?
15   A.  That position, about a month.  Before that, I
16       served, though, as the Title IX coordinator,
17       and I have been there for a little over a year.
18   Q.  So when did you start as the Title IX
19       coordinator?
20   A.  In July of 2022.
21   Q.  What did you do before that?
22   A.  I was a civil rights and Title IX private
23       attorney in Kentucky.
24   Q.  You were a private lawyer in Kentucky?
25   A.  Yes.
```

```
                                    5
 1   Q.  What -- how long did you practice law?
 2   A.  Four years.
 3   Q.  Four years.
 4   A.  Long enough.
 5   Q.  Long enough.  Where did you go to law school?
 6   A.  Brandeis, the University of Louisville law
 7       school.
 8   Q.  Did you have Dan Canon as a professor?
 9   A.  Oh, my gosh.  But, no, I have Dan Canon as a
10       friend.
11   Q.  Oh, well, Dan Canon is a lawyer at our law
12       firm.
13   A.  I like Dan very much.
14   Q.  Yeah, he's a good guy.
15          All right.  So you started in July of
16       2022.  You understand today you're designated
17       to speak about the Title IX process at Butler
18       for 2020, 2021, and 2022?  Is that your
19       understanding?
20   A.  Yes.
21   Q.  Okay.  What did you do to prepare for the
22       deposition today?
23   A.  I reviewed our previous policy, which was the
24       policy that I believe was in place for the case
25       that's at issue in this matter.  I also
```

Georgia Hensley
August 11, 2023

### Page 6

1  reviewed it in comparison to our new policy,
2  which just went into effect about a month and a
3  half ago.
4  Q. Okay. What are the key differences between the
5     two policies?
6  A. Oh, goodness. Well, that's about 70 pages of
7     information, and there are quite a few
8     differences. But most of the differences are
9     related to the changes that we expect in
10    October.
11 Q. What changes do you expect in October?
12 A. Well, the federal law surrounding Title IX
13    promises to change exponentially under the
14    Biden administration. It was originally
15    supposed to happen in May. And so we had
16    prepared for it to happen in May. And then it
17    was moved until October, but we were
18    comfortable going ahead and expanding the
19    definitions of sexual harassment and gender
20    discrimination pursuant to the anticipated
21    changes in the regulations, which will be
22    effective in October.
23 Q. And does the definition of sexual harassment
24    include sexual orientation?
25 A. It does.

### Page 7

1  Q. Okay. What do we understand -- just so we're
2     clear, what does sexual orientation mean?
3  A. One's sexual preference or sexuality
4     preference. I'm a queer person myself. So I
5     like to think of it as one's own understanding
6     of their sexual identity.
7  Q. So it would include homosexuality?
8  A. I don't like to use the term homosexuality.
9     It's a little bit outdated, antiquated, if you
10    will, but, yes.
11 Q. If a student identified as gay, a male student
12    identified as gay, would that be covered in the
13    sexual harassment policy I guess is what I'm
14    getting at?
15 A. Yes.
16 Q. Okay. Now, do you know if the policy in place
17    in 2020 and 2021 included coverage for a male
18    student who would identify as gay?
19 A. So you're asking me if it included sexual
20    orientation?
21 Q. Let me ask you this first: If a -- so in this
22    case, my client identifies as gay, a gay man,
23    right. Would a gay man have that -- by saying
24    he's a gay man, that's sexual orientation for
25    Title IX purposes, right?

### Page 8

1  A. Yes.
2  Q. Okay. Was sexual orientation included in the
3     2020 and 2021 version of Butler's policies?
4  A. It was not explicitly included in the policy
5     itself, although we did actually train as
6     though it was a part of it and we did actually
7     accept those cases. And what I mean by that is
8     every year we would train on our existing
9     policy, so the old policy, if you will, the
10    policy that is at issue in this case. And when
11    we trained on that policy and when we actually
12    implemented that policy, we did include it,
13    although the phrase itself wasn't included in
14    that policy document.
15 Q. Was the phrase homosexuality included as a
16    protected species in that policy?
17 A. So, again, I don't like to use the word
18    homosexuality. It's an antiquated term that is
19    often seen as offensive. But it was not
20    explicitly included. But as I said, we did
21    actually follow through on claims related to
22    sexual orientation or homosexuality, as you
23    referenced, and we did train on those. They
24    just weren't explicitly a part of the policy.
