UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN DOE,

          Plaintiff,

v.

                              Case No:  1:22-cv-01828-SEB-MG

BUTLER UNIVERSITY,

          Defendant.

---

## BUTLER UNIVERSITY'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

This case arises from the investigation of a stalking complaint filed against Plaintiff by another student, J.F. The stalking complaint alleged that Plaintiff had engaged in a pattern of conduct that included watching J.F. and her roommates to track when J.F. entered and exited her dorm building, entering J.F.'s dorm pod to search for her, entering J.F.'s bedroom and using her personal bathroom when she was not present, and using social media to locate and find her. Butler University ("Butler") investigated the complaint, interviewed the witnesses identified by both parties, issued a report, allowed J.F. and Plaintiff to issue a response to the report, and conducted a hearing with a neutral third-party decisionmaker. The result was favorable to Plaintiff – he was found not responsible for the alleged stalking.

Plaintiff is upset that Butler did not short-circuit the investigation, have the investigator (not the decisionmaker) determine the credibility of the witnesses, and make the decision that Plaintiff was not responsible for stalking without allowing a

1

neutral decisionmaker to hear the evidence. Plaintiff filed this lawsuit to address his frustrations.

Plaintiff alleges that he had a contractual relationship with Butler University based on express and implied contracts created through the Butler's Student Handbook, and specifically, the Sexual Misconduct Policy [hereinafter "SMP"]. [ECF No. 1, at ¶ 149]. Plaintiff claims various aspects of the investigation constitute a breach of either an express or implied contract. Plaintiff also asserts a claim for unjust enrichment.

Plaintiff's claims for breach of contract and unjust enrichment fail as a matter of law for several independent reasons. First and foremost, the Student Handbook, and the SMP, do not constitute an express contract between Butler and Plaintiff. To the contrary, it expressly disclaimed any such promises and reserved the University the right to change any policy or provision of the Handbook. Plaintiff's claim for breach of express contract rests on policies which expressly state they do not constitute a contract between Plaintiff and Butler. As such, no breach of an express contract could have occurred because the Student Handbook, or the SMP contained therein, does not constitute a contract.

As to any implied contract between Plaintiff and Butler, Plaintiff has not identified any promises to Plaintiff that Butler violated. Plaintiff has admitted that Butler either complied with or that he was not harmed by any alleged violations of an implied contract. Plaintiff's claim is based on aspirational and permissive statements in the Student Handbook. That document does not constitute a contract,

and the permissive and aspiration statements cited by Plaintiff do not constitute definite or certain terms of a contract that can be breached. Plaintiff has not otherwise demonstrated that Butler acted arbitrarily or in bad faith, which is the standard Plaintiff must meet against a university under Indiana law.

As to Plaintiff's claims of unjust enrichment, Plaintiff has received the benefit of his bargain. Butler charged tuition for college instruction. Plaintiff received college instruction, credits, and advancement towards a degree in exchange for the tuition paid each year. Indeed, Plaintiff graduated with a degree from Butler University and admits that none of the events alleged in the complaint have interfered with his ability to find employment. Thus, Plaintiff received the benefit of the bargain—a college education and degree in exchange for payment of tuition. Similarly, Plaintiff received the benefits for the room, board, and fees paid each year.

Because Plaintiff cannot satisfy the elements of either of his two claims against Butler, these claims fail as a matter of law.

## II.   PLAINTIFF'S LEGAL CLAIMS

### A.   Claims attempted to be added in the Statement of Claims

Plaintiff's Statement of Claims filed after discovery [ECF No. 59] improperly sought to add new claims that were not asserted in his Complaint. Specifically, he now asserts he is making claims for: (1) failing to provide aid to and/or options for Plaintiff when he expressed concerns for his safety, a desire to move his housing, and displayed utter distress over the situation; and (2) failing to enact policies and procedures to protect a homosexual student from harassment and bullying. [ECF No.

59, at 2, ¶1(vi) and ¶1(vii)] The assertion of new claims in a Statement of Claims is improper.

"[A] party may amend his pleading only with leave of court, _and not by asserting a new claim in his or her Statement of Claims_." _Sturm v. City of Indianapolis_, No. 1:14-CV-00848 RLY-MPB, 2016 WL 2894434, at *12 (S.D. Ind. May 18, 2016) (emphasis added) (citing Fed. R. Civ. P. 15(a)(2); _Hankins v. Cox_, No. 1:14-cv-00886-TWP-DML, 2015 WL 1800500, at *2 (S.D. Ind. April 15, 2015) ("Neither the statement of claims nor the supplemental statement of claims is a pleading."). Plaintiff did not seek to amend his Complaint. Plaintiff's Complaint does not assert any claim for failure to enact policies or failing to provide aid or options to Plaintiff. Significantly, since this is a breach of contract case, and there is no contractual provision identified in the Complaint alleging that a contractual obligation exists to support those claims.

Plaintiff cannot now add those new theories after the close of discovery. To the extent Plaintiff wanted to advance those claims, he could have asked to amend his Complaint. He did not. And rightly so, because the evidence – specifically Plaintiff's own emails – establishes that there is no factual basis for those claims and assertion of them would not be consistent with Federal Rule of Civil Procedure, Rule 11. Plaintiff's emails at the time of the events in the Complaint show that (1) he was provided the opportunity to change housing, but he opted not to do so [ECF No. 60-3 (Ex. C. Emails Doe and Kanger 04.05.21); Ex. T, Audio File of Voicemail from Plaintiff's Mother] and (2) support including emotional support, counseling services,

4

and academic accommodations were provided to Plaintiff. [ECF No. 60-3 (Ex. C. Emails Doe and Kanger 04.05.21)] Summary judgment is proper on all claims, despite Plaintiff's attempt to insert new claims in this Statement of Claims.

