UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:22-cv-01828-SEB-MG |
| | ) |
| BUTLER UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**

On September 15, 2022, Plaintiff John Doe ("Mr. Doe"), an undergraduate student, sued Defendant Butler University ("Butler"), alleging breach of contract and unjust enrichment. Dkt. 1. Mr. Doe claims that Butler entered into a contract providing, among other things, that in exchange for receipt of payment for Mr. Doe's tuition and fees, it would honor its commitment to apply its internal policies and procedures fully and fairly for his benefit (as well as others'), specifically those provided in its Sexual Misconduct Policy ("SMP"). Mr. Doe's breach-of-contract claim challenges Butler's purported missteps during its investigation into Mr. Doe regarding the report of another Butler student who had alleged that Mr. Doe had stalked her, in violation of the SMP. Pursuant to Federal Rule of Civil Procedure 12(b)(6), Butler has moved to dismiss the Complaint for its failure to state a claim upon which relief can be granted. Dkt. 21. For the reasons explained below, we **GRANT IN PART** and **DENY IN PART** Butler's motion.

## FACTUAL BACKGROUND

Mr. Doe matriculated to Butler in the fall of 2019, where he soon developed friendships with a group of eight to ten fellow students (the "friend group"). Five members of the friend group, including a female student referred to as J.F., cohabitated in an on-campus dorm suite in room 113 ("Room 113"). Mr. Doe and others in his friend group frequently spent time in Room 113, which soon became their default gathering spot.

In late September 2020, Mr. Doe came out to his friend group as gay and disclosed that he was feeling increasingly uncomfortable in his on-campus fraternity house. His discomfort with his living arrangement caused Mr. Doe to spend even more time in Room 113. However, by November 2020, the occupants of Room 113 imposed some new boundaries on Mr. Doe and B.P., a female member of the friend group, requesting that the two no longer use Room 113 as their default gathering spot or visit during daytime hours. Soon thereafter, a COVID-19 outbreak occurred in Mr. Doe's fraternity prompting him to return home to Washington state, where he completed the remainder of the fall 2020 semester remotely.

Mr. Doe returned to Indianapolis in early 2021 to enroll in the spring semester, and by mid-January, he had moved out of his fraternity and joined B.P. in a dorm room suite located across the hall from Room 113. One evening near the end of February, Mr. Doe, B.P., and another member of their friend group, S.B., gathered in Room 113. J.F. was out of town that night, but all four male residents of Room 113 were present. Because the bathroom usually available to Room 113 visitors was unavailable, Mr. Doe used J.F.'s private bathroom. When J.F. learned about this incident from S.B. the next day, J.F. expressed

her discontent, texting Mr. Doe that it was "so not cool" that he used her bathroom. Compl. ¶ 50, dkt. 1.

Soon thereafter, J.F. messaged the friend group through the social media application Snapchat, conditioning Mr. Doe's continued friendship with the group upon a laundry list of behavioral adjustments by him, including not leaving personal items in Room 113; asking in advance of coming over; reducing the length of time he stayed over; requesting J.F.'s express permission before entering her room; and using his own bathroom across the hall.

Mr. Doe received this message while he was in his suite with B.P., who promptly journeyed across the hall for conversation with the residents of Room 113. During this visit, B.P. misinformed members of the friend group that Mr. Doe "compulsively" monitored their locations on SnapMap,[1] that on one occasion, she had caught Mr. Doe staring out of his window suite, awaiting Room 113 residents' return, and that Mr. Doe checked Room 113 multiple times a day to see if people were there. *Id.* ¶ 58.

