John Doe
July 16, 2021

## Response to the Preliminary Investigative Report and Evidence

I would like to begin by addressing the overwhelming difficulties I experienced in trying to review the report and evidence. As noted in many emails sent to the investigator and Title IX Coordinator, the heavily redacted evidence files made it impossible to understand what I was reviewing. The result is that I am uncertain as to what all of the evidence files contain and therefore I cannot fully respond. My, and my advisor's, repeated requests to provide the evidence without redactions were denied without substantiation.

The complainant was identified in a notice of investigation on March 11, 2021, as J.F. in which she made an allegation against me for stalking. None of the hearsay in the evidence files by the eleven other individuals is relevant to J.F.'s complaint. Conversely, although letters with testimony regarding a party's character are permitted as evidence of credibility, three letters submitted on my behalf have been determined as not relevant.

I was not informed about the details of J.F.'s allegations until weeks later on April 8, 2021, which was after my mother and I communicated with with Dean of Students Martha Dziwlik, Title IX Coordinator Maria Kanger, investigator Kody Rother, and President Dankos' administrative assistant, Katie Palmer. The Title IX Coordinator determined that the allegations, if proven true, could constitute violations of the Butler Sexual Misconduct Policy for Stalking. There is absolutely no evidence to support allegations of stalking on the basis of sex in violation of the Policy.

EXHIBIT 16

DEFT RESP_001519

- Importantly, to begin, on Saturday, February 20, 2021, you will see in the text messages (Pg. 91, Appendix) that J.F. is very friendly when she messaged me to ask me to give her an essay that I had written for a course she was taking. She was quite persistent that I should check different programs on my computer to find it and was disappointed when I couldn't provide the essay to her.

- On Friday, February 26, J.F. claimed she had allegedly received texts that night that "Respondent was in their room and everyone had retreated." Where is the text evidence in the report to support this claim?

- <u>On Saturday, February 27, at 9:39 p.m.</u> J.F. <u>sent a text to me that it was "so not cool" that I had used her bathroom</u> while she was gone. (pg. 99, Appendix)

- However, in J.F.'s interview with Ms. Kanger on March 5, J.F. tells a very different story. She claimed she had returned to campus on Sunday, February 28, and was waiting "for hours" for me to come by her room to retrieve a water bottle I had left there (at this time I was living directly across the hall so she could have simply returned it or left it outside my door). J.F. <u>now claimed it was while she was waiting for me on Sunday night, that someone (redacted) informed her that I had used her bathroom</u>. She claimed that this was when she sent me the text about it not being cool and that it caused her to have "a really bad mental breakdown." J.F., who had known for over 24 hours about my having used her bathroom, suddenly had a "mental breakdown, there was a lot of uncontrolled screaming, crying, and rocking back and forth on the ground, repeating nonsensical sentences."

- I believe Singkai may have told J.F., because Singkai was the person I informed that I would be using J.F.'s bathroom and she witnessed the very brief time during which I

2

had left the room. Singkai said nothing about it at the time, and then we left to get something to eat at Plum Market and hang out at the fraternity house for a few hours.

- The following day, March 1, J.F. sent a long text to me with a list of requirements to "continue" our friendship. The "Requirements to be our friends" indicated a current and future friendship with J.F. and the others.

- In the investigator's notes, it states that it was during the March 2 meeting with the CAs, J.F. stated her rules were that "girls in the friend group can go in the bathroom as long as they ask permission before going in" and "the only guy who can use her bathroom is her boyfriend." These were new rules that had not been explained to me at any time prior. The only prior mention regarding her bathroom had been in the Fall 2020, when J.F. allowed that I could use her bathroom as long as I didn't "pee on the seat." It was not until the November 2020 meeting - which was directed at me and B.P. together, not just me - that the group discussed permitted times to hang out in the pod.

- J.F. claimed it was a "huge fear" that people would enter her space and hurt her, however she only locked her door when she would be gone for more than three or four hours or overnight while sleeping. She did not tell me this. I had heard about the cabin story but it was never described as a direct correlation to anyone using her bathroom. J.F. said she talked about the break-in but cannot say if I was present at those times as she does not remember. I wasn't there. On page 8 of the report, J.F. states that she is not certain if I was aware that she didn't want me using her bathroom.

- The report states that I agreed to some statements made during the CA meeting that I do not actually agree with. I was blindsided and in shock, being attacked and I felt scared. I

3

agreed with some of the statements simply to put a stop to the abuse I was experiencing, being ganged up on by people who I thought were my friends.

- On March 4, J.F. tells Ms. Kanger that she met with her professor that day, claiming she had been "too emotionally exhausted to do the assignments this past week" (i.e., the essay that she needed from me). The professor then refers J.F. to the Title IX office. J.F. claimed that "throughout the week" she had meetings with CAs, podmates, "and friends had a mediation with him and the CAs where we terminated our friendship." It was during this meeting with Ms. Kanger that at the mention of the availability of "academic adjustments," J.F. suddenly begins to cry. The rest of this section is redacted.

- It is later revealed in the evidence that B.P. also met with Ms. Kanger as well for academic accommodations, and B.P. was referred to BUPD although no Title IX complaint or CSA report was filed by B.P.

- J.F. stated that the CAs attempts at mediation made her feel as if they were against her. This was another example of J.F.'s inability to communicate and instead to blame others who did not acquiesce to her demands. J.F. and the other witnesses describe themselves as being "non-confrontational" although this was certainly not the case during the mediation with the CAs.

