7UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LUKE ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:22-cv-01828-SEB-MG |
| | ) | |
| BUTLER UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING BUTLER'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Luke Allen ("Mr. Allen") sued his alma mater, Defendant Butler University ("Butler"), alleging that Butler's flawed investigation of a stalking complaint that had been brought against him by another Butler student resulted in his incurring various breaches of contract as well as Butler's unjust enrichment. Before the Court is Butler's Motion for Summary Judgment. Dkt. 81. For the reasons explained below, Butler's motion is **GRANTED**.

**STANDARD OF REVIEW**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The summary judgment standard requires "no *genuine* issue of *material* fact," meaning that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material

1

fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

Because summary judgment is not "a vehicle for resolving factual disputes," the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Indeed, those tasks belong to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920 (citing *Anderson,* 477 U.S. at 249–50). When deciding whether a genuine dispute of material fact exists, the court construes all facts in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572 (7th Cir. 2021).

As the "put up or shut up" moment in a lawsuit, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact" to find in their favor on any disputed elements. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014). A movant's "facts as claimed and supported by admissible evidence . . . are admitted without controversy" unless "the non-movant specifically controverts the facts . . . with admissible evidence." S.D. Ind. L.R. 56-1(f). Proper evidentiary support often appears in the form of a "discovery response, a deposition, an affidavit," or the like. *Id.* at 56-1(e). While "the law allows *verified* complaints—containing not just allegations but sworn statements of fact— to serve as evidence for purposes of summary judgment," *Jones v. Van Lanen*, 27 F.4th 1280, 1287 (7th Cir. 2022) (emphasis added), an *unverified* complaint comprises nothing

more than mere allegations and does not have evidentiary value, *see Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017). Hence, a party opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading but must "marshal and present the court with the evidence [he] contends will prove h[is] case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## FACTUAL & PROCEDURAL BACKGROUND[1]

### I.    Mr. Allen & the Friend Group

Mr. Allen matriculated to Butler in the fall of 2019 and graduated with distinction in May 2023 with a major in sports media and minors in organizational communication and leadership. He entered his sophomore year in the fall of 2020, by which time he had also developed a network of friends loosely comprised of eight to ten fellow students (the "friend group"). In September 2020, Mr. Allen came out to the friend group as gay, apparently without incident.[2]

---

[1] Omitted from the following recitation of facts are Mr. Allen's embellished portrayals of certain underlying events as well as factual assertions that are ultimately immaterial to the claims before us. We likewise have excluded any competing factual assertions that are supported solely by the unverified Amended Complaint, which, as explained above, are not evidence and do not satisfy litigants' evidentiary burdens on summary judgment. *See* Def.'s Supporting Br. 6–8, 12, dkt. 82 (eight citations to the Amended Complaint); Pl.'s Resp. Br. 2–8, 10–12, 14, dkt. 90 (twenty-eight citations to the Amended Complaint); *see Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (district court has no duty to "scour the record" in search of admissible evidence to "make the lawyer's case"); *see also Reed v. Allied Waste Transp., Inc.*, 621 F. App'x 345, 347 (7th Cir. 2015) ("[U]nsworn allegations are not evidence . . . .").

[2] As noted in our Entry denying Plaintiff's request to continue proceeding under a pseudonym, dkt. 102, the parties disagree on the relevancy of the fact of Plaintiff's sexual orientation. We repeat here Plaintiff's (limited) factual assertions about his sexual orientation given his argument that they are necessary to provide context for his legal theories.

Five members of the friend group, including a female student referred to as J.F., cohabitated in room 113 ("Room 113"), an on-campus dorm suite, which became the friend group's default gathering spot. By November 2020, however, the Room 113 residents began to feel that members of the friend group, including Mr. Allen, frequently overstayed their welcome, for example, by visiting there without invitation. This frustration prompted the Room 113 residents to request that their friends limit the frequency and duration of future visits.

In early 2021, at the start of the spring semester, Mr. Allen moved into a dorm room suite located across the hall from Room 113 with another female member of the friend group, referred to as B.P. Around this same time, Mr. Allen entered into the early stages of a new relationship with a man.

## II.    February 2021 Bathroom Incident

One evening in late February 2021, while J.F. was out of town, Mr. Allen, B.P., and several other (unidentified) friends were gathered in Room 113. Because the bathroom ordinarily available to Room 113 visitors was unavailable, Mr. Allen accessed J.F.'s private bathroom, as he had apparently done on prior occasions. When J.F. learned the following day about the unauthorized use of her bathroom, she became upset with Mr. Allen.