25 Q. Was the word like "gay" as part of the policy

### Page 9

1     as protected or "queer"?
2  A. It was not explicitly included, no, not in the
3     policy.
4  Q. Okay. And so you obviously were practicing law
5     at this time, so you -- you're getting -- you
6     don't have any firsthand knowledge of how
7     Butler handled cases at that time, right?
8  A. I've reviewed several cases. There have been
9     several cases that have come up, since I have
10    taken my position, that were related to the
11    previous coordinator's role, so I've reviewed
12    some of those cases, as necessary, in order to
13    prepare trainings and sort of ensure that we
14    don't see continued behaviors that might
15    represent a pattern of certain student conduct
16    on our campus, certainly from a prevention
17    aspect. But I was not involved in the
18    administration of this, no.
19 Q. All right. So you didn't participate in any of
20    the trainings at that time, right?
21 A. No.
22 Q. So your knowledge of what was trained on is
23    hearsay, right?
24 A. It comes --
25       MS. ROBERTS: Just for the record, Jon,

3 (Pages 6 to 9)

Georgia Hensley
August 11, 2023

**Page 10**

1  she is designated as a 30(b)(6). This is not
2  her personal deposition. So I only -- I don't
3  know that we started out the record with that,
4  but, yes, she -- just for the record, she is
5  designated as the individual to testify to what
6  I believe was your second designated topic for
7  30(b)(6). But with that, I didn't mean to
8  interrupt. You can answer the question.
9  A. So I actually do. When I took my position, the
10 materials that Ms. Kanger used to train on were
11 provided to me, and I was able to preview those
12 and actually amend those in order to prepare
13 trainings that I felt more closely reassembled
14 the changes or the practices I would like to
15 see at Butler under my administration. So I
16 have reviewed those, I have amended those, and
17 used some of those similar documents in my own
18 trainings now.
19 BY MR. LITTLE:
20 Q. But you didn't attend the trainings in 2020 or
21 2021?
22 A. No.
23 Q. Okay. And you probably didn't attend -- did
24 you attend any trainings before July of 2022 at
25 Butler?

**Page 11**

1  A. No.
2  Q. Okay. All right. What did you -- you said you
3  reviewed the policy -- two policies, the
4  current one and the previous one. What did you
5  do -- what else did you review?
6  A. I think that's really it. I had previously --
7  I mean, like I said, in this role I pretty
8  constantly have to review our materials. But
9  in order to prepare for this deposition, really
10 just the two policies.
11 Q. Besides Ms. Roberts, did you speak with anybody
12 else?
13 A. No.
14 Q. Okay. And you've told me all the documents
15 you've reviewed, correct?
16 A. Yes.
17 Q. Okay. What other sources of information have
18 you drawn on to prepare for today's deposition?
19 Conversations, documents. I just want to make
20 sure I got the whole universe of everything you
21 looked at.
22 A. Okay. So we do keep our trainings, the
23 trainings that we utilize in a Teams folder,
24 obviously those are things that I review
25 regularly. It's obviously the time of year

**Page 12**

1  where our students return to campus and our
2  staff often returns to campus. And so those
3  have been a routine part of my day recently.
4     And then I have reviewed our ATIXA link
5  or our link to the trainings that we utilize,
6  which is federally required to be placed on our
7  website and is so placed on our website. So I
8  reviewed that list as well. I didn't review
9  each individual training, but I did review the
10 list of trainings that are on that link.
11 Q. Where is this Teams folder at?
12 A. In Teams.
13 Q. Right. So if I asked you how to -- because I'm
14 going to ask for a copy of it, so I want to
15 make sure I ask. How would you go about
16 retrieving of these trainings in Teams folder?
17 A. They're just PowerPoint documents that I put in
18 a folder on Teams so that my staff can see them
19 and utilize them if they cover a training.
20 Q. So if I asked: Please provide a copy of the
21 trainings in your Teams folder, you'll know
22 exactly what that is?
23 A. Yes. For my administration, yes. I don't know
24 what Ms. Kanger did prior to my time at Butler.
25 Q. And for the ATIXA trainings, you said they're

**Page 13**

1  on the website. Where -- can you tell me where
2  they are on the Butler website?