## B.    Breach of Contract[1]

In his Complaint, Plaintiff identified specific conduct of Butler in its handling of J.F.'s stalking complaint that he alleges constitute a violation of written statements and policies. Plaintiff alleges that Butler should have "screened" J.F.'s complaint and never investigated it or used a less formal process to investigate it [ECF No. 1, at ¶¶ 124, 125, 150(a); ECF No. 59 at 1-2, ¶1((i)]; should have provided a less-redacted investigatory record to "treat all parties and participants in this process fairly, equitably, and with respect" [ECF No. 1, at ¶¶ 130, 150(b); ECF No. 59 at 2, ¶ 1(ii)]; should have conducted a quicker, or "reasonably prompt" investigation by not interviewing all the students it did [ECF No. 1, at ¶131, 150(c); ECF No. 59 at 2,¶1(iii)]; should have given Plaintiff "proper notice" of his hearing; [ECF No. 1, at ¶131, 150(d); ECF No. 59 at 2, ¶1(iv)]; should have "addressed" harassment by B.P. and J.F. [ECF No. 1, at ¶¶ 139, 140, 150(f); ECF No. 59 at 2, ¶1(v)]; should have differently trained Resident Advisors for the mediation process [ECF No. 1, at ¶ 141, 150(g); ECF No. 59 at 2, ¶1(viii)]; and should have disciplined B.P. for being dishonest in the investigation [ECF No. 1, at ¶ 132, 150(h)]. Plaintiff alleges that the failure to

---

[1] In his Complaint, Plaintiff included a claim that Butler should have made the investigator available for questioning at Plaintiff's hearing; [ECF No. 1, at ¶131; 150(e)]. That claim was abandoned in Plaintiff's Statement of Claims filed after discovery. [ECF No. 59].

do each of those things was a violation of the SMP, Student Conduct System, the Campus Harassment Policy, and the Residence Life Community Standards and Rules – all of which are contained in the Student Handbook. [ECF No. 1, at ¶¶ 124, 132, 139, 138, & 141]

**C.    Unjust Enrichment**

Plaintiff alleges that he paid tuition, room and board fees, and various other costs and fees to Butler University for the Spring 2021 semester, for which Plaintiff was prevented from realizing the benefit of the bargain. [ECF No. 1 at ¶ 156; ECF No. 59 at 2, ¶2] He alleges that because of the investigation under the SMP and his feeling of being bullied and harassed, he was forced to leave campus in the middle of the Spring semester 2021, thereby losing the benefits of his payments. [ECF No. 1 at ¶ 157] Plaintiff claims that "Butler has therefore been unjustly enriched by Plaintiff's various payments." [ECF No. 1 at ¶ 158]

### III.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[2]

1.    Plaintiff began attending Butler University in Fall 2019, and in the spring of that academic year (his freshman year), he became friends with a group of 8-10 students ("the friend group") [ECF No. 1 at ¶ 21].

---

[2] These facts are designated as facts not in dispute for purposes of this Motion based on the standard of viewing the facts in the light most favorable to the non-moving party. Defendant does not accept the allegations in Plaintiff's Complaint or all the statements in this section as true. Defendant reserves the right to provide evidence contrary to these statements should this matter be litigated beyond this Rule 56 Motion.

2.      During the Plaintiff's Sophomore year (2020-2021 academic year), five members of the friend group, including a female individual with the initials J.F., lived together in an on-campus dorm suite, referred to as "Room 113," and Plaintiff lived in a fraternity house. [ECF No. 1 at ¶ 28].

3.      Plaintiff came out to the friend group as gay in September 2020, and thereafter, Plaintiff felt increasingly uncomfortable at the fraternity house, so he started spending more time in Room 113 because he viewed it as his "safe place." [ECF No. 1 at ¶ 28 & ¶ 30].

4.      J.F. and Plaintiff were like "peas in a pod" and spent time together often including on double dates with their boyfriends. [ECF No. 60-1 at 7, 9 (Ex. A, Kanger Tr. 68:15-69:15, 75:20-76:2; ECF No. 60-1 at 12 (Ex. A, Kanger Tr. Ex. 7)].

5.      In November 2020, the residents of Room 113 asked Plaintiff and another member of the friend group to stop using their room as the default hangout spot, stop coming over during daytime hours or late at night, and accept that the residents of Room 113 did not always want to host guests in their suite. [ECF No. 1 at ¶ 34].

6.      In January 2021, Plaintiff moved in with a member of the friend group who lived across the hall from Room 113. [ECF No. 1 at ¶¶ 39-40].

7.      In February 2021, Plaintiff used J.F.'s private bathroom in Room 113 while J.F. was not home. [ECF No. 1 at ¶ 46-49]. J.F. expressed to the Plaintiff that she was upset about this. [ECF No. 1 at ¶ 50].

8.      A few weeks later, J.F. sent a message in the friend group's group chat asking Plaintiff to not leave personal items in Room 113, to ask before coming over, to not stay too late or too long, to ask for J.F.'s permission before entering her bedroom, and to use his own bathroom that was across the hall. [ECF No. 1 at ¶ 52].

9.      That evening, Plaintiff's suitemate went to Room 113 and stated to J.F. that Plaintiff would check the entire friend groups' locations on SnapMaps "compulsively" and incessantly every day; that she once caught Plaintiff staring out of their suite window, waiting for members of Room 113 to come home; and that he would check Room 113 to see if people were home multiple times every day. [ECF No. 1 at ¶ 58].

10.     On March 3, 2021, Plaintiff's Resident Advisor and J.F.'s Resident Advisor held a "mediation" attended by the Plaintiff, Plaintiff's suitemate, the five residents of Room 113, and one other member of the friend group. [ECF No. 1 at ¶ 3, ¶¶ 59-60].

11.     At the "mediation," the members of the friend group repeated their concerns that Plaintiff had not adhered to the boundaries set by the friend group, and he was spending too much time in Room 113.  They essentially stated that they did not like the Plaintiff, found him annoying, and did not want to be his friend. [ECF No. 60-2 at 3 (Ex. B, Harris Tr. 34:16-35:6)].

12.     During the mediation, the J.F. and occupants of Room 113 were annoyed, exhausted, and fed up with Plaintiff's behaviors. [ECF No. 60-2 at 3 (Ex. B, Harris Tr. 35:7-25)]. Plaintiff was upset and apologetic; he thought the friend group

8

was asking him to pick up on "social cues" that were hard for him; and he cried. [ECF No. 60-2 at 3 (Ex. B, Harris Tr. 36:3-18)].