Several days later, J.F. asked Mr. Doe to meet with her, and when Mr. Doe arrived, he found that J.F., J.F.'s resident advisor, his own resident advisor, B.P., five residents of Room 113, and S.B. were in attendance. At J.F.'s request, her resident advisor had arranged this group "mediation" session. *Id.* ¶ 60. Throughout the session, members of the friend group recited previous complaints and stated that they no longer wished to maintain their friendship with Mr. Doe. After the meeting participants had departed, Mr. Doe's resident

---

[1] SnapMap is a feature of Snapchat that allows users to make their location data available to certain users. The platform's default is not to share a user's location, so users must elect to have their location information shared.

advisor lingered, apparently admitting that the others had "essentially ganged up on" Mr. Doe and that "the situation had gotten out of hand." *Id.* ¶ 65. Mr. Doe had no further contact with the friend group.

On March 9, 2021, Mr. Doe phoned his mother from his private suite to discuss the latest developments in his personal life. B.P., who allegedly could overhear Mr. Doe's side of the conversation, entered Mr. Doe's suite, objecting to what she apparently perceived as Mr. Doe "question[ing] her motives or behavior." *Id.* ¶ 69. B.P. also stated that "she was having meetings about [Mr. Doe] with campus security and the dean of students"; that they "kn[e]w what [Mr. Doe] did"; and that she "didn't want to make this any harder" on Mr. Doe than it already was. *Id.* Unbeknownst to Mr. Doe at this time, J.F. had filed a formal complaint against him with the university, alleging that Mr. Doe had stalked her, in violation of Butler's Sexual Misconduct Policy.

Following this exchange with B.P., Mr. Doe emailed the person in charge of Butler's housing arrangements, requesting an emergency room change. His email, also cc'd to Dean of Students Martha Dwizlik ("Dean Dwizlik"), read in relevant part: "The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment." *Id.* ¶ 71.[2]

Mr. Doe received an email from Butler's then-Title IX Coordinator Maria Kanger ("Ms. Kanger") on March 10, 2021, which stated:

---

[2] Mr. Doe's mother emailed Dean Dwizlik separately to report bullying and harassment, and Mr. Doe also informed his professors, again cc'ing Dean Dwizlik, that he was struggling to manage his coursework during this time. *Id.* ¶¶ 72–73.

> I'm reaching out because I've been made aware of your and your parents' conversations with Martha Dwizlik and Bridget Bucey.[3] Martha and Bridget are currently dealing with a campus emergency and are not able to return phone calls and emails. I'll be the point person for this situation moving forward.
>
> I would be happy to talk with you about what you've discussed with Martha and Bridget. I have information that I need to share with you, as well.

*Id.* ¶ 74. When Ms. Kanger and Mr. Doe met over Zoom the next day, Mr. Doe learned about J.F.'s stalking claim against him. The core of J.F.'s allegations, we are told, was that Mr. Doe had used her bathroom without express permission. Ms. Kanger instructed Mr. Doe about what he should expect as a respondent in Butler's formal grievance process, forewarning that the process "would likely go on for months." *Id.* ¶ 77. On March 12, Mr. Doe received a formal "Notice of Investigation" and a "No Contact Order" barring him from contacting J.F. *Id.* ¶ 78. Confronting the start of Butler's investigation into J.F.'s allegations, Mr. Doe apparently "felt obligated to hire a professional to assist him and serve as his advisor." *Id.* ¶ 83.

Over Mr. Doe's repeated requests, Butler "refused" to dismiss what was, in Mr. Doe's eyes, "an obviously bunk Stalking claim." *Id.* ¶¶ 83–87. According to Mr. Doe, the investigator's notes were "extremely sloppy" and littered with "countless typos, incomplete sentences, incorrect pronouns, and incoherent sentences." *Id.* ¶ 88(b). The investigator also fully redacted student and witness names, creating a "virtually incoherent" investigative

---

[3] Bridget Bucey's relevance has not been explained to us.

file.[4] *Id.* ¶ 88(c). Despite Mr. Doe's requests for legible copies of the evidence and reasonable time extensions, Butler provided none. Mr. Doe's only access to investigation materials was through non-downloadable files online, which consequently limited his ability to examine the evidence and prepare his defense.