It was not only with the Title IX Coordinator but also with the investigator that J.F. made fabricated claims. J.F. falsely told the investigator that I had used Snapmaps to determine her location. I had never used Snapmaps to connect with J.F., and from what I recall, she never had the location feature turned on in Snapmaps. I believe that she had the ghost feature turned on, which allowed her to see where other people were, but her location services were turned off. On

pg. 13 of the report, the investigator asks J.F. about this and she admits she does not have location services turned on and she never did. Witness 2 confirmed that complainant did not have her location turned on for Snapmaps and Witness 5 stated that he was not "100% sure" that the complainant had location services turned on for Snapmaps.

Additionally, allegations that I ever used Snapmaps to find D are not true and irrelevant to the investigation regarding J.F. . And, in response to another irrelevant claim, D was not studying in Irvington on the occasion alleged; he was watching a basketball game on television when I met up with him in the public lounge area. Being a sports media major and a sports fan, I was aware of who liked which teams and I knew that D liked the MN Golden Gophers. When I saw that the game was being televised, I wanted to go watch it. Thinking that D would probably be there was natural and that it would be fun to watch a game with a friend.

The vast number of statements included in the evidence from B.P. is irrelevant to the investigation of claims filed by J.F. . I never entered a room while B.P. was changing and certainly never watched her sleep. B.P. and I once had a confidential conversation during which I addressed my anxiety about feeling not a part of our friend group. B.P. said if they are your friends, they are not going to leave you out. I believed her. There was no reason for me to watch out a window for anyone and I provided a map to of the Fairview building to the investigator to explain this.

Regarding the evidence included and excluded from the investigation:

- I never saw or heard about the video about the beanbag chair until I read it in this report. What is the relevance and why wasn't the video included?

- What is the purpose and relevance of the video submitted by the complainant? Complainant referred to the video as "Family Night" in the suite. I was part of that family.

- What is the purpose and relevance of the audio recording from the Butler University Police Department? The audio has no date or time identification for the recording. On March 24, 2021, Title IX Coordinator Kanger wrote to me: "Per your advisor's question, I looked into whether there were reports available from Residence Life, the Dean of Students, and BUPD. A report was not made to the Dean of Students, nor is there a report from Residence Life. With regard to BUPD, they have let me know that they do not have a report in which you are listed as a suspect." In fact, Dean Dziwlik also told my mother, ^(Mother Doe), that she has not heard of a report to BUPD mentioning me. Nevertheless, the recording states that Officer Sweeney is following up on a CSA report.

- Complainant ^(J.F.) stated from her first meeting with Ms. Kanger that she did not wish to involve BUPD; however, ^(B.P.) called Officer Sweeney stating she was referred to call the officer following her meeting earlier that day with Ms. Kanger. Why is ^(B.P.) having an interview with BUPD if no report was filed?

- During the audio recording with Officer Sweeney, ^(B.P.) said she had <u>received a text</u> from my former boyfriend stating that ^(B.P.) "can't leave him because she is his only friend left or something bad could happen." No text evidence was produced. Later, ^(B.P.) contradicts herself by claiming to the investigator that this <u>was a conversation</u> when "Respondent's boyfriend was in their pod. He shared that Respondent is not alright or doing well, and she cannot leave him because something bad could happen."

- The Investigator claimed the aforementioned text evidence was "not relevant." Why isn't B.P.'s lack of credibility and inability to support her claims relevant?

- B.P. tells Officer Sweeney that she allegedly had a similar situation in high school during which she had to get a restraining order. This was the link to the AMSR video that I submitted to the investigator as evidence on May 17, 2021 stating: I would like to submit additional evidence in the form of a video on YouTube. This is a video posted by B.P. in which she details how she sought revenge on a male by falsifying information, lying about him and seeking revenge through ridicule and retaliation. This is very relevant to my investigation because, although the complainant is J.F., nearly every alleged claim by J.F. was based on hearsay as provided by B.P.. The video is here: ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- B.P. states that she met with Title IX Coordinator Kanger regarding this case. Why aren't the notes from this meeting between Ms. Kanger and B.P. included in the evidence files?

- B.P. stated that she met with Dean Dziwlik to discuss my case. Why aren't the notes from this meeting included in the evidence files?

- What specific efforts were made during the investigation to obtain exculpatory evidence to prove that I was *not* in violation of policy?

Regarding the process for the investigation, it seems inequitable that the complainant was interviewed three times and I was only interviewed twice, especially since I am the one defending myself against these false allegations.

- During the complainant's intake with Title IX, Ms. Kanger said she had never done a No Contact Order without a Title IX process before. In fact, if that is all that J.F. had wanted,

Ms. Kanger could have issued a NCO as a supportive measure without going forward with a formal investigation. The same is true for the academic accommodations that J.F. was seeking.

- To the respondent, Ms. Kanger "noted several times throughout the conversation that while stalking fell under the sexual misconduct policy, the definition did not require conduct of a sexual nature." In fact, Title IX regulations define stalking as sexual harassment on the basis of sex.

- On pg. 8 of the complaint intake, when "asked if there had to be sexual conduct in order for there to be stalking, because it was the Sexual Misconduct Policy and the Title IX Coordinator was involved, Ms. Kanger said no that was not part of the definition, and that stalking was included in the policy for compliance reasons." Again, this is incorrect. There is nothing about the evidence presented that meets a violation of the Butler Sexual Misconduct Policy.

- Title IX Coordinator Kanger said, "Complainant had reported a course of conduct on the part of Respondent that caused her to feel distraught, stressed out and uncomfortable." Significantly, the "reasonable person standard" as stated in the Policy is important when analyzing J.F.'s reaction to my having briefly used her bathroom while another witness was in the room. A reasonable person would not "fear for the person's safety or the safety of others" nor experience "significant mental suffering or anguish" even if all of the fabricated and alleged accusations by J.F. were true, which most critically, *they are not*.