On March 1, 2021, shortly after the bathroom access dispute, J.F., acting on the friend group's behalf, authored a lengthy message to Mr. Allen explaining the basis for the group's collective frustration towards him. J.F.'s message outlined various conditions and expectations the friend group imposed on Mr. Allen if he sought their continued friendship. These conditions primarily focused on Mr. Allen's behavioral adjustments, such as his not

leaving personal items in Room 113; requesting in advance to come over; reducing the length of his visits; requesting J.F.'s express permission before entering her room; and using his own assigned bathroom across the hall. Dkt. 88-2 at 43–45. J.F. also wrote that "we want to be your friends but we can't continue to be friends if these boundaries are pushed." *Id.* at 43.

### III.   March 2021 Mediation

On March 3, 2021, J.F. invited Mr. Allen to meet her in the commons area at Butler's business school. When Mr. Allen arrived, he encountered not just J.F. but also (allegedly to his surprise) J.F.'s resident advisor, his own resident advisor, B.P., and several other members of the friend group. At J.F.'s request, her resident advisor had arranged this meeting into a group "mediation" session so that J.F. and others could formally terminate their friendship with Mr. Allen. Over the course of the ensuing ninety-minute mediation session, members of the friend group expressed their various complaints about Mr. Allen's behavior and indicated that they no longer wished to maintain their friendship with him. By the end of the session, Mr. Allen was visibly shaken and emotionally upset; nonetheless, he ceased all further contact with the friend group.

### IV.   Mr. Allen Leaves Campus

Following the mediation, Mr. Allen began to feel that his living environment had become hostile, principally because B.P. would tell him "hearsay all the time" to the effect that the Butler University Police Department (the "BUPD") "knows what you did." Pl.'s Dep. 77:10–25, dkt. 81-4. Within a week, on March 9, 2021, Mr. Allen phoned his mother from his private suite to discuss these latest developments in his personal life. B.P., who

apparently overheard Mr. Allen's side of the conversation, entered Mr. Allen's room and "began yelling at [him]." *Id.* at 77:25–78:3.

Immediately following this exchange with B.P., Mr. Allen emailed his professors, also copying Dean of Students Martha Dwizlik ("Dean Dwizlik"), to inform them that he was struggling to manage his course work. Dkt. 87-15. He also emailed the Director of Residence Life, again copying Dean Dwizlik, stating: "The living situation I am in is not doable. I feel like I am being unfairly persecuted and harassed and it is definitely a toxic environment. I need to be moved immediately." *Id.*

Meanwhile, Mr. Allen's mother phoned the Dean of Students Office to report her concerns about Mr. Allen's wellbeing and to request a welfare check of her son. Dwizlik Dep. 17:20–25, dkt. 87-2. Dean Dwizlik returned her call and "explained that a welfare check would involve Butler Police Department going to check on [Mr. Allen] in his room if she was concerned for his safety . . . ." Dwizlik Dep. 19:2–22, dkt. 81-17. In her deposition testimony, Dean Dwizlik recalled that no officer was sent to check on Mr. Allen because Mr. Allen's mother ultimately concluded that a welfare check "was not needed at the time." *Id.* In contrast, Mr. Allen's mother testified that "Dean Dwizlik stated that she could not send anyone to check on" her son, which rendered her "speechless" at the time. Mother Allen Decl. ¶ 9, dkt. 87-14.

The next day, on March 10, 2021, Mr. Allen's mother sent a follow-up email to Dean Dwizlik, reiterating the reports of bullying and harassment that she believed Mr. Allen was experiencing and describing his situation as "pretty dire." Dkt. 87-8. That same day, Mr. Allen's discomfort with his living arrangements, fueled primarily by B.P.'s vague comments

6

about having spoken to Dean Dwizlik and the BUPD, prompted him to fly to Washington, his home state, to regroup before finishing out the Spring 2021 semester. As Mr. Allen journeyed home, his mother again called Dean Dwizlik, leaving a voicemail explaining that, because her son would be returning home that night, the "urgency of finding him a new room" had been mooted, though he would "need to be in a different room" when he returned to campus in about a month or so. Mother's Voicemail, dkt. 64 (manual filing).