3  A. I do not know the exact URL. I do know that
4  they are still placed on the Title IX office
5  landing page. They are required to be placed
6  there and they have been placed there since
7  I've been in this role.
8  Q. All right. Have you had a chance to review the
9  subpoena for today's deposition?
10 A. Yes.
11 Q. Okay. And you understand that you're speaking
12 on number 2, correct, part 2?
13 A. Yes.
14 Q. Okay. And so who could initiate the Title IX
15 process at Butler in 2020 and 2021?
16 A. So under the old policy, a student could
17 initiate a formal complaint, which is I'm
18 assuming what you're referring to as a formal
19 Title IX complaint. A student could initiate a
20 formal Title IX complaint or in rare -- very
21 rare circumstances, the Title IX coordinator
22 could sign the complaint his or herself.
23 Q. Okay. And what are those circumstances in
24 which a Title IX coordinator could sign a Title
25 IX complaint his or herself?

Georgia Hensley
August 11, 2023

**Page 14**

1  A. Those are circumstances where there's a pattern
2     of behavior that poses a risk to the campus
3     community at large or where there is an
4     immediate threat to a particular student's
5     safety or the student at issue's safety. So
6     one where emergency removal may also be on the
7     table. Very rare.
8  Q. Okay. And so either the students themselves
9     could initiate this process or, at that time,
10    Ms. Kanger?
11 A. Yes.
12 Q. Anybody else?
13 A. No.
14 Q. And what about terminating a process once it
15    was started, who at Butler at that time could
16    terminate a Title IX process once it was going?
17 A. The Title IX coordinator or a student. The
18    same rule.
19 Q. Just the complaining student, though?
20 A. Yes.
21 Q. If the Title IX coordinator, during this time,
22    noticed behavior that was concerning to her,
23    could she -- she could initiate a Title IX
24    process -- a formal Title IX process, correct?
25 A. It would have to be far more than behavior that

**Page 15**

1     was concerning.
2  Q. What would it have to be?
3  A. Well, as I stated, there is a very significant
4     implication when you sign a complaint yourself,
5     and so it would have to be more than you
6     noticed behavior. It would have to be that
7     you've noticed behavior and that behavior poses
8     a risk to -- or poses a threat, rather, to the
9     campus community or a particular student's
10    safety.
11 Q. Okay. And the Title IX process for sexual
12    harassment could -- strike that.
13       Okay. When a complaint was initiated
14    during this time period, so let's say you walk
15    in, you file the complaint, within how many
16    days did the responding party have to -- within
17    how many days did the responding party have to
18    be notified that there had been a complaint
19    filed?
20 A. It needed to be done promptly. So the
21    complaint would be filed, the student had -- at
22    that point, if they filled out a complaint
23    form, and I want to draw the distinction
24    between a report and a complaint, because
25    certainly there is -- there's a difference

**Page 16**

1     between receiving a report from a student,
2     coming in, a student telling you what they have
3     experienced, and a student filling out an
4     official form and electing to continue the
5     formal Title IX process.
6        When the student fills out that form and
7     elects for a formal investigation, our policy
8     required that that investigation begin
9     promptly. So the notice was to be sent
10    promptly. As a matter of practice, I expect it
11    to be sent nearly same day, if not same day.
12    And then at that point with the notice, the
13    parties are meant to receive notice of the
14    investigator's identity and being -- they are
15    given at that point the chance to object to
16    that investigator because of bias or
17    conflict.
18       So to answer your question, there isn't a
19    particular amount of time with which we have to
20    send a notice. It's meant to be done very
21    promptly so that that investigation can begin
22    promptly. And just in practice, it usually is
23    same day or the following day.
24 Q. During this time -- so -- but you're basing all
25    that now off -- your statements that -- you

**Page 17**

1     weren't there during this time, right?
2  A. That's correct.
3  Q. Okay. And so where did you arrive at the
4     understanding of what you just described to me?
5  A. The previous policy and our policy now expect a
6     prompt investigation. And I, as I've said,
7     have reviewed several of the cases that
8     preexisted my time in order to determine how to
9     create more efficient processes at Butler.
10    And, generally, those notices were sent very
11    quickly.