13.    The mediation ended with the two Resident Advisors dismissing the friend group, and comforting Plaintiff, who was crying. [ECF No. 60-4 at 59 (Ex. D, Plaintiff Tr. 86:2-7)].

14.    During the mediation, Plaintiff's sexual orientation was not mentioned. [ECF No. 60-2 at 6 (Ex. B, Harris Tr. 46:18-47:2)].

15.    Prior to the mediation, Plaintiff did not have any concerns or complaints about his living environment. [ECF No. 60-4 at 51 (Ex. D, Plaintiff Tr. 77:10-20)].

16.    After the mediation, Plaintiff and the friend group cut all contact, and Plaintiff reached out once to his Resident Advisor to discuss how to better deal with the situation, but otherwise he did not discuss the issues any further with his Resident Advisor (until after J.F. filed her stalking complaint). [ECF No. 60-4 at 49, 59-60 (Ex. D, Plaintiff Tr. 75:3-8, 86:14-87:3)].

17.    After the mediation Plaintiff felt like his living environment was "hostile" because his suitemate told him "hearsay all the time of the Butler police department knows what you did. And…at one point in time, [Plaintiff] was on a phone call with [his] mom. And [his suitemate] overheard and began yelling at [Plaintiff]." [ECF No. 60-4 at 51-52 (Ex. D, Plaintiff Tr. 77:21-78:3)].

18.    On March 9, Plaintiff's mom called the Dean of Students to request a welfare check on Plaintiff; Plaintiff was contacted; and the Dean of Students and

Mom had a thirty-minute discussion about Luke. [ECF No. 60-17 at 6-13 (Ex. Q, Dziwlik Tr. 17:17-24:16)].

19.     On the evening of March 9, Plaintiff sent his professors an email asking for accommodations on his work, and he sent an email to the Director of Residence Life asking to meet to discuss a room change. [ECF No. 60-17 at 6-15 (Ex. Q, Dziwlik Tr. 17:17-26:15)].

20.     On March 10, Plaintiff's mom called the Dean of Students (and called and left a voicemail) advising that Plaintiff was going home to Seattle that night, so the "urgency of finding him a new room for tonight, the urgency is gone….but he does plan on coming back to campus in a month or so, and he does need to be in a different room at that point in time…." (Ex. T, Audio File of Voicemail from Plaintiff's Mother).

21.     Plaintiff left Butler and flew home because he was uncomfortable with B.P. making comments about talking to the Dean of Students and BUPD and to regroup and come up with a strategy for finishing the semester; thus, Plaintiff's housing was not changed. [ECF No. 60-1 at 8-9 (Ex. A, Kanger Tr. 72:18-74:70); ECF No. 60-1 at 15-16 (Ex. A, Kanger Tr. Ex. 7 at 4-5)].

22.     On March 10, Butler's Title IX Coordinator Hinton emailed Plaintiff to set up a meeting. [ECF No. 1 at ¶ 74]. A Zoom meeting was arranged for the next day (March 11), and during that meeting Hinton informed Plaintiff that J.F. had filed a formal complaint against him on March 9, 2021, for stalking in violation of Butler's SMP. [ECF No. 1 at ¶ 76].

23.     Butler's Title IX Coordinator, Maria Kanger considered J.F.'s complaint and determined that the allegations, if true, could constitute stalking under the SMP. [ECF No. 60-1 at 3-4 (Ex. A, Kanger Tr. 34:10-39:4)]. Specifically she determined that the allegations could constitute a course of conduct that could cause a reasonable person to fear for the person's safety or the safety of others or to experience substantial emotional distress because J.F. alleged Plaintiff used social media to figure out J.F.'s location, watched from the window to see when J.F. was entering and exiting the building; entered the general area of J.F.'s pod and searched for J.F. and others; entered J.F.'s private bedroom and used her private bathroom when J.F. was not home; and made J.F. feel like "the TV show *You*, where someone pretends to be a friend in order to get information about the person they have befriended.". [ECF No. 60-1 at 3-4 (Ex. A, Kanger Tr. 34:10-39:4); ECF No. 60-19 at 1-2 (Ex. S, March 11, 2021 Letter)].

24.     On March 11, Plaintiff was provided a letter advising of the allegations made, that the conduct could constitute violations of the stalking provision in the SMP and advising him the matter would be resolved through the Administrative Investigation and Adjudication Process. [ECF No. 60-19 at 1-3 (Ex. S, March 11, 2021 Letter)].

25.     The investigation proceeded as follows:

| Date | Event | Exhibit |
|---|---|---|
| March 24 | The parties were advised of the selected investigator. | ECF No. 60-5 |
| March 29 | Plaintiff and J.F. had until this date to object to the investigator (neither did). | ECF No. 60-5 |

| March 30 | The investigator received the official referral or the investigation of the complaint. | ECF No. 60-6, at 1 |
|---|---|---|
| April 6 | The investigator met with J.F.; Investigator provided additional information to Plaintiff. | ECF No. 60-6, at 1 |
| April 9 | J.F. provided additional information to the investigator. | ECF No. 60-6, at 1 |
| April 15 | The investigator met with Plaintiff. | ECF No. 60-6, at 1 |
| April 16 | Plaintiff provided additional information to the investigator. | ECF No. 60-6, at 1 |
| April 22 – May 19 | The investigator interviewed 11 witnesses identified by either J.F. or Plaintiff. | ECF No. 60-6, at 2-4 |
| May 18 – May 21 | The investigator reached out to the Butler Police Department for information. | ECF No. 60-6, at 4 |
| May 19 | The investigator had a follow-up meeting with J.F. | ECF No. 60-6, at 4-5 |
| May 20 | The investigator had a follow-up meeting with Plaintiff. | ECF No. 60-6, at 5 |
| May 26 | Plaintiff submitted a letter from his professor | ECF No. 60-6, at 5 |
| June 11 | Investigation obtained additional information from Dean of Students. | ECF No. 60-6, at 5 |
| June 24 | Preliminary Report provided to Plaintiff and J.F. | ECF No. 60-6, at 5 |
| July 9 | Parties were each to submit their responses to the preliminary report. | ECF No. 60-6, at 5 |
| July 16 | Parties were granted an extension until this date to submit their responses to the preliminary report. | ECF No. 60-7 |
| August 2 | The investigator completed his final report. | ECF No. 60-8 |
| August 2 | Plaintiff was advised of the assigned decision-maker and of the hearing scheduled for August 20. | ECF No. 60-8 |
| August 5 | Plaintiff was given until this date to object to the assigned decision-maker. | ECF No. 60-8 |
| August 16 | Plaintiff was given until this date to submit a response to the Final Report. | ECF No. 60-8 |
| August 20 | The hearing was originally scheduled for this date. | ECF No. 60-8 |
| August 24 | Plaintiff received notice of the new-hearing date of September 2, which was assigned based on Plaintiff's request. | ECF No. 60-9 |