Butler's investigator completed his final report and investigative file on August 2, 2021. Soon thereafter, Butler notified Mr. Doe about a hearing scheduled for August 20, 2021, but, due to Mr. Doe's unavailability, the hearing was moved to September 2, 2021. A week prior to the hearing, Mr. Doe requested a hearing agenda and a witness list, which Butler eventually transmitted to Mr. Doe less than forty-eight hours before the hearing. Though the hearing would occur over Zoom, Mr. Doe (from Indiana) and his parents (from Washington) flew to his advisor's New York office. Just ninety minutes prior to the scheduled start time, Butler cancelled the hearing in an email, explaining that the investigator had quit that morning, effective immediately.

To nudge the proceedings along, Butler offered the parties the options either to conduct a hearing without the investigator available for questioning or pursue an informal resolution without a hearing. Because Mr. Doe and J.F. disagreed with both options, Butler stated that a new investigator would re-investigate the matter. After Ms. Kanger appointed a new investigator, Mr. Doe objected, fearing that another investigation would unreasonably prolong the matter.

On October 1, 2021, Ms. Kanger informed the parties of the following:

---

[4] By way of example, the investigator's interview summaries contained the following: (i) "(Redacted) believes that (Redacted) said something about (Redacted)"; and (ii) "(Redacted) heard that (Redacted) had sent (Redacted) a message, and (Redacted) asked (Redacted) about it." *Id.* ¶ 88(c).

> Given that both parties have raised concerns regarding re-investigation, [Butler has] identified another option for resolving this matter. We will be proceeding with a hearing, but because the investigator will not be present due to circumstances beyond our control, the decision-maker will not use the investigation report in determining responsibility. The materials gathered in the course of the investigation can be used to determine responsibility.

*Id.* ¶ 112. Butler notified Mr. Doe (apparently without verifying his availability) that the new hearing was scheduled for October 13, 2021. Because the hearing had been rescheduled on short notice, only three of the original nine witnesses were present. On October 29, 2021, Mr. Doe received an outcome letter finding him not responsible for Stalking in violation of Butler's SMP.

Mr. Doe initiated this lawsuit against Butler on September 15, 2022, alleging breach of contract and unjust enrichment. Dkt. 1. On November 15, 2022, Butler moved to dismiss Mr. Doe's Complaint for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), dkt. 21, which motion has now been fully briefed and is ripe for ruling.

## LEGAL ANALYSIS

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim becomes facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When ruling on a motion to dismiss, we must construe "all well-pleaded allegations of the

7

complaint as true and view[ ] them in the light most favorable to the plaintiff." *Zimmerman v. Tribble*, 226 F.3d 568, 571 (7th Cir. 2000).

### I. BREACH OF CONTRACT

Indiana courts regard the relationship between a student and an educational institution as "contractual in nature," but out of deference to "the subjective professional judgment of trained educators," they do not "apply contract law rigidly." *Neel v. Ind Univ. Bd. of Trs.*, 435 N.E.2d 607, 610–11 (Ind. Ct. App. 1982) (internal quotations and citations omitted). Accordingly, Indiana courts have adopted "a very flexible approach to the scope of contractual promises between students and universities . . . , exercis[ing] the utmost restraint in applying traditional legal rules to disputes within the academic community." *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) (citing *Neel*, 435 N.E.2d at 611). Thus, a student's burden in a breach-of-contract action against his university is twofold: First, he must identify the contractual promise breached by the university, *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992); and, second, he must allege facts to support a conclusion that the university acted "illegally, arbitrarily, capriciously, or in bad faith," *Amaya*, 981 N.E.2d at 1240.