## V.   J.F. Files a Formal Complaint Against Mr. Allen

On or around March 10, 2021, Butler's then-Title IX Coordinator Maria Kanger ("Ms. Kanger") reached out to inform Mr. Allen that she would henceforth be his new point person. When Ms. Kanger and Mr. Allen met over Zoom on March 11, 2021, Ms. Kanger disclosed to him that J.F. had filed a formal complaint against him for "stalking," in violation of Butler's Sexual Misconduct Policy (the "SMP").[3] Butler also provided a written notice to him of J.F.'s formal complaint, in which J.F. accused Mr. Allen of the following: tracking her location via SnapMaps; watching from his dorm suite window to monitor the arrivals and departures of his friends; entering Room 113 on multiple occasions without

---

[3] The SMP defined "stalking" as follows:

> Stalking occurs when a person engages in a course of conduct directed at a specific person under circumstances that would cause a reasonable person to fear for the person's safety or the safety of others or to experience substantial emotional distress.
>
> 1. "Course of conduct" means two or more acts, including but not limited to acts in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.
>
> 2. Substantial emotional distress means significant mental suffering or anguish.

Dkt. 81-19 at 2.

permission; entering Room 113 when none of its residents were present; and entering J.F.'s private room and using her bathroom without her permission.[4] Dkt. 81-19 at 1. The notice also informed Mr. Allen that the matter would be resolved through Butler's Administrative Investigation and Adjudication Process and imposed a no contact order prohibiting Mr. Allen from contacting J.F. directly or indirectly.

## VI.   The Investigation

Based on J.F.'s formal complaint against Mr. Allen, the following investigation ensued, pursuant to the policies and procedures set forth in the SMP:

### A.   Investigator Rother Begins the Investigation

On March 24, 2021, Ms. Kanger notified Mr. Allen that she had appointed Assistant Dean of Students-Investigator Kody Rother ("Investigator Rother") to investigate J.F.'s complaint. Ms. Kanger also advised Mr. Allen that, if he felt that Investigator Rother could not "conduct a thorough, impartial, and equitable investigation in this matter," he should "submit a challenge in writing" within five days. Dkt. 81-5 at 1. Mr. Allen did not challenge Investigator Rother's appointment.

Mr. Allen returned to campus on April 5, 2021, by which time he had communicated to Ms. Kanger that his room change request made three weeks prior was no longer necessary. Kanger Dep. Ex. A 15–16, dkt. 81-1. Ms. Kanger reminded him that, if he "found that

---

[4] Mr. Allen contends, albeit without any cited evidentiary support, that he urged the dismissal of J.F.'s complaint because the factual allegations, even if true, did not meet Butler's definition of stalking. Pl.'s Resp. Br. 7, dkt. 90 (citing only to unverified Amended Complaint). By contrast, Ms. Kanger testified at her deposition that she evaluated J.F.'s complaint and determined that the allegations, if true, could in fact constitute stalking under the SMP. Kanger Dep. 34:10–39:4, dkt. 81-1.

he could not stay in that living space, [he] could feel free to reach out to her." *Id.*; *e.g.*, Dkt. 81-3 at 2 (Ms. Kanger's April 5, 2021, email to Mr. Allen reminding him that she is available to assist with housing accommodations if necessary).

By early April 2021, the investigation was well underway. Over the course of the ensuing months, Investigator Rother questioned J.F. and Mr. Allen separately, invited both parties to submit names of potential witnesses and other relevant information, and interviewed eleven witnesses. During his deposition, Investigator Rother recalled that Mr. Allen was "upset" about the friend group; that Mr. Allen perceived one member of the friend group (identified only as "Witness 3") to be exacting revenge against him; and that, overall, Mr. Allen felt like the friend group was "plotting" and "conspiring" against him. Rother Dep. 75:11–25, 80:16–25, 82:5–25, dkt. 87-6. Investigator Rother also learned through J.F. that the friend group was "heavily male" and that these male students were "more conservative men" who were "not into trendy things." Dkt. 88-1 at 17 (under seal).

Throughout the investigation, Investigator Rother met periodically with Ms. Kanger to relay any new findings and latest developments. During these meetings, Investigator Rother conveyed Mr. Allen's suspicion about the friend group's retaliatory motive, but Investigator Rother did not view the friend group's conduct as a violation of Butler's policies. Rother Dep. 84:9–12, dkt. 87-6. In his own conversations with Ms. Kanger, Mr. Allen disclosed that J.F. "had seemed to like his boyfriend" and that they had even gone on double dates together: thus, "other than [Mr. Allen] not understanding why th[e] report was filed, he did not provide information that would indicate there was any concern with his sexual orientation." Kanger Dep. 69:3–15, dkt. 84-1.