12 Q. Now, at Butler, we've established that -- and
13    I'm just using the term my client uses,
14    homosexuality, or being a gay man, that was not
15    explicitly covered in the sexual harassment
16    policy, correct?
17 A. No.
18 Q. So could a gay man have filed a complaint for
19    sexual harassment at Butler?
20 A. Yes.
21 Q. But how could he have done that if it was not
22    prohibited to harass a gay man at that time?
23 A. Well, it still would have gone seen as sexual
24    harassment under our previous policy and I
25    believe -- or discrimination, and I believe

Fillenwarth Reporting Service
317.345.6179

**Page 18**

1  that's how it would have been treated.
2      I don't particularly know why it wasn't
3  included, because in practice, we did receive
4  those reports and we did administer Title IX
5  and that policy to those claims. I'm not sure
6  why it was not explicitly included because, as
7  I've stated, I do know that it was included in
8  practice.
9  Q. How do you know it was included in practice?
10 A. There are several instances with which I cannot
11     speak about, due to confidentiality reasons,
12     where those complaints were received.
13 Q. So between 2020 and 2022, there were complaints
14     made by gay men about sexual harassment at
15     Butler University?
16 A. There were student reports, not necessarily
17     complaints filed, seeking formal resolution.
18     But, yes, reports under Title IX, utilizing the
19     Title IX policy, that were accepted.
20 Q. Were there any formal Title IX processes at
21     Butler University between 2020 and 2022 for gay
22     men complaining of harassment?
23 A. I'm not sure that I know the answer to that.
24 Q. Okay. So once a complaint is made at the time,
25     they are to be promptly -- the responding party

**Page 19**

1  is to receive prompt notice of the
2  investigator's identity. Then what should have
3  happen next?
4  A. The parties get that period of time, I believe
5     it was three days under the previous policy, to
6     object to the investigator. After no objection
7     is received, which is usually what happens,
8     usually students don't respond at all, then the
9     student at that point would receive an initial
10    contact from the investigator just to set up a
11    meeting, both the complainant and the
12    respondent or complainants and respondents,
13    just depending, would receive that initial
14    outreach, get an opportunity to schedule a
15    meeting, a first meeting with the investigator,
16    and that is how the investigation really
17    proceeds.
18 Q. And then once -- how long is that investigation
19    supposed to take?
20 A. That varies based on the details of each
21    individual case.
22 Q. Okay. And then at the end of the
23    investigation, what's supposed to happen?
24 A. A preliminary investigation report is prepared,
25    dispersed to the parties, the parties get an

**Page 20**

1  opportunity to respond, their responses are
2  included in the final report. Sometimes
3  changes will occur to the preliminary report,
4  not based on one arguing, right, over what may
5  be fact or not, but perhaps a misstatement
6  about what someone personally said. Students
7  might say I didn't say that and correct that
8  type of information. But other than that,
9  the -- their responses are usually just
10 provided in their entirety as attached to the
11 final report, which is then provided to all the
12 parties.
13 Q. Okay. And then after the final report is
14    provided to all the parties, what would happen
15    next?
16 A. The case would go to a hearing, if one was
17    still being sought.
18 Q. And who could seek a hearing?
19 A. The complainant.
20 Q. Exclusively?
21 A. Yes.
22 Q. Could the Title IX coordinator, based on the
23    final report, say there's no need to have a
24    hearing?
25 A. So the Title IX coordinator can only step in

**Page 21**

1  and dismiss, right -- dismiss a Title IX
2  complaint when -- if all of the allegations
3  were true, no Title IX or sexual misconduct,
4  because our policy was more broad than just
5  Title IX, but if no conduct was alleged as
6  prohibited by that policy.
7      So you take all of the allegations as
8  true and accept those allegations as true, and
9  if all of those allegations are true, has a
10 violation of the policy occurred? That's the
11 question we ask ourselves. Only if there is no
12 policy violation alleged can the Title IX
13 coordinator dismiss an action at that point.
14     And then it would proceed to the appeal
15 process where the parties would have an
16 opportunity to say whether or not they
17 disagreed with that, based on the standards for
18 an appeal. But, again, that's also pretty
19 rare.
20 Q. Okay. So assuming the Title IX coordinator
21    doesn't terminate the process, and the parties
22    don't terminate -- and the complaining party
23    doesn't terminate the process, what happens
24    next?