| September 2 | The hearing was re-scheduled to this date (to be conducted via Zoom) at Plaintiff's request. | ECF No. 60-9 |
| September 2 | The hearing was cancelled due to the resignation of the investigator. | ECF No. 60-10 |
| September 8 | Plaintiff was provided options for how to proceed after the investigator's resignation – a hearing without the investigator, or a new investigation so that the new investigator could attend the hearing. | ECF No. 60-11 |
| September 13 | Plaintiff requested informal resolution. | ECF No. 60-12 |
| September 15 | J.F. rejected informal resolution, and opted to proceed with a new hearing date (instead of a re-investigation). | ECF No. 60-13 |
| September 22 | Plaintiff objected to having the matter re-investigated. | ECF No. 60-14 |
| October 1 | Plaintiff was advised the hearing was re-scheduled for October 13. | ECF No. 60-15 |
| October 13 | A re-scheduled hearing was held (via Zoom). | ECF No. 60-15, at 3 |
| October 29 | Plaintiff received an outcome letter finding him not responsible for Stalking under the SMP. | ECF No. 60-15, at 11 |

26. In the preliminary and final reports, witness names were redacted, the witnesses were referred to by generic identifiers such as Witness 1, and a Key of Participants was provided identifying the person associated with each generic identify which required Plaintiff to have to "comb back through the documents to put together who that exactly was." [ECF No. 60-4 at 26, 33-34 (Ex. D, Plaintiff Tr. 28:12-22, 39:22-40:19)].

27. Plaintiff was able to determine the identities of the redacted witnesses and his response to the preliminary report referred to the witness by both witness

number and by name. [ECF No. 60-4 at 26, 33-34, 37 (Ex. D, Plaintiff Tr. 28:12-22, 39:22-40:19, 43:2-12)].

28.     Plaintiff understood all the allegations made against him. [ECF No. 60-4 at 21-25 (Ex. D, Plaintiff Tr. 23:4-27:12)].

29.     The length of an investigation depends on the details of each individual case. [ECF No. 60-18 at 6 (Ex. R, Butler 30(b)(6) Tr. 18:23-20:12)].

30.     Plaintiff believes that J.F.'s filing of the stalking complaint and the subsequent investigation were "harassment" because at the end of the mediation, J.F. said that she would cut all contact with [Plaintiff and Plaintiff] did not have any contact with her or the other members of the friend group, and she still decided to file [the] complaint against [Plaintiff]." [ECF No. 60-4 at 48-49 (Ex. D, Plaintiff Tr. 74:18-75:14)].

31.     Plaintiff also believes that B.P. and J.F. harassed him by "making false allegations against [Plaintiff] to turn [the] friend group against [Plaintiff] and end all friendship with those people." [ECF No. 60-4 at 47 (Ex. D, Plaintiff Tr. 73:12-25)].

32.     Plaintiff did not file a written complaint against J.F. for what he identified as harassment, and Plaintiff testified he did not speak to anyone at Butler about filing a formal complaint against J.F. [ECF No. 60-4 at 49 (Ex. D, Plaintiff Tr. 75:15-22)].

33.     Because Plaintiff did not allege any type of conduct that would be considered harassment or any other concern that would implicate Plaintiff's sexual orientation, there was no investigation to determine whether Plaintiff was being

harassed because he was gay. [ECF No. 60-1 at 7 (Ex. A, Kanger Tr. 68:3-69:15, 70:19-75:19)].

34.    Butler's Title IX policy does not explicitly mention protections based on sexual orientation, but Butler's Title IX Office trainings included protecting people from harassment based on sexual orientation, and the Title IX Office received and accepted complaints based on sexual orientation. [ECF No. 60-18 at 3, 5-6 (Ex. R, Butler 30(b)(6) Tr. 8:2-24, 17:12-18:19)].

35.    Plaintiff asserts the resident assistants were not properly trained. [ECF No. 1 at ¶ 150(g); ECF No. 59 at 2]. But in his deposition, Plaintiff could identify no way he thought the resident assistants should have been, but were not, trained. [ECF No. 60-4 at 50 (Ex. D, Plaintiff Tr. 76:6-13)].

36.    Butler's Resident Assistants are trained in how to handle a mediation, and both resident assistants involved in Plaintiff's mediation had completed that training. [ECF No. 60-17 at 22-23 (Ex. Q, Dziwlik Tr. 50:5-23, 51:6-15)].

37.    Following mediation, additional services such as counseling can be offered—and were offered to Plaintiff. [ECF No. 60-17 at 28 (Ex. Q, Dziwlik Tr. 56:6-25)].

38.    Prior to Plaintiff returning to campus on April 5, he was given an option of changing his housing, but he advised he did not wish to do so, he thought it was unnecessary, and he planned to return to the room he shared with B.P. [ECF No. 60-1 at 8-9 (Ex. A, Kanger Tr. 72:18-74:7); ECF No. 60-1 at 15-16, (Ex. A, Kanger Tr. Ex. 7 at 4-5)].