Because "[t]he terms of the contract . . . are rarely delineated," *id.*, a student must "point to an identifiable contractual promise that the defendant failed to honor," *Ross*, 957 F.2d at 417. Generally, a university's "catalogues, bulletins, circulars, and regulations [that are] made available to the matriculant become part of the contract." *Id.* at 416. But only the "specific promise[s]" contained therein constitute the terms of the contract. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009). A university's expressions of

8

intent, hope, and desire, on the other hand, are unenforceable and do not become part of a student's contract with the school. *Galligan v. Adtalem Glob. Educ. Inc.*, No. 17 C 6310, 2019 WL 423356, at *7 (N.D. Ill. Feb. 4, 2019) (citing *Abrams v. Ill. Coll. of Podiatric Med.*, 395 N.E.2d 1061, 1065 (Ill. App. Ct. 1979)). Likewise, "promotional materials, like marketing and advertisements, do not constitute contractual promises." *Bissessur*, 581 F.3d at 602. Courts, therefore, distinguish "definite and concrete promises" from "unenforceable expressions." *Oyoque v. DePaul Univ.*, 520 F.Supp.3d 1058, 1064 (N.D. Ill. 2021) (internal quotations and alterations omitted).

Out of judicial deference to academic institutions, courts deem their "sole function" as "determine[ing] whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Amaya*, 981 N.E.2d at 1240 (citations omitted); *see Chang v. Purdue Univ.*, 985 N.E.2d 35, 47 n.2 (Ind. Ct. App. 2013) (noting that bad faith is required for breach-of-contract claims against a university for deviations from policies relating to student disciplinary proceedings and professional misconduct alike). "Literal adherence by a university to its internal rules will not be required when the dismissal of a student 'rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at.' " *Amaya*, 981 N.E.2d at 1240 (quoting *Neel*, 435 N.E.2d at 613). At the dismissal stage of litigation, it is enough for the plaintiff to "plead facts that plausibly [imply] that the defendant acted arbitrarily, capriciously, or in bad faith." *Doe v. Ind. Wesleyan Univ.*, No. 1:20-CV-00039-HAB, 2020 WL 2474483, at *9 (N.D. Ind. May 12, 2020) (generalized allegations supported inference that defendant-

9

university "arbitrarily applied its procedures, rushed to judgment, and acted in a manner designed to discriminate" against the plaintiff).

### A. Butler's Promises to Mr. Doe

To establish the terms of an implied contract with a university, a student must identify contractual promises that the university failed to honor. *Bissessur*, 581 F.3d at 603. In effect, the complaint must specify "the source of the implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 741 F.3d 769, 773 (7th Cir. 2013) (citations omitted). Mr. Doe has sufficiently pled that an implied contract existed between him and Butler by virtue of his enrollment and his payment of tuition and fees and in exchange for which Butler made binding promises in its Student Handbook and the subchapters contained therein; namely, the SMP, the Student Conduct System, the Campus Harassment Policy, and the Residence Life Community Standards and Rules. Mr. Doe identifies twelve policies that Butler's investigation of J.F.'s stalking complaint allegedly breached. We address each in turn below.

First, Mr. Doe claims that the SMP definition of "stalking" was a contractual promise that Butler contravened by "failing to properly apply the SMP definition of stalking and continuing to press forward in a lengthy, damaging disciplinary process." Dkt. 33 at 9. In relevant part, the SMP defines "stalking" as "a course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety of others or to experience substantial emotional distress." Compl. ¶ 126, dkt. 1. Butler's stalking definition does not set out any threshold screening procedure: indeed, the purpose of the investigation

10

was to determine the veracity of J.F.'s allegations and whether Mr. Doe had, as J.F. reported, committed stalking within the meaning set out by the SMP. The stalking definition, in and of itself, contains no concrete promises. In the end, Butler concluded that the conduct alleged did not satisfy its stalking definition, but this outcome does not retroactively transform a definition into a contractual promise.