9

B.     **The Preliminary Investigation Report**

Using the materials collected throughout the investigation, Investigator Rother pre-pared a Preliminary Investigation Report (the "Preliminary Report"), which he made avail-able to Mr. Allen and J.F. on June 24, 2021. Upon receipt of the Preliminary Report, both parties were allotted ten business days within which to submit a written response.

The Preliminary Report consisted of more than 300 pages of (allegedly) "heavily redacted" materials, as the witnesses' real names had been replaced with generic identifiers (e.g., "Witness 1"). Pl.'s Resp. Br. 25, dkt. 90. Mr. Allen was also provided a "Key of Par-ticipants" that listed each witness's identity with his or her corresponding identifier. The Preliminary Report was accessible only when Mr. Allen had internet access, which he said hindered his ability to review and prepare a timely response.

At Mr. Allen's request, Investigator Rother extended the response deadline by one week, giving both parties until July 16, 2021, to submit their responses. Dkt. 87-17 at 4. Investigator Rother also permitted Mr. Allen and his advisor to download the Preliminary Report and evidentiary materials, but the redacted content was not altered. *Id.* at 1–8. On the July 16th deadline, Mr. Allen submitted an eight-page response, noting the "over-whelming difficulties" caused by Butler's denial of his "repeated requests to provide the evidence without redactions." Pl.'s Resp. to Prelim. Rep. 1, dkt. 87-16. Difficulties aside, Mr. Allen successfully prepared a response, using the Key of Participants to "comb back through the documents [and] put together" the identity of each witness. Pl.'s Dep. 28:17–19, dkt. 81-4.

### C.   Final Hearing & Outcome

On August 2, 2021, Ms. Kanger shared copies of the Final Investigation Report (the "Final Report") with the parties and informed them that the final hearing would take place virtually on August 20, 2021. At Mr. Allen's request, Ms. Kanger rescheduled the final hearing for September 2, 2021, via Zoom.

On the morning of September 2, 2021, less than two hours before the final hearing, Investigator Rother resigned, effective immediately, which unexpected departure required Butler to postpone the hearing. Evidently, Mr. Allen and his mother had each traveled to New York City (he from Indiana, and she from Seattle) to participate in the hearing with access to the aid of his advisors.

On September 8, 2021, Ms. Kanger issued the following email update to the parties:

> There are two primary options for next steps. The first option is to move forward with the hearing, acknowledging that the investigator will not be available for questioning due to circumstances beyond the University's control and agreeing that the investigation report can still be used by the decision-maker in determining responsibility. . . . The second option is to pursue an informal resolution. This would mean that a hearing would not take place. . . . [T]o move forward with either of these options, both parties would need to consent. If there is not agreement from both parties . . . , then the matter would need to be re-investigated . . . .

Dkt. 81-11. On September 13, 2021, Mr. Allen responded, expressing his discontent with Investigator Rother's unanticipated resignation but stating that he was "willing to agree to a discussion of informal resolution with [Ms. Kanger] and [his] advisor present." Dkt. 81-12.

Because ultimately there was no agreement between the parties, Ms. Kanger notified Mr. Allen on September 20, 2021, that a new investigator would re-investigate J.F.'s

complaint. Mr. Allen objected to both the re-investigation and the newly appointed investigator.

On October 1, 2021, Ms. Kanger emailed Mr. Allen and his advisors:

> Given that both parties have raised concerns regarding re-investigation, we have identified another option for resolving the matter. We will be proceeding with a hearing, but because the investigator will not be present due to circumstances beyond our control, the decision-maker will not use the investigation report in determining responsibility. The materials gathered in the course of the investigation can be used to determine responsibility. The hearing will take place at 11am on October 13, 2021 via Zoom.[5]

Dkt. 81-15. Ms. Kanger reminded Mr. Allen that, "if this hearing conflicts with your class schedule, we can request an excused absence on your behalf." *Id.* Mr. Allen did not alert Ms. Kanger to any scheduling conflicts, allowing the hearing to proceed as planned.

On October 29, 2021, Mr. Allen was found "not responsible" for stalking under the SMP.