25 A. It goes to a hearing.

Georgia Hensley
August 11, 2023

```
                                                    22
 1   Q.  Okay.  Tell me what a hearing -- from 2020 to
 2       2022, what did a hearing entail?
 3   A.  Well, until October it's very much going to be
 4       the same.  A Title IX hearing --
 5   Q.  October of this year?
 6   A.  Yes.  A Title IX hearing is an administrative
 7       hearing that, at Butler, we host on Zoom, we
 8       host virtually, we still do that.  We utilize
 9       independent decision-makers; so decision-makers
10       that are not of or have any affiliation with
11       Butler.
12            Those decision-makers will hear the
13       evidence, listen to that evidence and then make
14       a determination about whether or not a student
15       is both, A, responsible, and, B, requiring
16       sanctions.  So if the student is found
17       responsible, then does that responsibility
18       necessitate an imposition of sanctions.  And
19       the decision-maker makes all of those
20       decisions.  But at the hearing --
21   Q.  When you're saying --
22   A.  Go ahead.
23   Q.  Let me slow you down here.  When you say
24       independent decision-maker, do you mean one
25       person or like a panel?

                                                    23
 1   A.  It depends on the circumstances.  Usually one
 2       person.  We have implemented a panel system
 3       before for cases where perhaps emergency
 4       removal was necessary or the Title IX
 5       coordinator signed the complaint rather than a
 6       student, just to add an extra layer of
 7       protection for our accused students or
 8       respondents.  But for the most part, it would
 9       be one person.
10   Q.  Okay.  What about cases where the police are
11       involved, does Butler have to go -- during this
12       time period, did Butler have to go through with
13       the Title IX process if the police were
14       involved?
15   A.  So, obviously, there's a bit of precedent that
16       arose after this particular case, but during
17       the period at issue, if the police were
18       involved, it would have been a determination
19       about whether or not it made more sense to
20       pause a Title IX investigation, cooperate with
21       law enforcement to the degree that's necessary,
22       due to court involvement or the imposition of a
23       subpoena or something to the tune of that
24       nature, and then return to a Title IX
25       investigation at the end of a criminal process,

                                                    24
 1       if one was to occur.
 2   Q.  During this time period, who made that
 3       determination?
 4   A.  It would have been the coordinator.
 5   Q.  Maria?
 6   A.  Yes.  For the purposes of this matter, yes.
 7   Q.  And it would have been Maria until June
 8       of 2022, right?
 9   A.  Yes.
10   Q.  Okay.
11   A.  I'm not sure how long Maria was at Butler,
12       though, so I'm not sure who it would have been
13       before her.
14   Q.  All right.  So there's a hearing, the
15       independent decision-maker, how long do they
16       have to make their decision?
17   A.  It varies.  Usually it was relatively quickly.
18       There's no requirement.  I would say generally
19       within a couple of weeks is what we see.  And
20       that has appeared to be consistent from before
21       my time at Butler and now.
22   Q.  Okay.  And during this time period, do you know
23       if RAs were trained on these policies and
24       procedures and guidelines we've just gone
25       through?

                                                    25
 1   A.  I do not know the answer to that.
 2   Q.  Do you know about if investigators were trained
 3       on these timelines and policies and procedures
 4       that we've just discussed?
 5   A.  I know that the investigator was subjected to
 6       an ATIXA training.  I do not know if it would
 7       have included particular timelines, because our
 8       policy did not necessarily happen an
 9       investigative timeline.
10   Q.  Okay.  Who -- how many investigators were there
11       during this time?
12   A.  I believe one.
13   Q.  What was his name or her name?
14   A.  Kody Rother, perhaps.
15   Q.  Okay.  And during this time period, what was
16       the staffing of the Title IX office?
17   A.  So I believe that it changed during this
18       period.  And I'll explain.  But, originally, I
19       believe that Ms. Kanger reported directly to
20       our vice president of student affairs,
21       Dr. Frank Ross.  And then I believe at some
22       point, Maria began to serve as both a Title IX
23       coordinator and assistant dean of students,
24       which would have meant that she would have
25       reported to Martha Dziwlik instead of, so our
```

7 (Pages 22 to 25)

26

1  dean of students, Martha Dziwlik, instead of
2  Dr. Ross.
3  Q. Okay. And so then underneath Maria -- or who
4     would have reported to Maria at this time?