39.     Under Butler's Title IX Policy, only the Title IX Coordinator or the student complainant can terminate a Title IX investigation—not the Title IX Investigator. [ECF No. 60-18 at 5 (Ex. R, Butler 30(b)(6) Tr. 14:14-20)]. The Title IX Investigator would only terminate the investigation if the allegations, assuming they were all true, do not constitute a violation of a policy. [ECF No. 60-18 at 6 (Ex. R, Butler 30(b)(6) Tr. 20:22-21:13)].

40.     Butler's Title IX Coordinator can initiate an investigation, but it is rare and only appropriate when there is a pattern of conduct that poses a risk to the campus community at large. [ECF No. 60-18 at 4-5 (Ex. R, Butler 30(b)(6) Tr. 13:14-15:10)]. Otherwise, Title IX generally advises schools to defer to the student's desire on whether to pursue an investigation. [ECF No. 60-18 at 9 (Ex. R, Butler 30(b)(6) Tr. 30:7-25)] (citing 34 CFR 106.45).

41.     Plaintiff graduated from Butler in May 2023 with a major in sports media and minors in organizational communication and leadership. [ECF No. 60-4 at 7 (Ex. D, Plaintiff Tr. 9:1-7)].

42.     Plaintiff graduated with distinction with a GPA of approximately 3.7. [ECF No. 60-4 at 7 (Ex. D, Plaintiff Tr. 9:8-11)].

43.     The investigation and events in this lawsuit have not hindered Plaintiff's employment options or plans. [ECF No. 60-4 at 8 (Ex. D, Plaintiff Tr. 10:18-21)].

### III.   STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party need not positively disprove the opponent's case; rather, it may prevail by "showing–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Seventh Circuit has described summary judgment as the "'put up or shut up' moment in litigation," which means "the non-moving party is required to marshal and present the court with the evidence she contends will prove her case. And by evidence, [the court] mean[s] evidence on which a reasonable jury could rely." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (internal citations omitted). In conducting this review, the court construes all relevant facts and reasonable inferences in the non-moving party's favor. *Porter v. City of Chicago*, 700 F.3d 944, 950 (7th Cir. 2013).

### V.   ARGUMENT

A.     **Breach of Contract**

Plaintiff's breach of contract claims against Butler fail as a matter of law for several, independent reasons—each of which warrant judgment as a matter of law in favor of Butler.

### 1.     *No express contract exists between Butler and Plaintiff.*

Plaintiff has not, and cannot, prove that Butler violated any express contract. Plaintiff's entire contract theory is based on provisions of Butler's Student Handbook – specifically, the SMP, Student Conduct System, the Campus Harassment Policy, and the Residence Life Community Standards and Rules. [ECF No. 1, at ¶¶ 124, 132, 139, 138, & 141] To succeed on any of his express contract theories, the Butler Student Handbook must be a contract. It is not. The Student Handbook expressly states:

> While this student handbook is intended to be a fair summary of certain matters of interest to students, its readers should be aware that it is not a complete statement of all procedures, policies, rules and regulations of Butler University; the University has the right to change without notice any procedures, policies or programs that appear in the student handbook; and the various colleges and departments of the University may have their own procedures and policies that apply to students. In addition, except where expressly noted herein, this student handbook is not, nor is it intended, to create a contract between any student and the University. The terms set forth in this student handbook do not create contractual or legal rights for students.

[ECF 60-4 at 12-14 (Ex. D, Plaintiff Tr.14-16); ECF 60-4 at 66 (Ex. D, Plaintiff Tr. Ex. 114)].

"There are three general types of contracts—express, implied and constructive." An express contract "is evidenced by spoken or written words." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024 (Ind. Ct. App. 2001). "The law concerning contracts

is well settled in Indiana…..A mutual assent or a meeting of the minds on all essential elements or terms must exist in order to form a binding contract." *Id.* at 1022

Here, Butler advised students that the policies in the Handbook were subject to change and did not create contractual or legal rights for students. A handbook with an express disclaimer that it is not a contract cannot create a contractual obligation. The written word of the handbook – which must be the basis for an express contract – does not form a contract when the written word specifically states (1) the document is not a contract, (2) does not create contractual rights, (3) the policies in the document are not complete, but a summary of the policies, and (4) the policies in the document may change at any time.

No express contractual terms exist under the Handbook. As such, the provisions of the Handbook including the SMP, Student Conduct System, the Campus Harassment Policy, and the Residence Life Community Standards and Rules do not constitute an express contract. Because there is no express contract, there can be no breach. Plaintiff's claims for breach of contract fail as a matter of law.

**2.**   ***Plaintiff's implied breach of contract claim fails because Butler complied with the policies and Plaintiff has not established that Butler violated any implied contract or acted arbitrarily or in bad faith.***

Plaintiff's claim for breach of an implied contract also fails as a matter of law. In Indiana, "[t]he relationship between a university and its students is considered contractual in nature" and that relationship is based on an implied contract between the student and the university. *See Neel v. I.U. Bd. of Trustees*, 435 N.E.2d 607, 610

(Ind. Ct. App. 1982). "The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly." *Id*.

### a. *Discussion of implied contract elements in Amaya v. Brater*

The Indiana Court of Appeals provided an in-depth analysis of the implied contract relationship between a university and a student in *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013). The Indiana Court of Appeals considered a claim against a university for an alleged breach of an implied contract for failure to follow its internal policies and procedures for disciplinary misconduct. The decision in that case is instructive here.

In *Amaya*, the plaintiff was a third-year medical student at Indiana University when, during a test, three professors observed Amaya look to his right at the paper of another student. *Id*. at 1237. Amaya denied that he cheated and stated he was merely looking at the wall clock on the right side of the room. *Id*. The chair of the Student Promotions Committee (the "SPC") wrote to Amaya and notified him that he had been accused of cheating and that, if true, his behavior constituted a serious breach of professionalism and a violation of the medical school's Honor Code. Amaya was advised that a hearing was scheduled, during which Amaya should appear and explain why he should not be dismissed from medical school "for failure to maintain acceptable professional standards." *Id*. Amaya was provided copies of written correspondence from the three professors wherein they each explained the basis of their allegations of cheating. *Id*. Prior to the hearing, Amaya was advised of the

process for the hearing. *Id*. At the hearing, Amaya maintained that he was not looking at the other student's paper. *Id*.