Other identified provisions also cannot be read to comprise contractual promises between Mr. Doe and Butler because they are mere expressions of intent, hope and desire. For instance, Mr. Doe avers that Butler's "aim[ ] to treat all parties and participants in th[e] process fairly, equitably, and with respect" is an enforceable promise. *Id.* ¶ 130. That Butler "aims" to achieve some flexible standard is the type of aspirational statement that cannot form the basis of a breach-of-contract claim. *Oyoque*, 520 F.Supp.3d at 1064. The same applies to the SMP's statement that Butler "*aims* to complete all investigations in a reasonably prompt manner." *Id.* ¶ 131 (emphasis added).

Similarly, Mr. Doe invokes several SMP provisions, which are paired with the verbiage of the discretionary "may." These provisions are:

- "All witnesses and parties are expected to prove true and accurate information. Should a witness or party willfully provide false information, they *may* be subject to disciplinary action. *Id.* ¶ 132 (emphasis added); and

- "Alleged harassment occurring between students . . . *may* result in referral to the University student conduct system." *Id.* ¶ 138 (emphasis added).

- "Each party's advisor *may* question the other party, witnesses, and investigator on behalf of their advisee." *Id.* ¶ 137 (emphasis added).

11

Because these purported promises are discretionary, they are neither definite nor concrete. They merely outline the circumstances in which certain steps *might* be taken, but there is no legal basis on which Butler could be found liable for their nonoccurrence.

Mr. Doe also claims that Butler violated its policy under the Residence Life Community Standards and Rules, which provides that "[t]he Butler community *expects* mutual respect from all members." *Id.* ¶ 141 (emphasis added). A mere expectation, however, is not a contractual promise or guarantee. *See Kashmiri v. Regents of Univ. of Cal.*, 67 Cal. Rptr. 3d 635, 647 (Cal. Ct. App. 2007) (citations omitted) (explaining that courts are generally "reluctant to apply contract law to general promises or expectations" in the education context). Moreover, the provision broadly describes the standard of conduct that Butler expects of its students—not a standard of conduct to which Butler promises to hold itself or especially every student.

Mr. Doe also quotes Butler's statement that "Resident Life staff members are trained to respond to emergency situations and conduct violations to maintain a safe and comfortable living environment for everyone." Compl. ¶ 141. This is a statement of fact; it is not a promise. It therefore provides no basis for Mr. Doe's breach-of-contract claim against the university.

However, the remaining provisions, we find, do satisfy Mr. Doe's burden in identifying concrete contractual promises:

- Parties to an investigation will be given access to "[a]n appendix containing raw materials gathered in the investigation (e.g., incident reports, documentation submitted by the parties, etc.)." *Id.* ¶ 133.

12

- "The Title IX Coordinator will send notice of the date, time, and location of the hearing, as well as the name(s) of the decision-maker(s) to the parties at least fourteen (14) business days prior to the hearing date." *Id.* ¶ 134.
- "In scheduling the hearing, the Title IX Coordinator will accommodate the parties' and advisors' schedules to the extent reasonable. *Id.* ¶ 135.
- "The decision-maker will be provided a copy of the Final Investigation Report." *Id.* ¶ 136.

These four provisions are sufficiently concrete because they describe specific actions that Butler explicitly stated it would take in investigating such cases. Butler raises, albeit only in passing, that Mr. Doe has not shown any recoverable damages or injuries resulting from Butler's alleged breaches of these SMP provisions because Mr. Doe was ultimately found not responsible. At the pleading stage, "we do not test the sufficiency of the facts alleged with regards to their adequacy to provide recovery," so we need not consider Mr. Doe's damages at this time. *Lei Shi v. Cecilia Yi*, 921 N.E.2d 31, 37 (Ind. Ct. App. 2010); *accord Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 888 (7th Cir. 2022) (concluding that courts "no not speculate on the validity or applicability of any contractual defenses or damages" at the pleading stage).