## VII.   Butler's Policies & Trainings

Upon Mr. Allen's initial acceptance for enrollment at Butler, he was provided with the Butler University Bulletin (the "Bulletin"), the Butler University Student Handbook (the "Student Handbook"), and the Sexual Misconduct Policy. During the 2021–22 academic year, the Student Handbook provided, in relevant part, that, "except where expressly noted herein, this student handbook is not, nor is it intended, to create a contract between

---

[5] The Court's understanding of this proposal is that the Final Report would be excluded from the decision-maker's consideration because it contained the opinions and conclusions of Investigator Rother, who would not have been present at the hearing and was thus unavailable for questioning. The decision-maker would have access to the raw evidentiary materials compiled by Investigator Rother.

any student and [Butler]. The terms set forth in this student handbook do not create con-tractual or legal rights for students." Pl.'s Dep. Ex. D 66, dkt. 81-4.

The SMP "defines prohibited conduct and outlines procedures for reviewing, inves-tigating, and resolving complaints . . . involving students . . . ." SMP 1, dkt. 81-21. Such prohibited conduct includes sexual harassment, stalking, and retaliation. "In the course of [prior] edits," however, Butler inadvertently omitted the definition of sex- and gender-based discrimination from the list of prohibited conduct. Kanger Dep. 19:17–21:7, dkt. 87-5. According to Butler's 30(b)(6) witness, Georgia Hensley ("Ms. Hensley"), the phrase "sexual orientation" was "not explicitly included in the [SMP] itself, although [Butler] did actually train as though it was a part of [the SMP] and [Butler] did actually accept those cases." Hensley Dep. 8:2–14, dkt. 87-4; *e.g.*, Kanger Dep. 62:19–63:6, dkt. 88-1 ("[A]t no point in time was there a thought that [harassment on the basis of sexual orientation] wasn't prohibited.").

## VIII.  This Litigation

Mr. Allen initiated this lawsuit against Butler on September 15, 2022, alleging breach of contract and unjust enrichment claims based on Butler's "failure to commence and handle an investigation in accordance with their [sic] procedures." Pl.'s Resp. Br. 1, dkt. 90. On September 29, 2023, we granted in part and denied in part Butler's Motion to Dismiss, ruling that eight (of twelve) alleged promises from Butler's policy materials did not support viable contract claims and were therefore subject to dismissal. *Doe v. Butler*, No. 1:22-cv-01828-SEB-MG, 2023 WL 6382587 (S.D. Ind. Sept. 29, 2023) ("*Butler I*").

We also dismissed without prejudice Mr. Allen's unjust enrichment claim but allowed him an opportunity to replead.

On October 23, 2023, Mr. Allen moved for leave to file an amended complaint that corrected his unjust enrichment claim's pleading deficiency and added two breach-of-contract theories of liability: (1) harassment through failure to include sexual orientation in the SMP and (2) failure to take proper action with regard to Mr. Allen's suffering and state of distress. On November 29, 2023, the Magistrate Judge permitted Mr. Allen to file his amended unjust enrichment claim but rejected the changes to his breach-of-contract claim, explaining that Mr. Allen could, nonetheless, "*argue* that his breach of contract claim, as originally pled, properly encompasses" his new theories. Entry on Pl.'s Mot. For Leave to File Am. Compl. 5, dkt. 74 (emphasis in original).

On December 20, 2023, Butler moved for summary judgment. That motion is fully briefed and ripe for ruling.

## DISCUSSION

Mr. Allen avers that a contractual relationship existed between himself and Butler through the express and implied contracts created by Butler's Student Handbook and the SMP; and that Butler's conduct, through the course of the investigation, violated Butler's promises contained therein. He also asserts a claim for unjust enrichment based on Butler's retention of his Spring 2021 tuition and fee payments, despite his having left campus and not being able to enjoy the benefit of his economic bargain.

14

## I.   Breach of Contract

Mr. Allen's breach of contract claim reflects the numerous ways he claims that But-ler's investigation of J.F's stalking complaint allegedly strayed from the procedures set forth in the SMP. Mr. Allen argues that the SMP embodies express and implied contractual prom-ises between him and Butler, and that Butler's failure to comply fully with its policies and procedures constituted a breach of that contract.