5  A. Just the investigator. There was a period of
6     time where our prevention specialist, who we
7     will refer to as our sexual assault response
8     and prevention, or SARP, personnel, there would
9     have been a time -- I know there was a time
10    during this period of time where that
11    individual also reported to Maria. Although I
12    believe that changed during her role -- during
13    her time at Butler.
14 Q. If during the -- if the Title IX coordinator
15    during this time noticed, you know, bullying of
16    a student for being gay, could she have
17    initiated a Title IX process herself?
18 A. It would, again, have to pose a severe risk to
19    the campus community or the student or student
20    safety in order for a Title IX coordinator to
21    sign the complaint themselves without student
22    consent.
23       Federal law asks us to really defer to
24    the student, as you would more akin to a
25    restraining order or a civil protective order

27

1  rather than utilizing it like a criminal
2  process. So I would say that for mere bullying
3  alone, no. It would require the student to
4  move forward with the complaint themselves.
5  Q. Can you give me an example of what severe risk
6     would be?
7  A. A student has a weapon and said that they plan
8     to harm their partner.
9  Q. Okay. So short of imminent physical harm, the
10    Title IX coordinator at this time wouldn't have
11    been able to act?
12 A. Not necessarily. I believe at the beginning, I
13    spoke about two distinct scenarios, one is
14    where there's a pattern of behavior that may
15    pose a risk to the campus community. So a
16    scenario where perhaps three people complain of
17    the exact same behaviors, so three individuals
18    come forward and complain of a sexual assault
19    at the hands of the same individual, that might
20    be a circumstance where the risk to the campus
21    community is so great that we are -- we should
22    act even without student consent.
23       Another circumstance is the immediate
24    risk, right. So there is really a twofold
25    evaluation that we do.

28

1  Q. During this time period, are you aware of any
2     Title IX processes initiated by the Title IX
3     coordinator?
4  A. Yes.
5  Q. What were the facts in that case?
6  A. I don't know that I can answer that.
7  Q. Well, let me ask you this, we'll go about it
8     this way: What was it -- was there a severe
9     like risk of physical danger as described or is
10    it a --
11 A. It was a pattern.
12 Q. Pattern?
13 A. Alleged pattern.
14 Q. Oh, sorry. Go ahead, I talked over you.
15 A. No, it was just a pattern of conduct alleged
16    against an individual.
17 Q. Okay. And how many -- was that -- was this the
18    only one time during that time period that the
19    Title IX office initiated?
20 A. I'm not sure. I only know of one, but I'm not
21    sure that that was the only one. I cannot make
22    that representation.
23 Q. Can the -- could the Title IX office at this
24    time do their own investigations, like
25    informally do an investigation?

29

1  A. So if a student does not want to move forward,
2     can we --
3  Q. No, that was a bad question. Let me ask a
4     better question.
5       During this time period, 2020, 2021,
6     2022, if there was a set of circumstances,
7     could the Title IX office say I'm going to go
8     and find out more about this? Right? I'm
9     going to investigate this.
10 A. Probably not. To put things in perspective for
11    you, we are required to reach out to students,
12    ask students if they need support after we
13    receive a report. Generally, if students don't
14    respond or indicate that they don't want to
15    move forward, we close the matter because,
16    again, this is meant to be a scenario where the
17    student is really given that autonomy,
18    especially when the allegations are usually
19    such that the student has allegedly been denied
20    some bodily autonomy. So we really try to
21    defer to the student. That's what federal law
22    asks of us. So normally, no.
23       And then as a logistical point, the Title
24    IX coordinator at Butler is the only person
25    tasked with reviewing reports. And there are

**Page 30**

1  5,000 students and one coordinator.  So if we
2  were to perform informal investigations about
3  every report received before making, you know,
4  a determination about whether or not we need to
5  sign a complaint, it would be logistically
6  impossible.
7  Q.  You said federal law.  What federal law are you
8     referring to?
9  A.  So the implementing regulations surrounding
10    Title IX, so really regulations, not law, ask
11    us to do certain things with regard to the
12    Title IX process.  And that section of the code
13    sort of walks you through what a hearing should
14    look like, sort of the minutia of it, not the
15    actual paragraph that says what Title IX is,
16    but the minutia of how we administer this area
17    of the law on college campuses.