Following Amaya's presentation, the SPC voted to table the matter so it could thoroughly review Amaya's information and then "deliberate with utmost seriousness and give due consideration to the evidence presented." *Id*. Over the next three weeks, instead of just considering the information from Amaya's presentation and the evidence already presented, the SPC directed additional written questions to the three professors, permitted Amaya to submit to the SPC Amaya's written responses to the Professors' additional comments, and conducted field tests by having members of the committee go to the testing location and sit in Amaya's seat while other members observed the difference between glances up at the clock and glances to a neighbor's paper. *Id*. The SPC concluded that the "field tests revealed that professors could easily distinguish between glances up at the clock and glances at another student's paper. *Id*. The SPC concluded "the preponderance of evidence support[ed] the charge of ethical misconduct (cheating) during the [] exam on March 29, 2010." *Id*. at 1238. Pursuant to the medical school's Student Handbook, "Dishonesty of any kind with respect to examinations ... shall be considered cheating. It is the responsibility of the student not only to abstain from cheating but, in addition, to avoid the appearance of cheating...." *Id*. at 145. The SPC voted to recommend to the Dean that Amaya be "dismissed from medical school for failure to maintain acceptable professional standards." *Id*. at 144.

Amaya requested reconsideration, and a reconsideration hearing was held. Amaya presented additional testimony and documentation, but the SPC declined to reverse its earlier recommendation for dismissal. Amaya then appealed the SPC's recommendation to the Dean. Prior to meeting with Amaya, the Dean requested additional field tests at the testing site, which tests again revealed that the proctors "could tell what direction the accused was looking by eye movement alone." *Id*. The following month, the Dean met with Amaya and reviewed all the material submitted but concluded he would not reverse the SPC's recommendation. *Id*. Amaya was dismissed from Indiana University School of Medicine. *Id*.

Amaya filed a lawsuit against IU alleging (among other things) breach of contract and breach of good faith and fair dealing. The trial court granted summary judgment in favor of IU and Amaya appealed. "[T]he sole issue for our determination on appeal is whether the trial court erred when it entered summary judgment on Amaya's claim for breach of contract." *Id*. at 1239.

In reviewing the decision, the Court of Appeals started by accepting that the legal relationship between Amaya and IU was one of implied contract, and that "the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become part of the contract." *Id*. at 1240. "[A]lthough an implied contract exists between the student and the university, the nature of the terms vary:

> In the area of academic services, the courts' approach has been similar to that used with contracts conditioned upon the satisfaction of one party. The university requires that the student's academic performance be satisfactory to the university in its honest judgment. Absent a showing of bad faith on the part of the university or a professor, the court will not interfere. The good faith judgment model both maximizes

22

academic freedom and provides an acceptable approximation of the educational expectations of the parties.

*Id.*

The court explained that "bad faith is not simply bad judgment or negligence, [r]ather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity" and that "[l]iteral adherence by a university to its internal rules will not be required when the process rests upon judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at." *Id.* The court succinctly stated, "In other words, the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Id.*

The Court found that IU substantially followed its procedures, and its decision to dismiss Amaya was not arbitrary, capricious, or made in bad faith. *Id.* Amaya's allegations that IU withheld evidence, misled him during the pre-hearing meeting, misled him during the hearing, inappropriately speculated regarding facts, and failed to disclose the second field test were not sufficient to support a finding that IU acted in bad faith. *Id.* at 1242. Those allegations did not support an assertion that IU engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or that IU had "a state of mind affirmatively operating with furtive design or ill will." *Id.* The Court gave "judicial deference" to IU's process and conclusion and noted that "[c]ourts are ill-equipped to second-guess professional judgments that are non-arbitrarily arrived at." *Id.*

Generally, written items made available to the students, such as school policies and student handbooks, become a part of the implied contract. *See Amaya*, 981 N.E.2d at 1240 (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)). But to establish entitlement to a right or benefit under the implied contract, a student must "point to an identifiable contractual promise that the [university] failed to honor." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 574 (1972); *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) (student must "be specific about the source of this implied contract, the exact promises the university made to the student, and the promises made in return").

Moreover, to state a claim for breach of implied contract involving matters of discipline or academic achievement, in which courts have traditionally granted universities deference, *Amaya*, 981 N.E.2d at 1240 (*citing Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007)), *trans. denied*, a student must allege facts to support a showing that the university acted arbitrarily or in bad faith. *See Chang v. Purdue Univ.*, 985 N.E.2d 35, 47 FN2 (Ind. Ct. App. 2013) ("bad faith is an element of a breach-of-contract claim by a student against a post-secondary institution that is premised upon a failure to adhere to university regulations pertaining to student disciplinary proceedings").

### b. *Plaintiff failed to identify any contractual promise made, but not honored, by Butler.*

Plaintiff contends that Butler failed to follow its own internal policies and procedures for investigating claims under the SMP. Plaintiff's claims are specific as

to the source of this implied contract. But Plaintiff fails to identify the exact contractual promises Butler made to him but failed to honor. Plaintiff fails to identify specific or definite terms or promises that Butler allegedly breached.

Butler cannot be liable for breach of contract based on alleged failures to follow nonexistent, discretionary, or aspirational terms of its policies and procedures. Moreover, aspirational statements about Butler's goals, desires, intentions, or "aims" are not terms of an implied contract. *See Oyoque v. DePaul Univ.*, 520 F. Supp. 3d 1058, 1064 (N.D. Ill. 2021) (holding that only a university student handbook's "specific promises become part of the contract, not its expressions of intention, hope or desire") (internal quotations omitted). Expressions of intention must be distinguished from definite and concrete promises. *Id.*

First, Plaintiff claims Butler misinterpreted the meaning of "stalking" resulting in an investigation into Plaintiff under the SMP. However, as demonstrated by the undisputed evidence, the allegations in J.F.'s complaint – if true – could constitute stalking as that term is defined in the SMP. This standard is much like the Rule 12(b)(6) standard applied by the Courts – could the allegations, if true constitute stalking? Here, Butler's application of the definition of stalking to the allegations was not a breach of any contractual promise to Plaintiff.