    **B.**     **Bad Faith**

At the outset, Mr. Doe asserts that he was not required to allege bad faith. He contends that non-academic disciplinary proceedings, such as those for sexual misconduct, adhere to "stringent procedural protections," whereas purely academic proceedings "involve qualitative evaluations of a student's performance." Dkt. 33 at 14. Because the

13

standards for the two "are entirely different," he believes, we "are not required to apply the same level of deference to university non-academic discipline," meaning that a showing of bad faith is not required. *Id.* at 15.

Mr. Doe has not pointed us to binding legal authority that supports this proposition, nor has our own search of Indiana law uncovered such a distinction.[5] Rather, Indiana courts—and federal courts sitting in diversity applying Indiana law—do not treat academic and non-academic discipline differently. *See*, *e.g.*, *Chang*, 985 N.E.2d at 47 n.2; *Doe*, 2020 WL 2474483, at *8 (student accused of violating university sexual misconduct policy must show bad faith); *Doe v. Indiana University – Bloomington*, No. 1:18-CV-03713-TWP-MJD, 2019 WL 341760, at *7 (S.D. Ind. Jan. 28, 2019) (reciting bad faith element in breach-of-contract claim against university). As a federal court exercising diversity jurisdiction over this case, our place is not to define the contours of state law. Whatever merit Mr. Doe's argument may have in other jurisdictions, we are bound to apply Indiana state law, not create it. Under Indiana law, bad faith is an element of a breach-of-contract claim against a university. *Amaya*, 981 N.E.2d at 1240.

Butler contends that because Mr. Doe's Complaint omits any averments of bad faith, dismissal is warranted. Dkt. 22 at 14. Butler is correct that Mr. Doe never uses the words

---

[5] Indeed, the closest we have found to Mr. Doe's point is *Trustees of Indiana University v. Spiegel*, 186 N.E.2d 1151 (Ind. Ct. App. 2022). In *Spiegel*, students sued their universities, alleging that the defendants, Indiana University and Purdue University, breached their contractual promises to provide in-person instruction, services, and activities after the COVID-19 pandemic pushed their instruction online. *Id.* at 1156. In a consolidated appeal, the Indiana Court of Appeals rejected the argument that the plaintiffs needed "proof of bad faith in a breach-of-contract case[ ] involving the provision of goods and services in an academic setting." *Id.* at 1159 n.4. Notwithstanding this distinction, the court recognized that bad faith is required in matters of academic discipline and academic achievement, but it drew no distinction between academic and non-academic discipline.

"bad faith" or the like to describe Butler's conduct. For example, Mr. Doe pleads: that despite repeated requests, Butler refused to provide unredacted or, at the very least, legible records of the evidence, Compl. ¶ 88(d), dkt. 1; that Butler declined his reasonable time requests, *id.* ¶ 88(f); and that Butler failed to properly follow up on his own (albeit evidently informal) complaints of bullying and harassment, *id.* ¶ 89–91. From these general allegations, it is plausible that Butler's deviations from its internal policies were products of arbitrary judgments, and this is all that is required at the pleading stage. "Whether th[e]se allegations ultimately bear fruit is a topic for another day." *Doe*, 2020 WL 2474483, at *9. At the pleading stage, we draw this inference in Mr. Doe's favor, as we must, and find that the allegations in Mr. Doe's complaint are sufficient to survive dismissal.

## II.    UNJUST ENRICHMENT

To state a claim of unjust enrichment, Mr. Doe "must demonstrate that a benefit was rendered to another party (the defendant) and that allowing the defendant to retain the benefit without paying for it would be unjust." *Hughes v. Chattem, Inc.*, 818 F.Supp.2d 1112, 1124 (S.D. Ind. 2011) (citing *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991)). As an equitable remedy, unjust enrichment is the operative vehicle of recovery only "when there is no governing contract." *DiMizio v. Romo*, 756 N.E.2d 1018, 1024–25 (Ind. Ct. App. 2001).