Indiana law characterizes the relationship between a student and an educational in-stitution as "contractual in nature"—i.e., an implied contract, not an express contract. *Neel v. Ind. Univ. Bd. of Trs.*, 435 N.E.2d 607, 610–11 (Ind. Ct. App. 1982); *Castelino v. Rose-Hulman Inst. of Tech.*, No. 2:17-cv-139-WTL-MJD, 2019 WL 367623, at *13 (S.D. Ind. Jan. 30, 2019), *aff'd*, 999 F.3d 1031 (7th Cir. 2021); *accord Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992) (noting that, under Illinois law, express contracts between students and universities are "rarely employed"). Generally, the specific promises found in "a university's catalogues, bulletins, circulars, and regulations that are made available to its students become part of the contract." *Chang v. Purdue Univ.*, 985 N.E.2d 35, 46 (Ind. Ct. App. 2013). Still, Indiana courts have maintained "a very flexible approach to the scope of the contractual promises . . . and have noted that hornbook rules cannot be applied mechan-ically where the principal is an educational institution and the result would be to override an academic determination." *Id.* (internal quotations and citations omitted). "In an attempt to avoid interfering with the 'subjective professional judgment of trained educators, courts have quite properly exercised the utmost restraint in applying traditional legal rules to dis-putes within the academic community.' " *Castelino v. Rose-Hulman Inst. of Tech.*, 999 F.3d

1031, 1040 (7th Cir. 2021) (quoting *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007)). Hence, "the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013).

Thus, to survive summary judgment, an aggrieved student must adduce "some evidence" from which a reasonable jury could conclude that the university "engaged in the conscious doing of a wrong because of dishonest purpose or moral obliquity or had a state of mind affirmatively operating with furtive design or ill will." *Id.* at 1241–42. A mere showing of "bad judgment or negligence" does not satisfy this bad faith requirement and is therefore insufficient to survive a motion for summary judgment. *Chang*, 985 N.E.2d at 47.

Applying these principles to the case at bar, we hold that an implied contract, not an express contract, existed between Mr. Allen and Butler by virtue of Mr. Allen's enrollment and his payment of tuition and fees, in exchange for which Butler made binding promises in the Bulletin, the Student Handbook, and the SMP.[6] However, neither the existence of an

---

[6] Because there can be no real dispute that the contractual relationship between Mr. Allen and Butler was implied, rather than express, we do not discuss Butler's contention that the Student Handbook's disclaimer, which disavowed the formation of any contractual rights, negates the existence of an express contract. We do, however, briefly address Butler's assertion that it "argued [in its opening brief] that the disclaimer . . . dispelled any existence of an *implied* contract . . . ." Def.'s Reply Br. 12, dkt. 91 (emphasis added). A careful reading of Butler's opening brief reveals no such argument: Though Butler did discuss the disclaimer's effect on the formation of an *express* contract, nowhere did Butler assert that the Student Handbook's disclaimer rendered unenforceable other aspects of the *implied* contractual relationship between it and Mr. Allen. Butler's mischaracterization notwithstanding, Butler cites no legal authority (and we have found none) enforcing such a disclaimer in the context of an implied contract between a student and a university. Because "[i]t is not this court's responsibility to research and construct the parties' arguments," we address this issue no further. *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011).

implied contract nor Butler's purported breach thereof suffices to establish a breach-of-contract claim against the university. *Amaya*, 981 N.E.2d at 1241. To survive summary judgment, Mr. Allen must also adduce evidence from which a reasonable jury could conclude that Butler's alleged policy deviations were the products of bad faith. *Id.* This he has failed to do.

Mr. Allen's claims that Butler's investigation of J.F.'s stalking complaint strayed from the SMP disciplinary procedure and resulted in various breaches of contract include the following specifics:[7]

- Butler "deprived him of access to critical information" by declining to provide him unredacted raw materials with the Preliminary Report. Pl.'s Resp. Br. 25, dkt. 90.

- Butler's Title IX Coordinator did not provide fourteen business days' notice of the rescheduled hearing date, having notified the parties on October 1, 2021, that the hearing was scheduled for October 13, 2021.

- Butler made no attempt to accommodate Mr. Allen's schedule when setting the second hearing date.

- Butler did not provide the final decision-maker with a copy of the Final Report.

"Literal adherence by a university to its internal rules will not be required when the [disciplinary process] 'rests upon expert judgments as to academic or professional standards and such judgments are fairly and nonarbitrarily arrived at.' " *Amaya*, 981 N.E.2d at

---

[7] Mr. Allen also re-asserts various breach-of-contract theories that we dismissed in *Butler I*. Given that Mr. Allen has not requested that we reconsider our prior ruling, we shall not revisit those theories herein.