18        Under that section and the related
19    notations and precedent that's followed, we are
20    meant to defer to student choice.
21 Q.  What -- can you give me the statutory sections
22    or the statutory section?
23 A.  I probably could if you give me a second.
24 Q.  Okay.
25 A.  34 CFR 106.45, I believe.

**Page 31**

1  Q.  Okay.  Just a second, I'm going to --
2  A.  I think that's right.
3  Q.  I'm going to text Regina.  I think we're pretty
4     close to being done.
5         I just have a couple more questions.  And
6     I apologize profusely for using outdated
7     phrases and such.  I'm just going -- my client
8     identifies as a gay man, right, and so that's
9     the term I want to use.
10        And you've included in your sexual
11    harassment policy now per -- you know,
12    explicitly gay men, right, they're explicitly
13    included?
14 A.  Well, it doesn't say the term a gay man.  Yes,
15    it does say sexual orientation, yes.
16 Q.  Okay.  Which we agree includes gay men, right?
17 A.  Yes.
18 Q.  And you included that when you redid the
19    policy, correct?
20 A.  Yes.
21 Q.  And can you tell me why you did that?  Why you
22    felt it was important to include that?
23 A.  Threefold response.  One, we were already doing
24    this, so it should have been an explicit
25    portion of the policy anyway.  It makes those

**Page 32**

1  claims easier to administer.
2      Two, the law is going to change and
3  require us to include that language in October.
4      And three, as a personal measure, we
5  train on this.  It's the type of campus climate
6  that we would like to see.  And there's nothing
7  that prevents us from creating a more inclusive
8  environment for our students.
9  Q.  But you would agree with me on a couple points,
10    during the relevant time period, sexual
11    orientation, which includes gay men, was not
12    included in the Butler policy, correct?
13 A.  Yes.
14 Q.  And that this -- that gay men -- actually.  I'm
15    going to leave it at that, I think.  I think
16    I'm good.  Let me just text Regina real quick.
17        MR. LITTLE:  I don't have any other
18    questions.  Libby?
19        MS. ROBERTS:  No questions.
20        MR. LITTLE:  So I mean, do you want her
21    to sign?
22        MS. ROBERTS:  Do you want to waive
23    signature or would you like the opportunity to
24    review?
25        THE WITNESS:  I'll waive signature.

**Page 33**

1       (Deposition concluded at 10:22 a.m.)
2
3       AND FURTHER THE DEPONENT SAITH NOT.
4
5          (Signature Waived)
           --------------------------
6          GEORGIA HENSLEY

Georgia Hensley
August 11, 2023

34

```
 1    STATE OF INDIANA   )
 2                       ) SS:
 3    COUNTY OF JOHNSON  )
 4
 5                CERTIFICATE
 6
 7       I, Valerie Fillenwarth, RPR, a Notary
 8    Public in and for the County of Johnson, State
 9    of Indiana, maintaining an office in Johnson
10    County, Indiana, do hereby certify the
11    following:
12
13       That the witness herein, GEORGIA HENSLEY,
14    was first duly sworn to tell the truth, the
15    whole truth and nothing but the truth in the
16    foregoing deposition;
17
18       That all testimony was taken down in
19    stenographic notes and afterward reduced to
20    typewritten form under my direction, and then
21    the reading and signing by the witness of said
22    deposition was waived; the deposition to be
23    read with the same force and effect as if
24    signed by said witness;
25
```

35

```
 1       That I recorded and transcribed any and all
 2    objections made by counsel and the reasons
 3    therefore; and
 4
 5       That I am not a relative or employee,
 6    attorney or counsel of any of the parties, nor
 7    a relative or employee of such attorney or
 8    counsel, nor am I financially interested in
 9    this action.
10
11       IN WITNESS HEREOF, I have hereunto set my
12    hand and affixed my Notarial Seal this 23rd day
13    of August 2023.
14
15
16
17            Valerie Fillenwarth, RPR
18            Notary Public
19            (Electronically Signed)
20
21
22
23    My County of Residence is: Johnson
24    Commission Number:  NP0749965
25    My Commission Expires:  July 5, 2031
```

10 (Pages 34 to 35)

Fillenwarth Reporting Service
317.345.6179