Second, Plaintiff claims Butler failed to provide Plaintiff with access to critical information during the investigation. However, there is no contractual provision or promise that was violated by the redaction. Nothing in the SMP provides that the report will not be redacted to protect witnesses. In his Complaint, Plaintiff alleges

that by over-redacting the preliminary and final reports, Butler violated a provision of the SMP that states Butler "aims to treat all parties and participants in this process fairly, equitably, and with respect." [ECF No. 1 at ¶ 130] However, Plaintiff admits he does not know if J.F. was provided with the same redacted report. [ECF No. 60-4 at 40 (Ex. D, Plaintiff Tr. 46:20-24)] Plaintiff admits that with the Witness Key provided and the other documents from Butler, he was able to determine who the witnesses were and was able to respond to the preliminary report despite the redactions.

Third, Plaintiff alleges that Butler failed to investigate within a "reasonably prompt" timeframe. However, there is no definite contractual promise to complete an investigation in a specific time. The SMP only states that Butler "*aims* to complete all investigations in a reasonably prompt manner." [ECF No. 1, ¶ 131] Such a non-specific goal or aspiration is not a contractual promise to Plaintiff. At most, that is a policy statement with subjective standards for Butler's conduct. There are no objective means for a court to determine whether Butler complied with these policy statements. Rather, the Court would be required to make its own subjective determinations of whether Butler lived up to its goal statements. Thus, public policy does not support an interpretation of these types of statements as contractual promises by a university to its students. Moreover, as shown above, given the number of witnesses identified by the parties who needed to be interviewed, and the fact that the interviews with students needed to be coordinated over the summer months when

the students were off-campus, there is no evidence to support an assertion that the investigation was not "reasonably prompt."

Fourth, Plaintiff claims Butler failed to provide Plaintiff with proper notice of the hearing because for the second rescheduled hearing date, the hearing was set 13 days out, instead of 14 business days. [ECF No. 1, ¶ 134(a)] However, Plaintiff ignores that this was the third rescheduled hearing date. Plaintiff had more than 14 business days' notice that the hearing was to be set, and the hearing was rescheduled once to accommodate Plaintiff's advisor's schedule, and once due to an unforeseen issue with the investigator's resignation. Regardless of the notice provided for the second re-scheduled hearing date, Plaintiff had notice of the hearing and an opportunity to prepare. Even if the final rescheduling of the hearing provided only 13 days' notice of the hearing, Plaintiff was not injured by that notice.

Fifth, Plaintiff claims Butler failed to address alleged harassment against Plaintiff. But Plaintiff did not submit a claim for harassment, nor did he talk to anyone at Butler about being harassed. Moreover the "harassment" plaintiff alleges to have endured was from his suitemate talking about the Butler Police Department knowing what Plaintiff had done. Such alleged "harassment" is not actionable under any policy identified by Plaintiff, and as such, Butler had no contractual obligation to "address [the] alleged harassment against Plaintiff." Even if Plaintiff had submitted a complaint, there is no contractual promise by Butler to take the action Plaintiff desired. In his Complaint, Plaintiff explained that he thought B.P. and J.F. should be disciplined for making false statements against him during

the investigation. However, the policy statement upon which Plaintiff relies states that persons providing false information ***may*** be subject to disciplinary action and harassment ***may*** result in referral to the University student conduct system. [ECF No. 1, ¶ 132 & ¶ 138] Like aspirational statements, statements that use the word "may" are not definite or concrete. They give the University discretion to take a specified action—or not. *See, e.g., Tsuruta v. Augustana Univ., No. 4:15-CV-04150-KES*, 2015 WL 5838602, at *7 (D.S.D. Oct. 7, 2015) (holding that the decision of a school to exercise discretion afforded by policy in student handbook was not a violation of that policy). Moreover, these provisions have nothing to do with the University's relationship with the Plaintiff. Plaintiff has no contractual right, implied or otherwise, to another student's discipline.

Finally, Plaintiff claims Butler failed to train staff to address the harm Plaintiff alleges he faced. Yet, Plaintiff has identified no training that was contractually promised to Plaintiff but was not provided. Rather, the undisputed evidence shows that the Resident Advisors and Title IX Office staff were trained.

It makes sense that Butler has not made specific promises to take the above actions. Each requires the use of Butler's subjective, professional judgment to best address the facts and circumstances of a situation. Out of deference to this professional judgment, "courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Castelino v. Rose-Hulman Inst. of Tech.*, 999 F.3d 1031, 1040 (7th Cir. 2021) (internal

quotations omitted).[3] Because Butler has not made specific promises to the Plaintiff to take the above actions, its decisions throughout the course of investigating the sexual misconduct complaint cannot provide grounds for breach of contract.

### c. Plaintiff has failed to show that Butler acted arbitrarily or in bad faith.

As discussed in *Amaya*, Plaintiff must show that Butler acted arbitrarily or in bad faith and breached a specific and definite term that was part of the offer and acceptance that forms the basis of the contractual nature of the relationship between Plaintiff and Butler. He has failed to do so.

Like Amaya, Plaintiff complains that Butler did not strictly comply with its procedures under a school conduct policy – there the Honor Code, here the SMP. Like Amaya, Plaintiff does not allege any facts to support an assertion that Butler engaged in "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or that Butler had "a state of mind affirmatively operating with furtive design or ill will." *See Amaya*, 981 N.E.2d at 1242.

Amaya claimed IU withheld evidence, misled him, and failed to disclose the independent testing, and those allegations were not sufficient to support a finding of arbitrariness or bad faith. Here, Plaintiff alleges that Butler failed to properly screen a complaint, take action against the student who submitted the complaint, take

---

[3] Indeed, even if a university does fail to follow specific and explicit provisions of its rules and policies regarding disciplinary proceedings, a student must show that the university acted illegally, arbitrarily, capriciously, or in bad faith before the university can be held liable for its exercise of professional judgment. *Chang v. Purdue University*, 985 N.E.2d 35, 47 (Ind. Ct. App. 2013).

action against witnesses who participated in the investigation, provide meaningful access to information, complete the investigation in a "reasonably prompt" in a manner, and give at least 14-business days' notice of the second rescheduled hearing.