Under the federal pleading rules, a plaintiff may plead breach of contract and unjust enrichment in the alternative. Fed. R. Civ. P. 8(a)(3) (pleading "may include relief in the alternative"), (d)(3) (party may plead "as many separate claims or defenses as it has, regardless of consistency"). But a party's freedom to plead contradicting theories is "limited,"

and a plaintiff may not recover under an unjust enrichment theory when an enforceable contract governs the subject matter. *Hernandez v. Ill. Inst. of Tech.*, 63 F.4th 661, 671 (7th Cir. 2023). But where "the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract," pleading unjust enrichment in the alternative is perfectly acceptable. *Gociman*, 41 F.4th at 887. Even a mere disagreement about the contract's terms is sufficient to survive a motion to dismiss. *Id.* Plaintiff must take special care, however, not to "incorporate by reference allegations of the existence of a [valid] contract between the parties in the unjust enrichment count." *Hernandez*, 63 F.4th at 671 (alteration in original) (quoting *Gociman*, 41 F.4th at 887).

Here, Mr. Doe's complaint neglects that special care, as he incorporated "each and every allegation" into his unjust enrichment claim. Compl. ¶ 155, dkt. 1. Though Butler concedes that an implied contract exists, it disputes whether it breached any enforceable promises contained therein. *See* dkt. 35 at 10. Ordinarily, that disagreement would be enough to keep Mr. Doe's unjust enrichment claim alive, but because he erroneously incorporated allegations of the existence of a contract between the parties, Mr. Doe's unjust enrichment claim must be dismissed. *Gociman*, 41 F.4th at 887. The Seventh Circuits advises "that 'it is typically premature to dismiss an unjust enrichment claim' before 'the validity or the scope of a contract is determined.'" *Delisle v. McKendree Univ.*, 73 F.4th 523, 528 (7th Cir. 2023) (quoting *Gociman*, 41 F.4th at 887). Generally, plaintiffs are also "entitled to at least one chance to amend their complaint to cure an error in response to a district court's dismissal order unless amendment would be futile or otherwise unwarranted." *Id.* (quoting *Gociman*, 41 F.4th at 887). Accordingly, we dismiss Mr. Doe's unjust enrichment

16

claim without prejudice and allow him time to amend his complaint and cure his pleading error.

## CONCLUSION

Based on the foregoing, we **DENY IN PART** and **GRANT IN PART** Defendant's Motion to Dismiss. Dkt. 21. Regarding Plaintiff's breach-of-contract claim, we **DENY** Defendant's motion as to the four provisions identified above and **DISMISS WITHOUT PREJUDICE** the eight remaining provisions. Plaintiff's unjust enrichment claim is also **DISMISSED WITHOUT PREJUDICE** for the pleading deficiency outlined in this order.[6]

IT IS SO ORDERED.

Date: 9/29/2023

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Stuart Bernstein
NESENOFF & MILTENBERG, LLP
sbernstein@nmllplaw.com

Regina M. Federico
NESENOFF & MILTENBERG, LLP
rfederico@nmllplaw.com

---

[6] Our docket reflects that Defendant recently filed a motion for summary judgment prior to receiving our ruling on the pending motion to dismiss. Assuming Plaintiff chooses to file an amended complaint in light of our decisions and guidance here, the Motion for Summary Judgment may require some retooling. We will enlist the assistance of our able magistrate judge to address these scheduling issues with the parties and get this case back on a workable procedural track headed toward a final and prompt resolution.

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Jonathan Charles Little
SAEED & LITTLE LLP
jon@sllawfirm.com

Andrew T. Miltenberg
NESENOFF & MILTENBERG, LLP
amiltenberg@nmllplaw.com

Kristen Mohr
Nesenoff & Miltenberg LLP
kmohr@nmllplaw.com

Gabrielle Emilia Olshemski
SAEED & LITTLE LLP
olshemski.law@gmail.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com