1240 (quoting *Neel*, 435 N.E.2d at 612). Accordingly, even accepting Mr. Allen's characterization that Butler did not literally adhere to aspects of the SMP, the undisputed factual record does not reveal evidence of Butler's having acted unfairly, illegally, arbitrarily, capriciously, or in bad faith. Mr. Allen adduces no evidence that Butler treated J.F. any differently, never mind more favorably, than it treated him. For example, there is no evidence that J.F. received an appendix of unredacted raw materials, that she was consulted before the hearing date was scheduled, or that she received earlier notice of the hearing dates. Furthermore, Mr. Allen cites no record evidence showing a scheduling conflict with the October 13, 2021, hearing date; that he requested to reschedule the hearing date and was denied; or that he otherwise lacked the ability to change the hearing date. Given that the decision-maker ultimately ruled in Mr. Allen's favor by finding him not responsible, we fail to see how the decision-maker's non-reliance on the Final Report was unfair to Mr. Allen or was otherwise the result of dishonest purpose, moral obliquity, or ill will toward him. His complaints to the contrary are both unavailing and unconvincing.

At each stage of the investigation, Butler's decisions were counseled by "precisely the sort of expert academic judgment to which we defer." *Castelino*, 999 F.3d at 1042. When Mr. Allen encountered difficulties accessing the Preliminary Report, Butler made the files downloadable and extended the response deadline. When Mr. Allen had a scheduling conflict with the original August 20, 2021, hearing, Butler rescheduled it. When Investigator Rother unexpectedly resigned, Butler inquired of both parties as to their preferences and sought a compromise that fairly balanced their competing interests. Mr. Allen points to no evidence in the record that suggests, never mind shows, that Butler was, at any

point, operating illegally, arbitrarily, capriciously, or in bad faith: He has thus fallen well short of establishing the grounds that warrant judicial interference in the "professional judgment of trained educators." *Gordon*, 862 N.E.2d at 1251. Accordingly, we decline Mr. Allen's request that we do so.

Mr. Allen insists that Butler acted in bad faith by "failing to implement policies to prevent [him], a gay man, from harassment," citing Butler's inadvertent omission of sex- and gender-based discrimination[8] protections from the SMP. Pl.'s Resp. Br. 20, dkt. 90. According to Mr. Allen's view of the facts, he was subjected to harassment by his peers, who "launched this attack . . . to remove him from the group" shortly after he started dating another man. *Id.* Despite his knowledge of Mr. Allen's sexual orientation and the friend group's "conservative" views, Investigator Rother did not press any of the witnesses further, nor did Ms. Kanger ever exercise her discretionary power as Butler's Title IX Coordinator to initiate an investigation on Mr. Allen's behalf. Mr. Allen maintains that Butler's failure to implement protections against sex- and gender-based discrimination "cuts directly against federal law." *Id.* at 21.

Despite the apparent emotional upheaval experienced by Mr. Allen, the Court's sole task in this breach-of-contract action is to determine whether Butler's alleged deviations from the SMP procedure were the result of bad faith. In making that determination, we find that Mr. Allen has been unable to muster the requisite factual or legal support to success- fully establish that case. Both assertions—that Butler failed to implement policies to protect

---

[8] "[D]iscrimination on the basis of sexual orientation is a form of sex discrimination." *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 341 (7th Cir. 2017).

Mr. Allen and that such failure violated federal law—are entirely unavailing. It is undisputed that the SMP's lack of sexual orientation verbiage was accidental and that Butler continued to train its staff on and investigate complaints of sex- and gender-based discrimination. Thus, there is no legitimate, factual basis on which to conclude, as Mr. Allen insists, that Butler undertook "the conscious doing of a wrong . . . or had a state of mind affirmatively operating with furtive design or ill will." *Amaya*, 981 N.E.2d at 1241–42.

Mr. Allen also asserts that Butler chose to ignore his suffering and state of distress, when it should have instigated an investigation of J.F. and B.P. Whatever the merit this grievance might pose, it falls beyond the scope of the breach-of-contract claim before us. *See* Entry on Pl.'s Mot. For Leave to File Am. Compl. 5, dkt. 74 (Magistrate Judge rejecting Plaintiff's attempt to add failure-to-address-harassment theory of liability to the Amended Complaint). In any event, Mr. Allen identifies no factual basis from which a reasonable jury could find that Butler's inaction was the result of bad faith, especially in light of the fact that Mr. Allen (admittedly) neither filed a formal complaint of sexual harassment against J.F. and B.P. nor spoke to any member of Butler's staff about potentially doing so. Pl.'s Dep. 75:15–22, dkt. 81-4. Although Ms. Kanger, as Butler's Title IX Coordinator, could have unilaterally instigated an investigation of J.F. and B.P., Mr. Allen adduces no evidence beyond his own supposition that her failure to do so was the result of anything suggestive of bad faith. *See, e.g.*, Kanger Dep. 69:12–15, dkt. 81-1 (recalling that Mr. Allen did not support suspicions of J.F.'s or B.P.'s motives with "information that would indicate there was any concern with his sexual orientation").