As was the case in *Amaya*, here Plaintiff's claims alleged failure to strictly comply with the procedures for investigating and arriving at a decision on Plaintiff's alleged misconduct. As the Court explained in *Amaya*, a plaintiff cannot maintain a claim for breach of implied contract against a university for failures in the process of investigating and deciding allegations of misconduct absent alleged conscious wrongdoing with dishonest purpose, moral obliquity, or ill will. The undisputed evidence demonstrates that Butler did not consciously do wrong because of dishonest purpose or moral obliquity, nor did it act with furtive design or ill will. Thus, Plaintiff's claim fails on its face for failure to sufficiently allege—let alone establish— arbitrary actions or bad faith.

Absent a specific promise by Butler, courts do not "second-guess[] the professional judgment of the University faculty on academic matters." *Bissessur v. Indiana Univ. Bd. of Trustees*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Ross*, 957 F.2d at 415). Thus, as a matter of law, Butler did not breach its implied contract with Plaintiff.

Because there is no evidence that Butler violated any contractual promise and no evidence that Plaintiff was harmed by any breach of a contractual promise, Plaintiff's claims fail as a matter of law.

**B.    Unjust Enrichment**

Plaintiff's unjust enrichment claims fails as a matter of law. No such claim exists where there is a contract, and as established above, the relationship at issue is contractual in nature, albeit an implied one.

"Unjust enrichment operates when there is no governing contract." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024–25 (Ind. Ct. App. 2001). "A claim for unjust enrichment "is a legal fiction invented by the common law courts in order to permit a recovery ... where the circumstances are such that under the law of natural and immutable justice there should be a recovery ..." *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (citation omitted). "A person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Id.* (*quoting* RESTATEMENT OF RESTITUTION § 1 (1937)). "To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Zoeller v. E. Chicago Second Century, Inc.,* 904 N.E.2d 213, 220 (Ind. 2009) Here, Plaintiff has pled the existence and enforceability of an implied contract. Based on the face of Plaintiff's Complaint, the implied contract purportedly governs the same relationship and alleged conduct that is at issue in his unjust enrichment claims. [ECF No. 1, at ¶¶ 155-159] His breach of contract and unjust enrichment claims are founded on the same facts. [ECF No. 1, ¶ 155] (incorporating by reference breach of contract allegations into his unjust enrichment claim). In both claims, Plaintiff alleges that he paid tuition based on an implied contract. If the contract does not support his claim, Plaintiff cannot rely on equitable theories of unjust enrichment

to fill in missing terms. *See Zoeller*, 904 N.E.2d 213, 221 (Ind. 2009) ("The existence of express terms in a valid contract precludes the substitution of and the implication in law of terms regarding the subject matter covered by the express terms of the contract.") (*quoting Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992))); *See also Amaya*, 981 N.E.2d at 1240 (noting that the law is clear that "the legal relationship between a student and a university [i]s one of implied contract"). Plaintiff's sole remedy is his breach of contract claim, even if that claim does not actually entitle him to the relief he seeks.

However, even if Plaintiff was legally entitled to recover under a theory of unjust enrichment, Plaintiff cannot do so because the evidence definitively establishes that Butler was not unjustly enriched. Plaintiff graduated from Butler in May 2023 with a major in sports media and minors in organizational communication and leadership. Plaintiff received the benefit of his bargain and thus suffered no viable damages. Tuition was charged for college instruction. Plaintiff received education, credits, and advancement towards a degree in exchange for the tuition paid each year. Thus, Plaintiff received the benefit of the bargain—a college education and degree in exchange for payment of tuition.

Similarly, Plaintiff received the benefits for the room, board, and fees paid each year. Plaintiff claims that he lost the benefit of his bargain because he left campus from March 10 through April 5. However, Plaintiff voluntarily left campus and he did so before the SMP investigation began. He left – not because of the SMP investigation or because of J.F.'s complaint – but because of conflict with his suitemate, B.P.

Moreover, when Plaintiff returned to campus, he advised Butler he did not wish to change his housing and he remained in this assigned housing until the end of the semester. The undisputed facts establish that Plaintiff paid housing fees and he received the benefit of those fees. The fact that Plaintiff voluntarily went home and did not stay in his assigned campus housing for three weeks is not unjust enrichment. It was the result of Plaintiff's own decision not to use the housing and food services during those three weeks. There is nothing "unjust" about Butler receiving payment for housing and food services it provided to Plaintiff, but which Plaintiff opted not to use for a short period.

Because Plaintiff has failed to establish any element of an unjust enrichment claim—even if he could bring one—summary judgment in Butler's favor is appropriate as a matter of law.

## VI.   CONCLUSION

WHEREFORE, Defendant Butler University, by counsel, respectfully requests that the Court enter judgment as a matter of law in favor of Defendant, and for all other appropriate relief.

Respectfully submitted,

*Liberty L. Roberts*
Liberty L. Roberts, Atty. No. 23107-49
Cassie N. Heeke, Atty. No. 36497-49
CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060

Attorney for Defendant Butler University

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of September 2023, a true and exact copy

of the foregoing was filed electronically via the Court's Electronic filing system.

Notice of this filing was sent to the following persons by operation of the Court's

Electronic filing system.

Jonathan Little
SAEED & LITTLE, LLP
133 W. Market Street #189
Indianapolis, IN 46204
jon@sllawfirm.com

Stuart Bernstein
Kristen Mohr
Andrew T. Miltenberg
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
sbernstein@nmllplaw.com
kmohr@nmllplaw.com
amiltenberg@nmllplaw.com

*Attorneys for Plaintiff John Doe*

> *Liberty L. Roberts*
> Liberty L. Roberts

CHURCH CHURCH HITTLE + ANTRIM
Two North Ninth Street
Noblesville, IN 46060
T: (317)773-2190 / F: (317)773-5320
LRoberts@cchalaw.com
CHeeke@cchalaw.com