As detailed above, Mr. Allen has failed to identify any evidentiary basis on which a reasonable jury could conclude that Butler acted illegally, arbitrarily, capriciously, or in bad faith towards him in any of the ways he has cited. Accordingly, Butler's Motion for Summary Judgment on Mr. Allen's breach-of-contract claim is **GRANTED**.

## II.   UNJUST ENRICHMENT

Mr. Allen also has claimed that Butler was unjustly enriched at his expense when it retained the entirety of his Spring 2021 tuition and fee payments, despite Butler's alleged failures to provide emergency housing accommodations for him and/or to investigate and/or remedy Mr. Allen's grievances, which "forced him to leave" campus from March 10, 2021, to April 5, 2021. Pl.'s Resp. Br. 31, dkt. 90. In his absence, Mr. Allen complains that he was unable to utilize his on-campus housing and meal plan and, relatedly, did not receive the full enjoyment of his academic courses, which he attended remotely. Thus, he concludes, "Butler remains unjustly enriched because [it] did not return the associated fees." *Id.*

Unjust enrichment enables "recovery where no contract . . . exists." *Fiederlein v. Boutselis*, 952 N.E.2d 847, 858 (Ind. Ct. App. 2011). "To prevail on a claim of unjust enrichment, a claimant must establish that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of the benefit without payment would be unjust." *Id.* Thus, a plaintiff's burden is three-fold: he must show that (1) he rendered a benefit to the defendant at the defendant's express or implied request; (2) he expected payment from the defendant; and (3) allowing the defendant to retain the benefit without restitution would be unjust. *Reed v. Reid*, 980 N.E.2d 277, 296 (Ind. 2012).

Here, Mr. Allen's unjust enrichment claim fails as a matter of law because he has neither shown that he expected reimbursement nor that Butler's retention of his payments was unjust. The undisputed facts relating to the unjust enrichment claim demonstrate as follows: In March 2021, before learning about J.F.'s formal complaint against him, a conflict had arisen between Mr. Allen and his suitemate, B.P. In the course of ongoing communications between Mr. Allen, his mother, and Dean Dwizlik regarding the need for immediate housing accommodations, Mr. Allen voluntarily chose to leave campus, at which point his mother informed Dean Dwizlik that the urgency of finding new housing had abated. Before returning to campus a month later in early April 2021, Mr. Allen himself informed Ms. Kanger that he no longer viewed housing accommodations as necessary. Under these circumstances, Mr. Allen's contention that Butler failed to provide accommodations or otherwise ignored his complaints is groundless, as is his purported entitlement to restitution. Mr. Allen's unjust enrichment claim is, at best, legally and factually underdeveloped and, thus, cannot survive summary judgment. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012). Butler's Motion for Summary Judgment on Mr. Allen's unjust enrichment claim is **GRANTED** accordingly.

## CONCLUSION

For the reasons explicated above, Butler's Motion for Summary Judgment, dkt. 81, is **GRANTED**. Final judgment shall be entered accordingly.

Additionally, Butler's Motion to Exclude Expert Testimony, dkt. 92, is **DENIED** as moot.

The Clerk is also **DIRECTED** to update the caption in this matter with Plaintiff's legal name, "Luke Allen," as well as all court docket references.

IT IS SO ORDERED.

Date:  _____8/2/2024_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Stuart Bernstein
NESENOFF & MILTENBERG, LLP
sbernstein@nmllplaw.com

Regina M. Federico
NESENOFF & MILTENBERG, LLP
rfederico@nmllplaw.com

Cassie Nichole Heeke
Church, Church, Hittle and Antrim
cheeke@cchalaw.com

Jonathan Charles Little
SAEED & LITTLE LLP
jon@sllawfirm.com

Andrew T. Miltenberg
NESENOFF & MILTENBERG, LLP
amiltenberg@nmllplaw.com

Kristen Mohr
Nesenoff & Miltenberg LLP
kmohr@nmllplaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com

23